UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAKAB SAUDI HOLDING COMPANY, | |
|      Plaintiff, | Case No. _____ |
| v. | |
| SAAD KHALID S AL JABRI, | |
| KHALID SAAD KHALID AL JABRI, | |
| MOHAMMED SAAD KH AL JABRI, | |
| NEW EAST (US) INC., | |
| NEW EAST 804 805 LLC, | |
| NEW EAST BACK BAY LLC, | |
|      Defendants. | |

## NOTICE OF REMOVAL

Defendants Saad Khalid S Aljabri and Khalid Saad Khalid Aljabri, by and through undersigned counsel, hereby effect the removal of this action from the Superior Court Department of the Trial Court, Suffolk County, Commonwealth of Massachusetts, Civil Action No. 2184-cv-00688 (the "Action"), to the United States District Court for the District of Massachusetts. Removal is proper under 28 U.S.C. §§ 1331, 1441, and 1446, because the Plaintiff's claims present substantial federal questions. Venue is proper because this is the district court of the United States for the district and division within which the Action is pending. Pursuant to 28 U.S.C § 1446(a), a true and correct copy of the state court case file is attached hereto as Exhibit 1 (Verified Complaint); Exhibit 2 (the Superior Court docket); Exhibits 3-16 (remainder of documents on

Superior Court docket[1]), and incorporated by reference herein.  These Exhibits include all process, pleadings, motions, and orders filed in this case.  A true and correct copy of the docket for this Action is attached as Exhibit 2.

## I.    BACKGROUND

1.      This Action purports to be brought by Sakab Saudi Holding Company ("Plaintiff" or "Sakab") but in reality is directed by the current Crown Prince of Saudi Arabia, Mohammed bin Salman, against a perceived political rival aligned with the former Crown Prince of Saudi Arabia, Mohammed bin Nayef.  In a widely publicized palace coup, bin Salman supplanted bin Nayef as Crown Prince, detained him, and ultimately had him extrajudicially disappeared.[2]  Since the coup, bin Salman has pursued political rivals and opponents with abandon, using every means at his disposal to quash dissent and consolidate power.  As the United States Office of the Director of National Intelligence recently confirmed, this includes but is not limited to approving the murder of journalist Jamal Khashoggi.[3]  This Action is bin Salman's latest attack in a violent campaign to silence Defendant Dr. Saad Aljabri ("Dr. Saad"), who poses a threat to bin Salman

---

[1] Exhibit 3 contains all documents filed on the Superior Court docket, except for the exhibits to the Affidavit of Abdulaziz Alnowaiser (Doc. No. 3 in Superior Court), which are attached as Exhibits 4-16.

[2] *See generally* Ben Hubbard, Mark Mazzetti & Eric Schmitt, *Saudi King's Son Plotted Effort to Oust His Rival*, New York Times (July 18, 2017), available at https://www.nytimes.com/2017/07/18/world/middleeast/saudi-arabia-mohammed-bin-nayef-mohammed-bin-salman.html; Bill Bostock, *MBS is stamping out the final threat to his rule, bringing an end to his 3-year coup marked by power grabs, forced disappearances, and assassinations*, Business Insider (Aug. 12, 2020), available at https://www.businessinsider.com/saudi-arabia-mbs-final-threats-saad-aljabri-mohammed-bin-nayef-2020-8.

[3] *See, e.g.*, Office of the Director of National Intelligence, *Assessing the Saudi Government's Role in the Killing of Jamal Khashoggi* (Feb. 11, 2021), available at https://www.dni.gov/files/ODNI/documents/assessments/Assessment-Saudi-Gov-Role-in-JK-Death-20210226v2.pdf (concluding that "bin Salman approved an operation in Istanbul, Turkey to capture or kill Saudi journalist Jamal Khashoggi).

by virtue of his close relationships with the former Crown Prince bin Nayef and the United States Government.  And though framed as a commercial dispute, this Action implicates serious federal interests.

2.      Plaintiff Sakab is a company created in 2008 by the former Crown Prince Mohammed bin Nayef, supported by bin Nayef's then-Chief of Staff Dr. Saad, pursuant to an order of the former King of Saudi Arabia.  Sakab was created with the primary purpose of funding and undertaking clandestine and sensitive operations in partnership with the United States Government.  These national security operations have helped to thwart terrorist attacks in the United States, and the United States Government continues to rely on programs established through Sakab with the support of Dr. Saad.[4]

3.      Sakab is an instrumentality of the government of the Kingdom of Saudi Arabia.  It is now controlled by Crown Prince Mohammed bin Salman.

4.      What Plaintiff describes in the Complaint as Defendants' "fraudulent activity" refers to conduct undertaken at the direction of the then-leadership of the Kingdom of Saudi Arabia, at times in partnership with the United States.

5.      After deposing bin Nayef and seizing power in 2017, bin Salman, in his capacity as Chairman of Saudi Arabia's so-called "Supreme Anti-Corruption Committee," issued a "top secret" order requiring ownership of Sakab to be "transferred" to the Saudi Public Investment

---

[4] Spencer S. Hsu & Shane Harris, *Former Saudi Intelligence Officer Accuses Crown Prince of Ordering His Assassination in Canada*, Washington Post, August 6, 2020, https://www.washingtonpost.com/local/legal-issues/former-saudi-intelligence-officer-accuses-crown-prince-of-ordering-his-assassination-in-canada/2020/08/06/04aab9a4-d7e3-11ea-9c3b-dfc394c03988_story.html; Lucien Bruggeman, *In Wake of Khashoggi Report, ex-Saudi Spymaster's Assassination Plot Accusation May Complicate Riyadh Relations*, ABC News, March 2, 2021, https://abcnews.go.com/Politics/saudi-spymasters-assassination-plot-accusation-complicates-riyadh-relations/story?id=76182523.

Fund, which bin Salman chaired.  (Ex. 1 ¶ 24).  This order was carried out over the following months.  As a result, Sakab and similar companies, which had been owned and controlled by bin Nayef, were placed under bin Salman's control through the Public Investment Fund.

6.       Since seizing power, bin Salman has carried out a series of actions purportedly targeting corruption but in reality aimed at consolidating his power and silencing his critics.[5]  Deposing and disappearing Crown Prince Mohammad bin Nayef is one example.  Bin Salman also has "arrested scores of princes and members of the kingdom's political and business elite in what was billed as an attempt to combat corruption among the higher echelons of the Saudi bureaucracy," but in reality was used "to remove people who could potentially pose a political threat."[6]  And, as the U.S. Intelligence Community concluded, bin Salman also had a personal hand in the murder of Khashoggi, a former Saudi insider who was living in exile in the United States and a vocal critic of bin Salman.[7]  Khashoggi is by no means the only victim:  bin Salman has used actual and attempted extrajudicial killings, disappearances, and torture to silence many of his critics.[8]

---

[5] *See, e.g.*, *Saudi Arabia detains hundreds of government officials*, Al Jazeera (Mar. 16, 2020), https://www.aljazeera.com/news/2020/3/16/saudi-arabia-detains-hundreds-of-government-officials.

[6] *Id.*

[7] *See supra* n. 2; *see also* Stephanie Kirchgaessner, *US finds Saudi crown prince approved Khashoggi murder but does not sanction him*, The Guardian (Feb. 26, 2021), https://www.theguardian.com/world/2021/feb/26/jamal-khashoggi-mohammed-bin-salman-us-report.

[8] *See* Nicholas Kulish, *Ritz-Carlton Has Become a Gilded Cage for Saudi Royals*, N.Y. Times (Nov. 6, 2017), https://www.nytimes.com/2017/11/06/world/middleeast/ritz-carlton-riyadh-saudi-princes.html; *The High Cost of Change: Repression Under Saudi Crown Prince Tarnishes Reforms*, Human Rights Watch (Nov. 4, 2019), https://www.hrw.org/report/2019/11/04/high-cost-change/repression-under-saudi-crown-prince-tarnishes-reforms (noting that "abusive practices have included extorting financial assets of detainees in exchange for their release outside of any legal process and seeking the death penalty against detainees for acts that do not resemble recognizable crimes").

7.      This Action purports to reflect a continuation of bin Salman's so-called anti-corruption campaign—this time in the courts of the United States.  But in fact it is part of a wide-ranging scheme targeting Dr. Saad.  In August 2020, months before Sakab instituted any legal proceeding against Dr. Saad, Dr. Saad filed a lawsuit in the U.S. District Court for the District of Columbia against Mohammed bin Salman, stating claims under the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note) and the Alien Tort Statute, 28 U.S.C. § 1350.  These claims arose from bin Salman's attempts to assassinate Dr. Saad using similar extrajudicial methods to those he used to kill Jamal Khashoggi.[9] According to Plaintiff, that suit is a "separate action" unrelated to this Action.  (Ex. 1 ¶ 90).

8.      Although Plaintiff brought this suit in state court, Defendants hereby remove it to federal court because the case implicates serious federal interests and issues.  Sakab was created with the primary purpose of carrying out covert and clandestine national security programs and operations in partnership with the United States Government.  Plaintiff claims that Defendant Dr. Saad Aljabri absconded with some of Sakab's funds and that his actions constituted fraud, breach of fiduciary duty, and conversion.  But the funds that Dr. Saad earned through Sakab with the blessing of the Kingdom's Crown Prince bin Nayef are inextricably linked to Sakab's sensitive operations, and an examination of Sakab's finances necessarily requires examining those operations.  Adjudicating Plaintiff's claims will therefore require the Court to decide whether certain activities by Dr. Saad and the then-Crown Prince of Saudi Arabia bin Nayef, including covert counterterrorism operations in partnership with the United States Government, constituted fraud, breach of fiduciary duty, or conversion under the law of Saudi Arabia.  To assess these

---

[9] *See Aljabri v. Mohammed Bin Salman Bin Abdulaziz Al Saud, et al.*, No. 1:20-cv-02146-TJK (D.D.C.), Am. Compl. ¶¶ 22, 24 (Feb. 4, 2021).

claims, the Court will necessarily need to examine Sakab's finances, including how they were used to finance sensitive programs operated in partnership with the United States Central Intelligence Agency, the United States National Security Agency, and the United States Department of Defense.  As such, Plaintiff's claims of fraudulent activity at Sakab require examination of the counterterrorism and national security activities of the United States Government, raising disputed and substantial federal issues in this case.

9.     Plaintiff's claims are also rooted in a political struggle between two crown princes of an absolute monarchy; the now-Crown Prince of the absolute monarchy of Saudi Arabia alleges that actions undertaken by the previous Crown Prince (and approved by the King) were unlawful. Plaintiff's claims thus call on the Court to apply the law of Saudi Arabia as it existed under former-Crown Prince bin Nayef as to whether certain business arrangements and financial transactions were proper, questions that implicate the government officials who authorized the arrangements and transactions, including the longtime partner of the United States Government, and now disappeared, Crown Prince bin Nayef.[10]  Assessing those claims implicates serious foreign policy interests of the United States Government.

10.     Plaintiff's claims also represent a stark effort by a foreign sovereign to reach into the United States to target a perceived dissident and political opponent by attaching property, creating a substantial federal interest.  And even before assessing Plaintiff's claims, the Court will

---

[10] In 2017, then-CIA Director Mike Pompeo presented Mr. bin Nayef with the George Tenet Medal for his "excellent intelligence performance" in the domain of counterterrorism.  Bethan McKernan, *CIA Awards Saudi Crown Prince With Medal for Counter-Terrorism Work,* Independent (Feb. 13, 2017), https://www.independent.co.uk/news/world/middle-east/cia-saudi-arabia-crown-prince-muhammed-bin-naye-medal-counter-terrorism-work-intelligence-a7577221.html.

need to determine how the case should proceed in light of state secrets of the United States Government, an issue touching directly on the national security of the United States.

11.     Plaintiff has attempted to frame what is in fact an international political dispute implicating U.S. national security interests as a dispute concerning nothing more than routine and legitimate commercial claims arising under Massachusetts state law.  But Plaintiff fundamentally is asking the Court to examine a partnership between the government of Saudi Arabia and the intelligence and national security agencies of the United States Government, and to hold liable an ally (Dr. Saad) of a deposed foreign government official (bin Nayef) in aid of a purported "anti-corruption" campaign directed by the same government official (bin Salman) who ousted Dr. Saad and bin Nayef.  Federal issues and interests thus pervade Plaintiff's claims.

## THE PARTIES

12.     Plaintiff Sakab is incorporated under the laws of the Kingdom of Saudi Arabia (the "Kingdom"), and its principal place of business is Riyadh, Saudi Arabia.  (Ex. 1 ¶ 17).

13.     Sakab is owned by Tahakom Investment Company, which is wholly owned by the Public Investment Fund of Saudi Arabia.  (Ex. 1 ¶¶ 18, 24).  In his capacity as Chairman of the Public Investment Fund, Crown Prince Mohammed bin Salman controls the activities of Plaintiff and other related companies.

14.     Defendant Dr. Saad is a citizen of the Kingdom of Saudi Arabia, Malta, and a resident of Toronto, Ontario, Canada.  Dr. Saad is a former Minister of State and senior intelligence officer in the Saudi government and advisor to former Crown Prince Mohammed bin Nayef.  While serving at the Ministry of the Interior during bin Nayef's tenure as Minister and Crown Prince, Dr. Saad supported the then-King and Crown Prince in carrying out covert counterterrorism operations and other highly sensitive national security projects.  These projects included providing assistance

in establishing Sakab, the Plaintiff in this action, a company that carried out sensitive covert programs with the United States Government.  Even after leaving office in September 2015, Dr. Saad continued to act as an advisor to bin Nayef and participated in bin Nayef's businesses— including Plaintiff Sakab—while bin Nayef served as Crown Prince.  The United States Department of State has recognized that Dr. Saad "has been a valued partner to the United States Government, working closely with us to ensure the safety of Americans and Saudis," pursuing "shared counterterrorism efforts" that contributed to "keeping our citizens safe."[11]

15.     Defendant New East (US) Inc., is incorporated under the laws of Delaware, with its principal place of business in New York, New York.  Its Directors are Khalid Aljabri, Jonathan Wainwright (an attorney in the New York Office of Cadwalader, Wickersham & Taft), and Leonhard Toenz (an attorney based in Zurich, Switzerland).

16.     Defendant Khalid Saad Khalid Aljabri is a son of Dr. Saad, and a citizen of the Kingdom.  He is a cardiologist who lives in exile as a resident of Toronto, Ontario, Canada.

17.     Defendant Mohammed Saad Kh Aljabri is a son of Dr. Saad, and a citizen of the Kingdom.  He lives in exile as a resident of the United Kingdom.[12]

18.     Defendant New East 804 805 LLC is a limited liability company organized under Massachusetts law.  Its managers are Khalid Aljabri, Leonhard Toenz, and Jonathan Wainwright.

19.     Defendant New East Back Bay LLC is a limited liability company organized under Massachusetts law.  Its managers are Khalid Aljabri, Jonathan Wainwright, and Leonhard Toenz.

---

[11] Letter from Ryan M. Kaldahl, Acting Assistant Secretary, Bureau of Legislative Affairs, U.S. Dep't of State, to Sen. Patrick Leahy, U.S. Senate 1 (Aug. 6, 2020), https://twitter.com/hsu_spencer/status/1291766667639496706/photo/1.

[12] In addition to the two named defendants, Dr. Saad has other children who were "disappeared" in March 2020 and who are currently being held at an undisclosed location in Saudi Arabia.  *See Aljabri v. Mohammed Bin Salman Bin Abdulaziz Al Saud, et al.*, No. 1:20-cv-02146-TJK (D.D.C.), Am. Compl. ¶¶ 182–95 (Feb. 4, 2021).

## SUMMARY OF PLEADINGS

20.     Plaintiff Sakab filed a Verified Complaint and Demand for Trial by Jury ("Complaint") in Suffolk Superior Court on March 24, 2021.  (Ex. 1).

21.     In the Complaint, Plaintiff alleges that Defendants purchased real property in Massachusetts with the proceeds of business activities that Plaintiff mischaracterizes as a "fraudulent scheme." (Ex. 1 ¶ 2).

22.     According to the Plaintiff's own filings, the allegations in fact concern Defendant Saad Khalid S Aljabri's work on behalf of Sakab and 17 similar companies that were "established between 2008 and 2016 pursuant to a 2007 Royal Instruction issued by King Abdullah Bin Abdulaziz for the purpose of performing anti-terrorism activities in the public interest, and funded by the Kingdom's Ministry of Finance."  (*See* Ex. 1 ¶ 17).

23.     Plaintiff's own filings further make plain that King Abdullah bin Abdulaziz signed "Royal Instruction 19134/B, which increased the level of funding from the [Ministry of Finance] to be used by the [Ministry of Interior] for counter-terrorism activities."  (Ex. 1 ¶ 40).  According to Plaintiff's translation, the Royal Instruction stated that the increased funding "was to be managed by the [Ministry of Interior's] then-Assistant-Minister for Security Affairs Prince Mohammed Bin Nayef" in order to "'fight terrorism activities as the situation and public interest require,' and that it could be used to 'establish and fund investment intermediaries in the private sector as His Royal Highness sees to serve the public interest.'"  (Ex. 1 ¶ 41 (quoting Royal Instruction)).

24.     Plaintiff alleges that former Crown Prince bin Nayef distributed funds to Dr. Saad and others to support companies pursuant to the Royal Instruction, but, without further specification as to what constitutes common business practices in Saudi Arabia, Plaintiff states

that the agreements accompanying those distributions were not on government letterhead or sealed "as would be customary under [Saudi] law and practice."  (Ex 1 ¶ 42–43).

25.     Plaintiff alleges that, instead of "fund[ing] counter-terrorism activities" in Saudi Arabia, "Sakab was used as a vehicle" for the fraudulent schemes.  (Ex. 1 ¶ 23).

26.     Plaintiff alleges that much of the funding for other companies created under the Royal Instruction was "directed first into accounts held by Sakab" (Ex. 1 ¶ 52), and that "aside from the co-conspirators' activities in furtherance of the fraudulent scheme," the other companies created under the Royal Instruction "also conducted legitimate business in a number of industries, including aviation, security and technology."  (Ex. 1 ¶ 55).

27.     The Complaint references an action in the Ontario Superior Court of Justice ("Ontario Action") in which Plaintiff, along with other co-plaintiffs, is litigating similar claims against the Defendants, along with other co-defendants.  (Ex. 1 ¶ 1).  A recent preliminary order from the Ontario Action, originally obtained *ex parte*, is currently being appealed.  The merits of the Ontario Action have not yet been adjudicated.  Nor has the substantive legal position of the Defendants in that action been presented to the Ontario court.

28.     While obscuring and distorting the counterterrorism mission made plain in its own filings, Plaintiff seeks compensatory damages, an order for Defendants to hold their assets in the Commonwealth of Massachusetts in constructive trust for the benefit of the Plaintiff, an order for the disgorgement of certain rents received by the Defendants from properties in the Commonwealth of Massachusetts, an order of attachment of the assets held by Defendants in the Commonwealth of Massachusetts, and an order piercing the corporate veil, among other relief. (Ex. 1, pp. 43–46).

10

29.     In conjunction with its Complaint in the underlying action, Plaintiff filed an Emergency Motion To Stay Proceedings (Ex. 3, p; 154); an Emergency Motion For Approval of Memorandums of Lis Pendens (Ex. 3, p. 86); an Emergency Motion For A Short Order of Notice and Other Relief (Ex. 3, p. 52); and an Emergency Motion for Attachment of Real Property (Ex. 3, p. 60).

30.     Plaintiff acknowledged in its Emergency Motion For A Short Order of Notice and Other Relief that it plans to "seek to effect formal service on Defendants as provided in the applicable Massachusetts rules and statutes," but that "given the emergency nature of the Motions," it sought leave to "serve the papers in a manner reasonably calculated to provide actual and timely notice to Defendants."  (Ex. 3, p 53).  Plaintiff filed its "emergency" motions 61 days after obtaining a preliminary order in the Ontario Action, which Plaintiff cites as one basis for its motions.[13]  (Ex. 1 ¶ 1).  To date, service has not been effected on any defendant.

## II.     GROUNDS FOR REMOVAL

### A.  The Court Has Jurisdiction Over This Action.

31.     Under 28 U.S.C. §§ 1331, 1441, and 1446, this Court has original jurisdiction over any action in which (1) the notice of removal has been filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable; and (2) the case presents a substantial federal question.  Defendants satisfy these requirements, and this Action therefore may be removed pursuant to 28 U.S.C. §§ 1441 and 1446.

---

[13] Plaintiff also filed the "emergency" motions approximately two years after Plaintiff first received a report from Deloitte purportedly documenting the alleged fraud.  (*See* Ex. 3, p. 105 (*Sakab Saudi holding Co., et al. v. Saad Khalid S Al Jabri, et al.*, No. CV-21-00655418-00CL, *Ruling on Set Aside Motions*, ¶ 22 (Ontario Superior Court of Justice Jan. 22, 2021)).

**B. Plaintiff's Claims Present a Substantial Federal Question.**

32.     Complaints raising state law claims may nevertheless "aris[e] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

33.     Federal jurisdiction over state law claims arises "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *see also Atlantic Richfield Co. v. Christian*, 140 S. Ct. 1335, 1350 n.4 (2020); *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 312 (2005).

34.     A federal issue is "substantial where the resolution of the issue has 'broader significance . . . for the Federal Government.'" *Municipality of Mayaguez v. Corporacion Para el Desarollo del Oeste, Inc.*, 726 F.3d 8, 14 (1st Cir. 2013) (quoting *Gunn*, 568 U.S. at 1066). And "issues involving 'our relationship with other members of the international community must be treated exclusively as an aspect of federal law.'" *Republic of Philippines v. Marcos*, 806 F.2d 344, 352 (2d Cir. 1986) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964)); *see also Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368, 1377 (11th Cir. 1998) ("Where a state law action has as a substantial element an issue involving foreign relations or foreign policy matters, federal jurisdiction is present."); *Scrogin v. Rolls-Royce Corp.*, No. 3:10-CV-442 WWE, 2010 WL 3547706, at *3 (D. Conn. Aug. 16, 2010).

35.     The federal interest is particularly strong in cases involving "disputes in which a foreign government, or its instrumentality, is a named party to the lawsuit, or where the actions of a foreign government are a direct focus of the litigation." *Pacheco de Perez*, 139 F.3d at 1377 (citing *Sabbatino*, 376 U.S. at 425; *Republic of Philippines*, 806 F.2d at 353; *Republic of Iraq v. First Nat'l City Bank*, 353 F.2d 47 (2d Cir. 1965)).

36.     Sakab's parent company, Tahakom Investment Company, is wholly owned by the Public Investment Fund of Saudi Arabia, which is chaired and controlled by Crown Prince Mohammed bin Salman.  (Ex. 1 ¶ 24).  Sakab is an instrumentality of the Kingdom of Saudi Arabia, acting at the direction of bin Salman, seeking to attach assets in the United States based on the activities of the former (now disappeared) Crown Prince of Saudi Arabia bin Nayef.

37.     According to Plaintiff's pleadings, the "fraudulent scheme" involves Dr. Saad's role in companies "established between 2008 and 2016 pursuant to a 2007 Royal Instruction issued by King Abdullah Bin Abdulaziz," and through which the Kingdom of Saudi Arabia conducted sensitive "anti-terrorism" and other national security operations.  (*See* Ex. 1 ¶ 17).

38.     Plaintiff alleges that Dr. Saad's conduct did not advance the counterterrorism, national security, and other goals under which Sakab and the other companies were organized, but instead constituted fraudulent activity.  (*See*  Ex. 1 ¶ 23).

39.     Although Plaintiff alleges that "[t]he vast majority of financial transactions funneled through Sakab took place 'off-the-book' and were not recorded" (Ex. 1 ¶ 22), the financial arrangements of Sakab and the affiliated companies were opaque by design and at the direction of the then-leadership of the Kingdom of Saudi Arabia.

40.     Plaintiff alleges that "nominee shareholders" were appointed to Sakab (Ex. 1 ¶ 19), but the entire purpose of the Sakab was to conceal the involvement of the Saudi government in covert operations. It would have defeated the purpose of the Royal Instruction if Saudi government officials held official roles recorded in the corporate records.

41.     Plaintiff has made Dr. Saad's involvement in Sakab and Sakab's covert operations with partners, including the United States Government, central to this suit by alleging that Dr. Saad

defrauded the Plaintiff while working at the direction of the then-Crown Prince and, often, in cooperation with the United States Government.  (*See* Ex. 1 ¶ 2).

42.     Deciding Plaintiff's claims will require the Court to examine the relationships between Sakab and its affiliated companies; the affiliated companies' accounting practices; financial transactions between Sakab or the affiliated companies and the United States Government; the extent to which Sakab and the affiliated companies and their officers, directors, and executives operated at relevant times in compliance with Saudi law; and whether their actions were taken at the direction of the then-leadership of the Kingdom and, at times, in coordination with the United States Government.  It will also require the Court to assess the role of former Crown Prince Mohammed bin Nayef, who approved all expenditures of Sakab and its affiliated entities in his role as Interior Minister and Crown Prince, and who has now been disappeared by the current Crown Prince and detained in an unknown location in Saudi Arabia.  And the Court will be required to assess the authority of Crown Prince bin Nayef to approve expenditures involving Dr. Saad even after Dr. Saad left the Saudi government but continued to be employed by the Crown Prince as an advisor and continued to support the sensitive activities of Sakab and its affiliated entities.

43.     Plaintiff's claims will also require the Court to decide whether Dr. Saad's actions were consistent with the broad mandate ordered by the King in establishing the entities, including in the context of the Saudi partnership with the United States in engaging in counterterrorism activities.  (*See* Ex. 1 ¶ 43).

44.     Deciding the Plaintiff's claims in the underlying action will require the Court to evaluate whether certain alleged conduct was somehow fraudulent or whether it instead involved conduct undertaken pursuant to Sakab's original purpose—clandestine counterterrorism and

national security operations, often in partnership with the United States Government.  Furthermore, the Court will need to determine whether Dr. Saad's alleged conduct was undertaken at the direction of then-leadership of the Kingdom, an absolute monarchy, even where the then-Crown Prince is now disappeared by the current Crown Prince.  These issues have "broader significance" to the Federal Government.  *See Municipality of Mayaguez*, 726 F.3d at 14 (internal citation omitted).  They "involve[e] 'our relationship with other members of the international community [and] must be treated exclusively as an aspect of federal law.'"  *Marcos*, 806 F.2d at 352 (quoting *Sabbatino*, 376 U.S. at 425); *see also McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1201 (M.D. Fla. 2006).

45.     Further, assessing Plaintiff's claims will implicate serious federal interests—touching on the national security of the United States—about how the case should proceed in light of state secrets of the United States government.  It is a question of federal law whether "it may be impossible to proceed with the litigation because—privileged evidence being inseparable from nonprivileged information that will be necessary to the claims or defenses—litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets, such that the matter should not be allowed to proceed at all."  *Husayn v. Mitchell*, 938 F.3d 1123, 1135 (9th Cir. 2019) (internal quotations and citations omitted); *see also In re Nat'l Sec. Agency Telecommunications Recs. Litig.*, 483 F. Supp. 2d 934, 942 (N.D. Cal. 2007).

**C.  The Notice of Removal Is Timely.**

46.     Under 28 U.S.C. § 1446(b), notice of removal of a civil action must be filed within thirty (30) days of the defendant's receipt of service of the summons and the Petition.  Although Defendants have not yet received a summons, and do not waive their rights to challenge service of process, Plaintiff filed the Complaint on March 24, 2021.  (Ex. 1); *see Novak v. Bank of New York*

*Mellon Tr. Co., NA.*, 783 F.3d 910, 911 (1st Cir. 2015).  This Notice of Removal is being filed prior to the first hearing scheduled in Superior Court on March 29, 2021.

**D. Defendants Have Satisfied All Other Requirements for Removal.**

47.     <u>No Responsive Pleadings Filed in State Court</u>.  Defendants have not filed any responsive pleadings or filed any papers responding to the Complaint in Suffolk County Superior Court.  (Ex. 2).

48.     <u>Attachment of Pleadings</u>.  Pursuant to 28 U.S.C. § 1446(a), Defendants have attached all process, pleadings, or orders in the Action to this Notice of Removal as Exhibits 1-16.  A true and correct copy of the docket for this Action is attached as Exhibit 2.

49.     <u>Intradistrict Assignment</u>.  Venue is proper in this Court under 28 U.S.C. § 1446(a) because it is the district court of the United States for the district and division within which the Action is pending.

50.     <u>Notice to State Court/Plaintiff</u>.  A copy of the Notice of Filing of Notice of Removal, attached as Exhibit 19, will promptly be filed with the clerk of the Suffolk Superior Court and served on Plaintiff pursuant to 28 U.S.C. § 1446(d).  Defendants will also serve a copy of this Notice of Removal and the Notice of Filing of Notice of Removal upon counsel for Plaintiff by e-mail and first-class mail, in accordance with the certificate of service on this filing.

51.     <u>Joinder</u>.  All Defendants in the underlying action have consented to this Notice of Removal.  (Exhibits 17 & 18).

**NON-WAIVER OF DEFENSES**

52.     Defendants Saad Khalid S Aljabri and Khalid Saad Khalid Aljabri expressly reserve all of their defenses.  By removing this Action to this Court, Defendants do not waive any rights or defenses available under federal or state law. Defendants expressly reserve the right to move

for dismissal of the Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure. Nothing in this Notice of Removal should be taken as an admission that this Court has personal jurisdiction over Defendants, that venue is proper, that Defendants were properly served in the Action, or that Plaintiff's allegations are sufficient to state a claim or have any substantive merit, nor do Defendants waive any rights to raise such challenges in this proceeding. *See Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) ("Petitioner suggests that, by removal of the case to the federal court, objection to jurisdiction over the person of respondent was waived. Our decisions are to the contrary."); *In re Lupron Mktg. & Sales Practices Litig.*, 245 F. Supp. 2d 280, 302 (D. Mass. 2003) (removal from state to federal court does not waive the right to object to a lack of personal jurisdiction) (citing *Nationwide Engineering & Control Systems, Inc. v. Thomas*, 837 F.2d 345, 347–348 (8th Cir. 1988)).

## CONCLUSION

WHEREFORE, Defendants hereby give notice that this action is removed from the Suffolk County Superior Court to the United States District Court for the District of Massachusetts.

Dated: March 29, 2021                          Respectfully submitted,

                                               /s/  Scott C. Ford
                                               R. Robert Popeo (BBO #403360)
                                               Scott C. Ford (BBO # 629280)
                                               MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
                                               AND POPEO, PC
                                               One Financial Center
                                               Boston, MA 02111
                                               Phone:  (617) 348-1744
                                               Fax:  (617) 542-2241
                                               rrpopeo@mintz.com
                                               scford@mintz.com

Lindsay C. Harrison (pro hac vice
application forthcoming)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Phone:  (202) 639-6865
Fax:  (202) 639-6066
lharrison@jenner.com

*Attorneys for Saad Khalid S Aljabri &*
*Khalid Saad Khalid Aljabri*

## <u>CERTIFICATE OF SERVICE</u>

I certify that the above Notice of Removal and all associated papers were filed electronically using the CM/ECF system on March 29, 2021, and that on the same date copies were served on counsel for the Plaintiff by first-class mail and e-mail.

/s/ *Scott C. Ford*
Scott C. Ford