# Exhibit 1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                              SUPERIOR COURT DEPARTMENT
                                          OF THE TRIAL COURT

                                          CIVIL ACTION NO. _____

SAKAB SAUDI HOLDING COMPANY

                Plaintiff,

      v.
                                          **EFILED 3/24/21     EC**
SAAD KHALID S AL JABRI,

KHALID SAAD KHALID AL JABRI,

MOHAMMED SAAD KH AL JABRI,

NEW EAST (US) INC.,

NEW EAST 804 805 LLC,

NEW EAST BACK BAY LLC,

                Defendants.

## VERIFIED COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiff Sakab Saudi Holding Company ("Sakab"), by and through its attorneys,

Goulston & Storrs PC and Hughes Hubbard & Reed LLP, brings this action against Defendants

Saad Khalid S Al Jabri, Khalid Saad Khalid Al Jabri, Mohammed Saad Kh Al Jabri (collectively,

the "Al Jabri Family Defendants") and New East (US) Inc., New East 804 805 LLC and New

East Back Bay LLC (collectively the "New East Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff Sakab brings this action to give effect to orders issued by the Ontario

Superior Court of Justice (the "Ontario Orders") freezing and appointing a receiver over luxury

real property located in the Commonwealth of Massachusetts in a parallel action already

underway in Toronto, Ontario, Canada, entitled *Sakab Saudi Holding Co., et al. v. Saad Khalid S Al Jabri, et al.*, No. CV-21-00655418-00CL (Ontario Superior Court of Justice (Commercial List)) (the "Ontario Action").  In issuing the Ontario Orders, the Ontario Superior Court requested the aid and recognition of foreign courts, including in the United States, in giving effect to its orders.

2.      The present action, like the Ontario Action, involves an elaborate, multi-billion dollar, international fraud scheme, orchestrated by Defendant Saad Khalid S Al Jabri ("Al Jabri"), a former high-ranking government official in the government of the Kingdom of Saudi Arabia ("KSA") (the "Fraudulent Scheme").  Through this scheme, and assisted by members of his immediate family and close friends, Defendant Al Jabri defrauded Plaintiff Sakab and its affiliated companies of at least 13 billion Saudi Riyals ("SAR") (3.47 billion U.S. Dollars ("USD"), valued at 3.75 SAR per USD).   Al Jabri and his sons and co-conspirators Defendants Khalid Saad Khalid Al Jabri ("Khalid Al Jabri") and Mohammed Saad Kh Al Jabri ("Mohammed Al Jabri"), acting through their alter ego companies the New East Defendants, wrongfully acquired properties located in Massachusetts worth approximately $29 million USD with the proceeds of the Fraudulent Scheme.

3.      As detailed below, the Fraudulent Scheme was complex and involved sham shareholder agreements, unauthorized and illegal payments of purported compensation and bonuses, off-the-book payments of unauthorized and illegal "dividends," purported "profit sharing" and "rewards" based on minimal or non-existent records, and the transfer of tens—if not hundreds—of millions of dollars into real estate in the names of Al Jabri, Al Jabri's children, various companies they controlled and other co-conspirators, including the real property in

Massachusetts that is the subject of the present action and other luxury properties in the United

States, Canada, the United Kingdom, Europe, the KSA and likely elsewhere not yet known.

4.      Like the Ontario Action, the present action results from detailed, substantial and

comprehensive forensic investigative and financial tracing efforts performed by Deloitte

Financial Advisory Services Limited (which are still ongoing and may uncover additional

wrongdoing).  As described below, those efforts show that billions of dollars of assets have been

misappropriated from Sakab and its affiliated companies that had been under Al Jabri's direction

and control, both through direct payments to Al Jabri and his co-conspirators, and through a

variety of more complicated actions, including self-dealing and the fraudulent transfer of assets

to Al Jabri and his co-conspirators, and the use of stolen and fraudulently transferred funds to

acquire real property in the Commonwealth of Massachusetts.

5.      The purpose of the present action is to maintain the status quo—that is, to

preserve the fruit of the Fraudulent Scheme now located in Massachusetts that is subject to the

Ontario Orders.  Accordingly, immediately upon commencing this action, Plaintiff Sakab intends

to file Emergency Motions for Attachment of Real Property, Approval of Memorandums of *Lis*

*Pendens* and to Stay Proceedings pending the ultimate adjudication of the Ontario Action.

Plaintiff Sakab expects that, should the Court grant the requested emergency relief, it will come

again before this Court upon the conclusion of proceedings in Canada, either to enforce a final

judgment against Defendants or to dissolve the attachment and *lis pendens*.

6.      As detailed below, the Ontario Superior Court initially issued the Ontario Orders

on an *ex parte* basis, finding that Plaintiff Sakab and other defrauded affiliated companies

presented to the Ontario court "overwhelming evidence of fraud" by Defendant Al Jabri and his

co-conspirators.  Defendants had the opportunity but chose not to challenge the Ontario court's

*ex parte* orders on the merits; instead, Al Jabri sought to set aside the *ex parte* orders on the

purported grounds that Plaintiff Sakab and other defrauded affiliated companies failed to disclose

or misled the Ontario court with respect to material facts.  After a full-day evidentiary hearing

held on February 19, 2021, the Ontario Superior Court denied the set aside motion and extended

the Ontario Orders (subject to certain modifications not relevant to this proceeding),

characterizing the motions to set aside and extend those orders as "but one initial step in what

will likely be lengthy and complex litigation."

## THE ONTARIO ACTION

7.      On January 22, 2021, Plaintiff Sakab, along with nine other affiliated defrauded

companies, brought the Ontario Action against Al Jabri and a number of his co-conspirators,

including all Defendants in this action.  The plaintiffs in the Ontario Action immediately moved

for *ex parte* relief, submitting to the court in support a voluminous record that described in detail

the extent of the Fraudulent Scheme and the efforts to trace misappropriated assets.  These

materials included:

   a.   a 102-page Statement of Claim;

   b.   an 111-page affidavit of Abdulaziz Alnowaiser, the CEO of Tahakom

        Investment Company and current General Manager of Plaintiff and the other

        Group Companies (as defined herein), sworn on January 18, 2021, and 248

        exhibits attached thereto;

   c.   a 156-page Report of Deloitte Financial Advisory Services Limited and

        Deloitte Professional Services (DIFC) Limited, affiliated firms of Deloitte and

        Touche (M.E.) (collectively, "Deloitte") dated January 18, 2021 (the "Deloitte

        Report"); and

      d.   a legal expert report of Abudulaziz H. Al Fahad, dated January 17, 2021, regarding relevant law of the KSA.

8.      This extensive record in the Ontario Action explained in detail the particulars of the Fraudulent Scheme and forensically traced the flow of misappropriated funds through Sakab and its affiliated companies to Al Jabri and his family members and friends.

9.      That same day, based on the substantial record put before the court, the Honourable Justice Cory A. Gilmore of the Ontario Superior Court issued, among other relief, three *ex parte* orders relevant to this Complaint:

      a.   an interim Order in the form of a *Mareva* injunction (the "*Mareva* Order") (attached hereto as Exhibit 1) restraining Al Jabri from dissipating his assets worldwide (including the real property in Massachusetts that is the subject of the present action), requiring Al Jabri to provide a sworn statement detailing the nature, value and location of his assets worldwide, and requesting that foreign courts or tribunals give effect to the injunction and assist the plaintiffs in carrying out its terms;

      b.   a Receivership Order (attached hereto as Exhibit 2) appointing KSV Restructuring Inc. as receiver and manager over certain assets and properties of the New East Defendants, including real property in Massachusetts that is the subject of the present action, as well as other U.S. and Canadian companies; and

      c.   a Disclosure (Norwich) Order (the "*Norwich* Order"), requiring various Canadian and international financial institutions, entities and individuals to disclose and produce certain information to the plaintiffs in the Ontario

Action, including records related to individuals, companies, accounts and transactions that may assist in the effort to trace the funds stolen from Plaintiff Sakab and its affiliated companies.

10.     On January 27, 2021, Madam Justice Gilmore released "Reasons on Ex Parte Order" (attached hereto as Exhibit 3) finding, among other things, that the evidence submitted by the plaintiffs in the Ontario Action "demonstrate that Al Jabri used fraudulent means to divert funds that rightfully belonged to the Plaintiffs," and that "Al Jabri was in a position of trust and confidence in relation to the Plaintiffs.  He breached his duties to the Plaintiffs by preferring his own interests and those of his family, friends and co-conspirators over those of the Plaintiffs."

11.     Madam Justice Gilmore also found based on the substantial evidence before her that "Al Jabri is adept at moving money around the world including establishing corporations (such as the New East [Defendants]) to permit him to hold property indirectly," and that "Al Jabri has been bold in his schemes including transferring large amounts of money to himself and other Persons of Interest even after he was relieved of his duties with the government of the KSA."  Madam Justice Gilmore therefore concluded that "the risk of removal or dissipation [of assets] may be established by inference given Al Jabri's sophisticated, international, and multi-layered means of moving money and assets."

12.     Madam Justice Gilmore acknowledged in the Reasons on Ex Parte Order that, under Ontario law, "[a]s a Receivership is intrusive and thus to be used sparingly, the threshold for an appointment is a high one."  However, she found that the plaintiffs in the Ontario Action met that threshold, given the presence of assets that are only beneficially owned by Al Jabri (such as the Massachusetts properties held in the name of the New East Defendants), and thus at

6

greater risk of dissipation, and the fact that the rents derived from the U.S. real estate holdings (which are at issue in this case) are substantial.

13.     On January 28, 2021, Al Jabri submitted a motion requesting that the Ontario Superior Court set aside or stay enforcement of the *Mareva*, Receivership and *Norwich* Orders. Al Jabri submitted an affidavit of his son, Defendant Khalid Al Jabri, sworn on January 31, 2021, in support of that motion.

14.     On February 1, 2021, Madam Justice Gilmore issued an Endorsement (attached hereto as Exhibit 4) denying Al Jabri's motion to set aside or stay the *Mareva*, Receivership and *Norwich* Orders, finding that "[t]here is overwhelming evidence of fraud that has been presented to court."   In so finding, Madam Justice Gilmore rejected Defendant Khalid Al Jabri's affidavit, which she characterized as "more of a political treatise than any concrete response to the serious allegations raised [by the Plaintiffs]."  Given the urgency of the matter, Madam Justice Gilmore extended the *Mareva*, Receivership and *Norwich* Orders to February 19, 2021 and set the matter for a full-day evidentiary hearing on that date.  On February 5, 2021, Madam Justice Gilmore entered an order, dated February 1, 2021, effectuating the extension of the *Mareva*, Receivership and *Norwich* Orders.

15.     On February 19, 2021, the Ontario Superior Court held a day-long evidentiary hearing on motions filed by parties to the Ontario Action, including Al Jabri's motion to set aside the *Mareva*, Receivership and *Norwich* Orders, and the plaintiffs' motion to extend those orders. The parties had the opportunity to present evidence and arguments of their choosing to the Ontario court, including by questioning and cross-examining witnesses.  Defendants had the opportunity but chose not to challenge the Ontario court's *ex parte* orders on the merits; instead, Al Jabri sought to set aside the *ex parte* orders on the purported grounds that Plaintiff Sakab and

other defrauded affiliated companies failed to disclose or misled the Ontario court with respect to material facts.

16.     On March 11, 2021, Madam Justice Gilmore issued a thorough, 30-page Ruling (attached hereto as Exhibit 5), denying Al Jabri's set-aside motion and extending the *Mareva*, Receivership and *Norwich* Orders.  (While the Ontario court modified the *Norwich* and Receivership Orders as to certain Canadian defendant companies and assets transferred by Al Jabri to his son Mohammed Al Jabri, it did not alter the application of the *Mareva*, Receivership and *Norwich* Orders as to entities or real property in the Commonwealth of Massachusetts.)  The Ruling described in detail the evidence and arguments presented by the parties, the applicable legal standards, and the court's findings.  The thrust of Al Jabri's position in seeking to set aside the Ontario Orders was that the Ontario Action purportedly is not a commercial dispute, but rather a political attack.  However, the Ontario Superior Court rejected that contention, finding that the plaintiffs in the Ontario Action (including Sakab) have "the right . . . to pursue their claims against [Al Jabri]."

## PARTIES

A.     **The Plaintiff**

17.     Plaintiff Sakab Saudi Holding Company was incorporated pursuant to the laws of the KSA on May 10, 2008.  Its place of business is Riyadh, KSA.  Sakab is one of seventeen KSA companies (the "Group Companies") established between 2008 and 2016 pursuant to a 2007 Royal Instruction issued by King Abdullah Bin Abdulaziz for the purpose of performing anti-terrorism activities in the public interest, and funded by the KSA's Ministry of Finance ("MOF").

18.    Prior to its transfer to Tahakom Investment Company ("TIC"), Sakab's Articles of Association provided that Abdullah Homoud A Alsowailem ("Abdullah Alsowailem") and Majed Obaid S Almuzaini ("Majed Almuzaini") were equal shareholders, each holding fifty percent (50%) of the company.

19.    In fact, Abdullah Alsowailem, Al Jabri's friend and personal banker, and Majed Almuzaini, Al Jabri's nephew, were nominee shareholders for Al Jabri, appointed in order to allow Al Jabri to exert control over Sakab while maintaining an illusion of separation.  As described below, Al Jabri installed his friends or family members as the nominee shareholders of all seventeen Group Companies.  Plaintiff is informed and believes, and upon such information and belief alleges that the nominee shareholders had no control over the Group Companies.

20.    Plaintiff is informed and believes, and upon such information and belief alleges that Al Jabri used his ability to exercise control over Sakab to misappropriate funds by causing Sakab to make unauthorized and improper direct payments to himself and to his family and friends.  Additionally, Al Jabri directed Sakab to:  (i) transfer funds to other Group Companies, which then (at Al Jabri's direction) made further unauthorized and improper payments to Al Jabri, his family and friends, (ii) engage in self-dealing transactions that improperly benefitted Al Jabri and his family members, and (iii) purchase substantial assets that were later transferred to Al Jabri and his co-conspirators.  Plaintiff is informed and believes and upon such information and belief alleges that in order to disguise this wholesale looting, Al Jabri structured and used Sakab as a vehicle to distribute funds that had been allocated for anti-terrorism activities to the Group Companies, and then from the Group Companies unlawfully to himself, other co-conspirators and companies under his and their control.

9

21.     From July 2008 to August 2017, at least SAR 30 billion (USD 8 billion) flowed through Sakab's accounts to the other Group Companies and, as detailed below, in many instances from Sakab and the other Group companies to Al Jabri and his co-conspirators.  During this time period, Al Jabri directed Sakab alone to make direct payments to himself of at least SAR 950,891,970 (USD 253,571,192).

22.     Plaintiff is informed and believes, and upon such information and belief alleges that Al Jabri directed and controlled the flow of funds through Sakab.  The vast majority of the financial transactions funneled through Sakab took place "off-the-book" and were not recorded in the company's financial statements.

23.     Despite the amounts of money that moved through its accounts during this period, Sakab had no actual operating business.  Its purported "business" was limited to investments that were intended to fund counter-terrorism activities in the KSA.  Plaintiff is informed and believes, and upon such information and belief alleges that, in fact, Sakab was used as a vehicle for Al Jabri to embezzle and launder funds for himself and those close to him.

24.     Following Al Jabri's removal from his government positions, based on a government direction, ownership of Plaintiff Sakab and the other Group Companies was transferred to TIC, an entity wholly owned by the Public Investment Fund of Saudi Arabia (the "PIF"), an independent sovereign wealth fund of the KSA.

**B.     The Defendants**

  **a.   Saad Khalid S Al Jabri**

25.     Saad Khalid S Al Jabri is a former high ranking government official of the KSA. He previously served as Director of the Department of Officers and Personnel Affairs and as a Security Advisor in the Ministry of Interior ("MOI").  In 2015, he was named a Minister of State

and appointed to the KSA Council of Ministers and the Council of Political and Security Affairs. However, later that year, on September 10, 2015, Al Jabri was stripped of his titles and positions.

26.     As a result of the roles he held in the KSA government, Al Jabri was forbidden by Saudi law (of which he was or should have been aware) from obtaining any additional compensation or profits from private companies such as Sakab.

27.     Nevertheless, during this time period and continuing through 2017, Al Jabri was the directing mind of the Fraudulent Scheme, which resulted in direct payments from Sakab to Al Jabri totaling SAR 950,891,970 (USD 253,571,192) and payments of additional amounts worth billions of U.S. dollars from Group Companies to Al Jabri and other co-conspirators. Al Jabri also received payments from other co-conspirators as "kickbacks" from the amounts that they received through the Fraudulent Scheme.

28.     Al Jabri fled the KSA while under investigation in 2017, and has been a resident of Toronto, Ontario, Canada, along with his wife and several members of his family, since then.

### b. Khalid Saad Khalid Al Jabri

29.     Khalid Saad Khalid Al Jabri is a resident of Toronto, Ontario, Canada, and is Al Jabri's son. He is the beneficial owner of tens of millions of dollars in misappropriated funds and real estate in the United States, the KSA and Canada that was purchased with funds that were misappropriated and fraudulently transferred as part of the Fraudulent Scheme. He conspired with his father and his brother, Defendant Mohammed Al Jabri, to use misappropriated funds to acquire real estate in the United States, including in the Commonwealth of Massachusetts.

### c.  Mohammed Saad Kh Al Jabri

30.     Mohammed Saad Kh Al Jabri is a resident of Toronto, Ontario, Canada, and is Al

Jabri's son.  He is the beneficial owner of tens of millions of dollars in misappropriated funds

and real estate in the United States that was purchased with funds that were misappropriated and

fraudulently transferred as part of the Fraudulent Scheme.  He conspired with his father and his

brother, Khalid Al Jabri, to use misappropriated funds to acquire real estate in the United States,

including in the Commonwealth of Massachusetts.  He also served as Al Jabri's nominee

shareholder of multiple Group Companies and was involved in fraudulent real estate transactions

in the KSA and Europe.

### d.  New East (US) Inc.

31.     New East (US) Inc. ("New East US") is a corporation organized pursuant to the

laws of the State of Delaware.  Its current directors are Khalid Al Jabri, Jonathan Wainwright

("Wainwright"), an attorney at the law firm of Cadwalader, Wickersham & Taft LLP, and

Leonhard Toenz ("Toenz"), a lawyer based in Zurich, Switzerland.  Its registered address is 200

Liberty Street, New York, New York 10281 (Cadwalader's New York office).  New East US is

the registered owner of properties located in the Millennium Place luxury condominium building

in Boston that are beneficially owned by Al Jabri.

32.     Plaintiff is informed and believes, and upon such information and belief alleges

that the Al Jabri Family Defendants are the ultimate beneficial owners of New East US.  The

company served and continues to serve as the Al Jabri Family Defendants' alter ego and was and

remains completely dominated and controlled by them.  Al Jabri and his sons incorporated New

East US, and at all relevant times used it and continue to use it as a vehicle to effectuate elements

of the Fraudulent Scheme, to hide misappropriated funds and assets acquired with

misappropriated funds, and to hinder the ability of Sakab and other Group Companies to recover the money Al Jabri and his sons stole from them and now owe them.

        **e.   New East 804 805 LLC**

33.     New East 804 805 LLC ("New East 804 805") is a limited liability company organized pursuant to the laws of the Commonwealth of Massachusetts.  Its current managers are Khalid Al Jabri, Mohammed Al Jabri and Wainwright.  Its registered address is 580 Washington Street, Penthouse 1, Boston, Massachusetts 02111 (a property owned by New East US).  New East 804 805 is the registered owner of properties located in the Millennium Place luxury condominium building in Boston that are beneficially owned by Al Jabri.

34.     Plaintiff is informed and believes, and upon such information and belief alleges that the Al Jabri Family Defendants are the ultimate beneficial owners of New East 804 805. The company served and continues to serve as the Al Jabri Family Defendants' alter ego and was and remains completely dominated and controlled by them.  Al Jabri and his sons formed New East 804 805, and at all relevant times used it and continue to use it as a vehicle to effectuate elements of the Fraudulent Scheme, to hide misappropriated funds and assets acquired with misappropriated funds, and to hinder the ability of Sakab and other Group Companies to recover the money Al Jabri and his sons stole from them and now owe them.

        **f.   New East Back Bay LLC**

35.     New East Back Bay LLC ("New East Back Bay") is a limited liability company organized pursuant to the laws of the Commonwealth of Massachusetts.  Its current signatories and directors are Khalid Al Jabri, Wainwright and Toenz.  Its registered address is 580 Washington Street, Penthouse 1, Boston, Massachusetts 02111 (a property owned by New East US).  New East Back Bay is the registered owner of properties in several luxury condominium

buildings in Boston, including the Mandarin Oriental and One Dalton Place, located at the Four Seasons.

36.     Plaintiff is informed and believes, and upon such information and belief alleges that the Al Jabri Family Defendants are the ultimate beneficial owners of New East Back Bay. The company served and continues to serve as the Al Jabri Family Defendants' alter ego and was and remains completely dominated and controlled by them.  Al Jabri and his sons formed New East Back Bay, and at all relevant times used it and continue to use it as a vehicle to effectuate elements of the Fraudulent Scheme, attempt to hide misappropriated funds and assets acquired with misappropriated funds, and to hinder the ability of Sakab and other Group Companies to recover the money Al Jabri and his sons stole from them and now owe them.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction over this matter pursuant to M.G.L. c. 212, § 3, and the amount in controversy exceeds $50,000.

38.     This Court has personal jurisdiction over the Defendants pursuant to M.G.L. c. 223A, § 3, based on Defendants' transacting business in the Commonwealth of Massachusetts, holding an interest in, using or possessing real property in the Commonwealth of Massachusetts, and causing a tortious injury by an act or omission in the Commonwealth of Massachusetts.

39.     Venue, pursuant to M.G.L. c. 223 § 1, is proper in Suffolk County, Massachusetts because the usual place of business of Defendants New East 804 805 and New East Back Bay is within Suffolk County.  Additionally, the real property held by Defendants is located in Suffolk Country.

## STATEMENT OF FACTS

### A.  The Royal Instruction and the Compensation Letter

40.     On December 27, 2007, King Abdullah Bin Abdulaziz signed Royal Instruction 19134/B, which increased the level of funding from the MOF to be used by the MOI for counter-terrorism activities from thirty percent (30%) of the MOI's operational funds to forty-five percent (45%) (the "Allowance").

41.     The Royal Instruction expressly stipulated that the Allowance was to be managed by the MOI's then Assistant-Minister for Security Affairs Prince Mohammed Bin Nayef ("Bin Nayef") to "fight terrorism activities as the situation and *public interest require*" and that it could be used to "establish and fund investment intermediaries in the private sector as His Royal Highness sees *to serve the public interest*" (emphasis added).

42.     On January 19, 2008, Bin Nayef purportedly wrote a letter (the "Compensation Letter") to Al Jabri and Abdullah Saleh Abdullah Alhammad ("Abdullah Alhammad"), another KSA government official and a long-time colleague and trusted associate of Al Jabri, requesting that they establish companies in the technological and aviation security sectors.  That purported Compensation Letter stated that Al Jabri and Abdullah Alhammad would receive five percent (5%) of the net profits of those companies (which ultimately would be the Group Companies), described as "compensation for administrative, supervisory and follow up efforts."  The purported Compensation Letter also stated that, in the event of "future success," Al Jabri and Abdullah Alhammad might be entitled to a "rewarding percentage" in those companies.  The purported Compensation Letter is not on any proper or formal government letterhead, is not sealed nor stamped as would be customary under KSA law and practice, and does not contain a

log number as would normally be expected of such a significant, legitimate government authorization.

43.     Royal Instruction 19134/B authorized Bin Nayef to distribute the Allowance to achieve the goals prescribed by the King.  Nevertheless, in exercising this authority, Bin Nayef was bound by that Instruction's clear restrictions on how the funds could be used, and by the general requirement that all activities must be undertaken in the public interest.  Further, any additional authority Bin Nayef may have held under Saudi law in his role as Assistant-Minister of Security Affairs was limited to the inherent powers of that position.  Bin Nayef's position did not allow him to waive Saudi legal restrictions against government employees profiting from commercial activities, and he had no authority to grant a percentage of profits or any rewards to Al Jabri or Abdullah Alhammad under the Royal Instruction, the purported Compensation Letter or otherwise under Saudi law.

44.     Under Saudi law, Al Jabri and Abdullah Alhammad, as government officials, were prohibited from earning more than their government salaries through other commercial sources.  Al Jabri knew or should have known that, under Saudi law, Bin Nayef was prohibited from authorizing payments to Al Jabri and Abdullah Alhammad of five percent (5%) of the profits of the Group Companies or other "rewarding percentages," and that Al Jabri and Abdullah Alhammad were legally prohibited from accepting such payments.

45.     Plaintiff is informed and believes, and upon such information and belief alleges that the purported Compensation Letter was one of the first means by which Al Jabri and others attempted to lay a paper trail to cover their vast misappropriation of funds as part of the Fraudulent Scheme.  Indeed, even if the payments purportedly authorized by the Compensation

Letter had been legal (they were not), Al Jabri and his co-conspirators in fact received staggering sums, well in excess of the five percent (5%) of net profits that they were purportedly granted.

**B. Use of Nominee Shareholders to Implement the Scheme**

46.     As noted above, Sakab was established on May 10, 2008.  The sixteen other Group Companies were established from 2008 to 2016, ostensibly for the purpose of performing activities related to the anti-terrorism mission described in Royal Instruction 19134/B.  That Instruction made Bin Nayef responsible for managing and disbursing the Allowance in the public interest.  Bin Nayef, in turn, delegated that responsibility and authority to Al Jabri, who selected and installed his friends and family members as the nominee shareholders, and who was able to exercise control over the Group Companies for purposes of carrying out the Fraudulent Scheme.

47.     Upon the creation of each Group Company, Al Jabri directed the installation of "nominee shareholders" to hold the shares of that company.  All of these nominee shareholders were family members or friends of Al Jabri who, upon information and belief, were selected to allow Al Jabri to retain control over the Group Companies while maintaining an illusion of separation.  Abdullah Alsowailem and Majed Almuzaini, who were the nominee shareholders of Sakab, also served as the nominee shareholders for fourteen of the seventeen Group Companies; the nominee shareholders of the other three companies included Al Jabri's son Mohammed Al Jabri (21 years old at the time he was appointed), Al Jabri's nephew and son-in-law Salem Abaid S Almuzaini (Majed Almuzaini's brother), Al Jabri's brother Abdulrahman Al Jabri, and Al Jabri's trusted associate Bejad Barka SH Alharbi.  These appointments allowed Al Jabri to maintain control over the activities of Sakab and the other Group Companies.

48.     The nominee shareholders were installed pursuant to side agreements that were frequently signed by Bin Nayef and by the nominees.  Those side agreements provided that the

nominee shareholders' ownership of the Group Companies was a "sham ownership arrangement." In fact, the Group Companies were intended to be, and in fact were, actually owned by the MOI, based on the Allowance established by the Royal Instruction.

49. As part of the Fraudulent Scheme, the nominee shareholder side agreements also provided that the nominees would each receive one percent (1%) of the yearly net profits of the relevant Group Company as compensation for registering the company in their names and for their participation on the Board of Directors, could receive additional compensation through contracts with the Group Company and would maintain strict confidentiality about the nominee shareholding arrangement. The nominee shareholder side agreements were not logged or registered as would be expected for properly authorized corporate documents. Plaintiff is informed and believes, and upon such information and belief alleges that, like the purported Compensation Letter, these side agreements were a means to "paper" a purported basis to transfer substantial funds from the Group Companies to Al Jabri and his family and friends. In fact, since the one percent (1%) compensation was a reward for helping to disperse funds beyond the scope allowed by the Royal Instruction, it was invalid under Saudi law. Moreover, the funds that these nominee shareholders actually received greatly exceeded what they were purportedly entitled to receive under the side agreements.

**C. The Sakab Profit Distribution Resolution**

50. On June 15, 2008, after the nominee shareholder side agreement for Sakab was signed, the Sakab Board of Directors, in breach of their fiduciary duties and in furtherance of the Fraudulent Scheme, passed a resolution stating that fifty percent (50%) of Sakab's net profits would be distributed to Board members as compensation for their "efforts." The resolution purported to divide the fifty percent (50%) as follows:

a.   Al Jabri and Abdullah Alhammad would each receive five percent (5%);

b.   Abdullah Alsowailem and Majed Almuzaini, as nominee shareholders, would each receive one percent (1%); and

c.   Bin Nayef would receive thirty-eight percent (38%).

51.     However, in reality and under Saudi law, none of these individuals had any entitlement to Sakab's profits; upon information and belief, the resolution was instead an attempt to establish a fictitious basis to siphon funds away from Sakab and into the pockets of Al Jabri and the other participants in the Fraudulent Scheme.  Moreover, the funds that these individuals actually received vastly exceeded the division of profits set out in the resolution.

**D.  Funding the Group Companies**

52.     From 2008 to 2017, the Group Companies received more than SAR 30 billion (USD 8 billion) in funding.  The vast majority of these funds were directed first into accounts held by Sakab, largely through checks issued by the Saudi Arabian Monetary Authority (the Saudi Arabian Central Bank) and the Ministry of Finance.

53.     Despite receiving these funds, Sakab had no operational business.  The only reported revenue it generated stemmed from "investments."  From fiscal years 2013 to 2016, Sakab reported "investments" in Group Companies of a maximum of SAR 96 million (USD 25.6 million).  Most of the billions in SAR that moved through Sakab's accounts were not treated as an investment or accounted for in Sakab's books and records.

54.     Plaintiff is informed and believes, and upon such information and belief alleges that instead, during this period Sakab was almost exclusively used by Al Jabri as a vehicle to funnel funds directly to Al Jabri and his co-conspirators, or indirectly via the other Group

Companies.  Payments to Al Jabri and his co-conspirators were made primarily through bank accounts held in the KSA, as well as through international bank accounts held with HSBC.

55.     However, throughout this time period, aside from the co-conspirators' activities in furtherance of the Fraudulent Scheme, the Group Companies (other than Sakab) also conducted legitimate business in a number of industries including aviation, security and technology.

### E.  Misappropriation of Funds Directly from Sakab and the Other Group Companies

56.     Over the course of the Fraudulent Scheme, Al Jabri and his co-conspirators received significant unlawful transfers of funds directly from Sakab to accounts held in their names or to offshore entities that they controlled.  Each such transfer of funds was part of the Fraudulent Scheme, and constituted a misappropriation of funds from Sakab for which there was no legal or other justification.  Plaintiff is informed and believes, and upon such information and belief alleges that each such transfer was made at Al Jabri's direction, or with his knowledge, assistance or approval.

57.     The ongoing forensic investigation conducted by Deloitte over the course of more than two years has determined that during the course of the Fraudulent Scheme, Al Jabri caused Sakab to transfer directly to Al Jabri and the other co-conspirators at least SAR 3,180,807,609 (USD 848,215,362).  Al Jabri caused at least SAR 950,891,970 (USD 253,571,192) of those misappropriated funds to be transferred directly to himself.

58.     The forensic investigation is ongoing and additional fraudulent transfers may be uncovered.

59.     These massive and fraudulent transfers of funds were done entirely "off-the-book," meaning that, in order to avoid detection, they were intentionally not recorded in the financial records or audited financial statements of Sakab.

60.     Many transfers were effected without any effort to "paper" a purportedly legitimate basis for the transfers; in other cases, however, Al Jabri and his co-conspirators created a rudimentary and fictitious paper trail in an attempt to lend a veneer of legitimacy to their misappropriation of funds from Sakab.  Some examples of those instances are outlined below.

### a.  Fraudulent "Valuation" Rewards

61.     Al Jabri and his co-conspirators received significant transfers of funds directly from Sakab on the basis of unsubstantiated and absurdly inflated "valuations" of certain Group Companies.  These purported "valuations" were in fact handwritten, unsigned documents containing no analysis but simply ascribing an arbitrary and vastly inflated value to each company.  These valuations in no way reflected a plausible true value of the companies.  In one egregious example, the "valuation" of a Group Company implied a multiple of 595 times the company's net income; the "valuation" of this company was set at SAR 1.3 billion (USD 346.66 million), despite the fact that the company's annual net income was SAR 2.2 million (USD 586,666) and it held net assets worth a total of SAR 12.66 million (USD 3.38 million).

62.     These "valuations" were then used as a purported basis to make substantial payments, characterized as "rewards," from Sakab to Al Jabri and other co-conspirators.  Sakab made these payments despite the fact that there was no corresponding transfer of funds from the Group Companies to Sakab and no other indication that any sale of shares in the Group Companies or other similar transaction took place.  Rather, Al Jabri and the co-conspirators appear to have received significant "reward" payments based on essentially a hypothetical valuation of those companies, where the "valuation" itself was nothing more than an unsubstantiated, handwritten figure.

**b. Fraudulent Profit Distributions, Rewards and Other Compensation**

63.     Al Jabri and his co-conspirators received numerous transfers directly from Sakab that were characterized as distributions of Group Companies' profits, rewards for their participation on Group Companies' Boards, or other forms of compensation.

64.     In fact, some or all of the purported profit distributions bore no relationship to the actual profits of the Group Company to which the payment was linked.  Additionally, in several cases, Al Jabri and his co-conspirators received "profit distributions" that were paid two or even three times based on the same purported profits of a particular Group Company for the same year.  In many instances Sakab paid these "profit distributions" to Al Jabri and his co-conspirators without any corresponding payments from the relevant Group Company into Sakab.

65.     Plaintiff is informed and believes and upon such information and belief alleges that the rewards and other forms of compensation paid to Al Jabri and his co-conspirators were arbitrarily determined.

66.     The recipients of these transfers had no legal or other entitlement to the funds.  In fact, these transfers were characterized as profit distributions, rewards or other forms of compensation only in an effort to create a "paper trail" that would disguise the massive misappropriation of funds from Sakab.

**F.  Further Extent of the Fraudulent Scheme**

67.     In addition to transfers directly from Sakab, large amounts of funds were improperly and illegally transferred from Sakab to other Group Companies, and then from the other Group Companies to Al Jabri and the other co-conspirators.  Each such transfer of funds was part of the Fraudulent Scheme and constituted a misappropriation of funds for which there was no legal or other justification.  Plaintiff is informed and believes, and upon such information

and belief alleges that each such transfer was made at Al Jabri's direction or with his knowledge, assistance or approval.

68.     Funds were also improperly and illegally transferred to Al Jabri and his co-conspirators through more complex methods, including self-dealing and skimming from several real estate transactions in the KSA, the purchase of valuable real estate assets outside of KSA by a Group Company that later transferred control of those assets (without receiving fair value) for the ultimate benefit of Al Jabri, Mohammed Al Jabri and Bin Nayef, and payments from Group Companies to foreign corporate entities that Al Jabri and his co-conspirators control.

69.     In addition, Al Jabri received "kickback" payments of at least SAR 697,861,920 (USD 186,096,512) from other co-conspirators and third parties from misappropriated funds that had been transferred to them from Plaintiff and other Group Companies.

**G.  Efforts to Disburse and Conceal the Proceeds of the Fraudulent Scheme**

70.     Plaintiff is informed and believes, and upon such information and belief alleges that in order to enjoy and conceal the vast sums of money misappropriated from Sakab and the other Group Companies, Al Jabri, assisted by his sons Khalid Al Jabri and Mohammed Al Jabri, acquired real estate and corporate assets around the world.  As described in greater detail below, this included establishing companies in the United States, including in the Commonwealth of Massachusetts, and in other countries for the purpose of acquiring luxury real estate assets with the proceeds of the Fraudulent Scheme, and to avoid holding those properties directly in his own name.

71.     These efforts led Madam Justice Gilmore, in the January 27, 2021 "Reasons on Ex Parte Order" issued in the Ontario Action, to note "Al Jabri's sophisticated, international, and multi-layered means of moving money and assets" and to find that "Al Jabri is adept at moving

money around the world including establishing corporations (such as the New East [Defendants]) to permit him to hold property indirectly."

### H. Misappropriated Funds Used to Purchase Real Property

72.     Al Jabri, along with his sons Khalid Al Jabri and Mohammed Al Jabri, used funds misappropriated from Sakab and the other Group Companies to purchase substantial real estate assets around the world, including in the United States, Canada and the KSA.  Plaintiff is informed and believes, and upon such information and belief alleges that these properties were purchased with misappropriated funds, have been used to secret the ill-gotten proceeds of the Fraudulent Scheme to foreign locations in order to enrich Al Jabri and his immediate family, and/or are being used as a means (and with intent) to hinder, delay and defraud Sakab and other Group Companies in their ability as Al Jabri's and his family members' creditors to recover what Al Jabri and his family members owe them.

73.     In the Commonwealth of Massachusetts, Al Jabri, Khalid Al Jabri and Mohammed Al Jabri purchased a number of luxury real estate properties, with the transactions following a similar pattern:

      a.  First, Al Jabri establishes a company in the United States using some variant of "New East" in the naming convention.

      b.  Al Jabri establishes himself as manager and/or director in the entity at the time of its organization, along with his son Khalid Al Jabri and Wainwright.

      c.  After a property is purchased by the company using funds misappropriated from Sakab, Al Jabri removes himself from his position as manager and/or director of the company, and replaces himself with one of his sons or Toenz.

### a.  Properties Owned by New East US and New East 804 805

74.     New East US owns three, and New East 804 805 owns two, properties located in a Boston luxury condominium building developed by Ritz Carlton.

### i.  Establishment of New East US

75.     On March 14, 2013, New East US was incorporated pursuant to the laws of the State of Delaware, where it remains in good standing.  New East US registered to do business in the Commonwealth of Massachusetts on March 28, 2013.  At the time it registered in Massachusetts, Al Jabri was identified as the President and Director, and his son Khalid Al Jabri was identified as the Vice-President, Treasurer and a Director.  Both listed their address as Cadwalader's New York office.

76.     At some time between filings made on April 6, 2017 and March 7, 2019, Mohammed Al Jabri replaced Al Jabri as President and Director of New East US.

77.     At some point between March 7, 2019 and March 16, 2020, Mohammed Al Jabri was replaced as President and Director by his brother Khalid Al Jabri.  Wainwright now holds the role of Vice-President and Director.  Toenz is Secretary and Director.

### ii.  Establishment of New East 804 805

78.     On April 30, 2013, New East 804 805 was established as a limited liability company pursuant to the laws of the Commonwealth of Massachusetts.  At the time it was established, the company's managers (and the individuals with signing authority) were Al Jabri, Khalid Al Jabri and Wainwright, each listing Cadwalader's New York office as its address.

79.     As with New East US, at some point between March 12, 2018 and March 7, 2019, Al Jabri was replaced as manager and authorized signatory by his son Mohammed Al Jabri, also using Cadwalader's New York address.  Further changes were made, and the 2020 Annual

Report lists the company's managers as Khalid Al Jabri, Mohammed Al Jabri and Wainwright, with Khalid Al Jabri, Wainwright and Toenz having signatory authority.

### iii. The Boston Ritz Carlton Properties Owned by New East US and New East 804 805

80.    On December 18, 2013, New East US and New East 804 805 acquired five properties in the Millennium Place building at 580 Washington Street, a luxury condominium tower by Ritz Carlton developers.  These properties include:

a.  PH-01—a 2,654 square foot penthouse acquired by New East US for approximately $3.495 million.  The property's current assessed value is in excess of $5 million, and it is currently being rented for $14,000 per month.

b.  Unit 805—a 1,166 square foot unit, the purchase of which included a parking easement (which was signed by Khalid Al Jabri on behalf of New East 804 805), acquired by New East 804 805 for $1.04 million.  The property's current assessed value is in excess of $1.3 million, and it is currently being rented for $5,800 per month.

c.  Unit 804—a 777 square foot unit, the purchase of which included a parking easement (which was signed by Khalid Al Jabri on behalf of New East 804 805), acquired by New East 804 805 for $750,000.  The property's current assessed value just under $1 million, and it is currently being rented for $4,300 per month.

d.  Unit 714—a 799 square foot unit, the purchase of which included a parking easement (which was signed by Khalid Al Jabri on behalf of New East US), acquired by New East US for $670,000.  The property's assessed value is just under $1 million, and it is currently being rented for $4,000 per month.

e.  Unit 3E—an 814 square foot unit, the purchase of which included a parking easement (which was signed by Khalid Al Jabri on behalf of New East US), acquired by New East US for $715,000.  The property's assessed value is just under $1 million, and it is currently being rented for $3,900 per month.

81.  Al Jabri funded these purchases through a wire transfer of $6,075,000 from an account with HSBC Private Bank Switzerland to an account Al Jabri established in the name of New East US at HSBC Bank USA.  On December 11, 2013, an HSBC employee sent Al Jabri instructions to transfer "the required amount to close your real estate acquisition in the USA."  The next day, December 12, 2013, Al Jabri sent a signed authorization for the transfer from a fax machine located at Sakab's office.

82.  Plaintiff is informed and believes, and upon such information and belief alleges that Al Jabri directed, authorized and funded the purchase of these five properties at the Boston Ritz Carlton with funds he misappropriated from Plaintiff, and continues to beneficially own these properties with his sons Khalid Al Jabri and Mohammed Al Jabri, through their alter ego companies New East US and New East 804 805.

83.  Together, these five properties are estimated to be able to generate gross rental proceeds of approximately $32,000 per month.

84.  Al Jabri also established an account in the name of New East 804 805 at HSBC Bank USA.  From January to February 2014, Al Jabri transferred a total of SAR 1,126,710 (USD 300,456) from an account in the KSA to the New East 804 805 account.

85.  In addition to the transfer of funds noted above, Al Jabri also transferred an additional total of SAR 14,318,860 (USD 3,998,684) from an account in the KSA to the New East US account from January 2014 to July 2015.

b.  **Boston Mandarin Oriental and Four Seasons Properties Owned by New East Back Bay**

86.     New East Back Bay was established as a limited liability company pursuant to the laws of the Commonwealth of Massachusetts on June 23, 2015.  At that time, Al Jabri, Khalid Al Jabri and Wainwright were identified as managers.  The listed address for Al Jabri and Khalid Al Jabri was 580 Washington Street, Penthouse 1 (a property owned by New East US).

87.     The Annual Reports filed by New East Back Bay indicate that, at some point between March 12, 2018 and March 7, 2019, Mohammed Al Jabri was added as a manager.  However, between March 7, 2019 and June 23, 2020, Toenz replaced Al Jabri and Mohammed Al Jabri as manager and authorized signatory.  The 2020 Annual Report identifies the company's managers and authorized signatories as Khalid Al Jabri, Wainwright and Toenz, and the company's principal office as Cadwalader's New York address.

88.     New East Back Bay is the owner of three properties located in Boston:

    a.  On April 10, 2017, New East Back Bay acquired Unit W10-C, a 2,556 square foot property located at 776 Boylston Street, a luxury condominium building at the Mandarin Oriental in Boston, for $4.3 million.  The property's assessed value is approximately $5.9 million.  It was previously rented for $13,568 per month; it is unknown if the property is rented at this time.

    b.  On September 10, 2019, New East Back Bay acquired two properties in One Dalton Place, a luxury condominium building located at the Four Seasons in Boston:

        i.  Unit 5203 is a 1,403 square foot property purchased for $4 million.  The property's assessed value is slightly under the purchase price, and it is currently being rented for $13,000 per month.

ii.  Unit 5202 is a 2,945 square foot property purchased for $9.75 million. The property's assessed value is around $1 million less than the purchase price, and it is currently being rented for $20,000 per month.

89.  Plaintiff is informed and believes, and upon such information and belief alleges that Al Jabri directed, authorized and funded the purchase of these properties at the Boston Mandarin Oriental and Four Seasons with funds he misappropriated from Plaintiff, and continues to beneficially own these properties with his sons Khalid Al Jabri and Mohammed Al Jabri through their alter ego company New East Back Bay.

90.  In filings in a separate action in the United States District Court for the District of Columbia, Al Jabri referred to the property located at 776 Boylston Street in the Mandarin Oriental as "family owned" and a "family residence."

91.  Together, these three properties are estimated to be able to generate gross rental proceeds of approximately $46,500 per month.

92.  Al Jabri established an account in the name of New East Back Bay, held at HSBC Bank USA.  In February 2017, Al Jabri transferred of SAR 1,181,880 (USD 315,168) from an account in the KSA to the New East Back Bay account.

**I.  Discovery of the Fraudulent Scheme**

93.  As described above, based on a government direction, ownership of Sakab and the other Group Companies was transferred to TIC and the PIF.  In advance of that transfer, Ernst & Young LLP ("EY") was engaged to perform due diligence and valuation of several Group Companies.  In the course of that review, EY identified and reported irregularities to the PIF in January 2018.

29

94.     Based on these findings of irregularities, Deloitte was engaged to perform a forensic review related to the issues identified by EY.  In the course of that forensic review, Deloitte identified a number of additional issues suggesting the need for a further investigation, which were summarized in a report dated October 31, 2018.

95.     Based on that report, and TIC's growing suspicion that Al Jabri and others may have been involved in or condoned misconduct including misappropriation of funds from Group Companies, Deloitte was engaged to perform a wider forensic investigation, including all seventeen of the Group Companies created under Al Jabri's direction, with a particular focus on Sakab as the entity used as the "clearinghouse" for the Allowance funds and the conduit for disbursing funds to the other Group Companies.

96.     Deloitte presented its preliminary findings from this investigation to TIC in a report dated December 5, 2019.  Based on those findings, TIC engaged Deloitte to undertake further analysis and efforts to trace the funds that appeared to have been misappropriated from Sakab and the other Group Companies.

97.     In connection with the effort to trace the movement of these funds, Sakab brought a motion seeking a disclosure order from the Ontario Superior Court of Justice (Commercial List).  On December 18, 2020, the Honourable Justice Glenn A. Hainey of the Ontario Superior Court granted that motion, ordering the disclosure to Sakab of certain information related to funds transferred to specified individuals and entities.

98.     On January 22, 2021, as described above, Sakab and other plaintiffs brought the Ontario Action.

## COUNT ONE
### (Breach of Fiduciary Duty Against Al Jabri)

99.     Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 98 as if fully set forth herein.

100.    At all relevant times, Al Jabri had a fiduciary relationship with Plaintiff.  He exercised control over Plaintiff by selecting friends and family members to serve as Sakab's nominee shareholders and by directing the transfer of funds (i) directly from Sakab to himself and his co-conspirators and (ii) to other Group Companies, and then from those other Group Companies to himself and his co-conspirators.  He was Plaintiff's *de facto* director and manager in a position of trust, confidence and reliance.  He assumed the responsibility to act as Plaintiff's trusted agent. Al Jabri was aware of and accepted the trust and confidence placed in him.

101.    Al Jabri undertook activities on behalf of Plaintiff and customarily performed services for Sakab as part of the company's normal course of business.

102.    Al Jabri owed Plaintiff the fiduciary duties of care, loyalty, good faith and fair dealing.

103.    Al Jabri breached these duties by engaging in self-dealing and failing to act in Plaintiff's best interests.  Instead, Al Jabri put his own interests, and the interests of his family, friends and associates, above those of Plaintiff.  Al Jabri abused his position of trust to misappropriate funds from Plaintiff, and to engage in self-dealing with Plaintiff's assets.  He concealed from Plaintiff the nature and extent of his conflicts of interest, misappropriation of funds and self-dealing.

104.    As a direct and proximate result of Al Jabri's breach of these duties owed to Plaintiff, Plaintiff has suffered substantial damages.  Deloitte's forensic accounting investigation to date has identified approximately $850 million in funds that were misappropriated from Sakab

31

and paid directly to Al Jabri and his co-conspirators as a direct and proximate result of Al Jabri's actions. Had Al Jabri not engaged in his breaches of duty, Plaintiff would not have suffered these damages. Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.

105.    In equity and good conscience, Al Jabri should be required to disgorge the full amount of funds Al Jabri improperly received.

## COUNT TWO
### (Fraud Against Al Jabri)

106.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 98 as if fully set forth herein.

107.    Al Jabri engaged in and masterminded a massive fraudulent scheme to misappropriate funds from Plaintiff.

108.    He appointed his friends and family members as the purported shareholders and Board Members of Plaintiff and other Group Companies, while in fact Al Jabri controlled and directed Plaintiff's and other Group Company activities.

109.    Al Jabri's control of Plaintiff and the other Group Companies allowed him to cause those companies to improperly disburse funds to him and his co-conspirators, and to manipulate the books and records of the Group Companies in an effort to hide the misappropriations. Al Jabri, directly and indirectly, through use of fictitious paper trails, false valuations, off-the-book and unrecorded transactions and payments, payment of unlawful profit-sharing rewards and distributions, and by other fraudulent means, caused Plaintiff and other Group Companies to improperly and unlawfully, and without authorization, transfer funds to himself and his friends, family and co-conspirators, and to companies they controlled.

110.    Al Jabri knew or should have known that these transfers of funds were improper and unlawful.

111.    Plaintiff's reliance on Al Jabri's direction was reasonable and justified based on Al Jabri's role as a senior government official and as Plaintiff's *de facto* director, and based on the control he exercised over Plaintiff and the other Group Companies.

112.    As a direct and proximate result of Al Jabri's fraud and Plaintiff's reliance on Al Jabri's fraudulent actions, misrepresentations and material omissions, Al Jabri succeeded in obtaining improper and unlawful transfers of funds from Plaintiff to himself and to his co-conspirators.  Had Al Jabri not engaged in fraudulent conduct, Plaintiff would not have suffered these damages.  Deloitte's forensic accounting investigation to date has identified approximately $850 million in funds that were misappropriated from Sakab to Al Jabri and his co-conspirators. Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.

113.    Plaintiff is entitled to a determination that Defendants hold the misappropriated funds, and any property acquired with misappropriated funds, in constructive trust for the benefit of Plaintiff.

## COUNT THREE
### (Fraudulent Misrepresentation Against Al Jabri)

114.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 98 as if fully set forth herein.

115.    Al Jabri made misrepresentations of material fact to Plaintiff.  Al Jabri falsely represented that he and his co-conspirators were entitled to "reward" payments on the basis of the valuation of Group Companies.  Al Jabri further falsely represented that the Group Companies' valuations were substantially higher than could be justified by the companies' financial performance.  Al Jabri also falsely represented that Plaintiff should make these

payments, despite the fact that there was no corresponding transfer of funds from the Group

Companies to Sakab, and that no shares had been sold in and no funds had been raised by the

Group Companies at this valuation.

116.    Al Jabri also made misrepresentations that he and his co-conspirators were

entitled to "profit distributions" from Group Companies and that these payments should be made

by Plaintiff.  He falsely represented that these Group Companies had earned profits that were

well in excess of what was indicated on their audited financial statements.

117.    These misrepresentations were false and were known by Al Jabri to be false.  Al

Jabri knew or should have known that as a KSA government official he was prohibited from

earning more than his government salary through other commercial sources.  He was also aware

that, under Saudi law, it was illegal for him and his co-conspirators to receive "rewards" or

"profit distributions" from the Group Companies.  As a senior government official who exercised

control over Plaintiff and the other Group Companies, Al Jabri knew or should have known that

his representations regarding the valuation and profits of the Group Companies were inflated and

false.

118.    In reliance on Al Jabri's misrepresentations, Plaintiff made or caused to be made

transfers of very large amounts of funds to Al Jabri and his co-conspirators.

119.    Plaintiff's reliance on Al Jabri's representations were reasonable and justified

based on Al Jabri's role as senior government official and as Plaintiff's *de facto* director, and

based on the control he exercised over Plaintiff and the other Group Companies.

120.    As a direct and proximate result of Plaintiff's reliance on Al Jabri's

misrepresentations, Al Jabri succeeded in obtaining transfers of funds from Plaintiff to himself

and to his co-conspirators.  Forensic accounting investigation to date has identified

approximately $850 million in funds that were misappropriated from Sakab and paid directly to Al Jabri and his co-conspirators.  Had Al Jabri not made these fraudulent misrepresentations, Plaintiff would not have suffered these damages.  Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.

121.    Plaintiff is entitled to a determination that Defendants hold the misappropriated funds, and any property acquired with misappropriated funds, in constructive trust for the benefit of Plaintiff.

**COUNT FOUR**
**(Fraud by Omission Against Al Jabri)**

122.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraph 1 through 98 as if fully set forth herein.

123.    Al Jabri continuously concealed from Plaintiff material facts concerning the illegality and impropriety of transferring funds for "rewards," "profit distributions" and other compensation to Al Jabri and his co-conspirators.  Upon information and belief, this information was concealed from Plaintiff for the purpose of misleading Plaintiff and inducing Plaintiff to rely on and act upon a false belief that such payments were properly authorized and lawful.  Al Jabri concealed these facts in order to continue to improperly and unlawfully obtain funds from Plaintiff for himself and his co-conspirators.

124.    Al Jabri knew or should have known that these payments were improper and unlawful.  As a senior Saudi government official, he was well-aware that it was prohibited for government officials to receive more than their government salary through other commercial sources.  He was also aware that, under Saudi law, it was illegal for him and his co-conspirators to receive "rewards" or "profit distributions" from the Group Companies.

125.     These undisclosed facts were both basic and central to the transactions in question:  the transfer of funds from Plaintiff to Al Jabri and his co-conspirators.

126.     Al Jabri had a duty to disclose to Plaintiff that these payments were not legally authorized.  Because of his role as a *de facto* director of Plaintiff, and his position of control and dominance over Plaintiff, he owed a duty of care and loyalty to Plaintiff.

127.     As a direct and proximate result of Al Jabri's intentional omission of material fact, Al Jabri and his co-conspirators succeeded in their plan to illegally obtain payments from Plaintiff.  Forensic accounting investigation to date has identified approximately $850 million in funds that were misappropriated from Sakab and paid directly to Al Jabri and his co-conspirators.  Had Al Jabri not engaged in these frauds by omission, Plaintiff would not have suffered these damages.  Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.

128.     Plaintiff is entitled to a determination that Defendants hold the misappropriated funds, and any property acquired with misappropriated funds, in constructive trust for the benefit of Plaintiff.

## COUNT FIVE
### (Conversion Against Al Jabri)

129.     Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 98 as if fully set forth herein.

130.     Plaintiff had possession of funds that were allocated for anti-terrorism activities in the service of the KSA and its public interest.

131.     Al Jabri converted specific, identifiable amounts of Plaintiff's funds to his own use.  He intentionally appropriated and exercised ownership of the funds by causing them to be transferred to accounts that he controlled.  Although these transfers were in some cases described

as "rewards," "profit distributions" or "compensation," they were in fact unlawful and Al Jabri had no right to Plaintiff's funds.

132.    Al Jabri also converted specific, identifiable amounts of Plaintiff's funds by intentionally exercising control or dominion over the funds and transferring them into the possession of his co-conspirators.

133.    By so doing, Al Jabri intentionally interfered with Plaintiff's property and caused Plaintiff to be deprived of the possession or use of these funds.

134.    As a direct and proximate result of Al Jabri's actions, Plaintiff suffered damages in the specific amount of the funds that Al Jabri caused to be transferred away from Plaintiff and to himself or his co-conspirators.  Forensic accounting investigation to date has identified approximately $850 million in funds that were misappropriated from Sakab and paid directly to Al Jabri and his co-conspirators.  Had Al Jabri not converted these specific funds, Plaintiff would not have suffered these damages. Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.

135.    Plaintiff is entitled to a determination that Defendants hold the converted funds, and any property acquired with misappropriated funds, in constructive trust for the benefit of Plaintiff.

## COUNT SIX
### (Conspiracy Against All Defendants)

136.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 98 as if fully set forth herein.

137.    Defendants and their co-conspirators (named and unnamed in this complaint) had a common design or agreement to improperly obtain funds from Plaintiff and to conceal those funds throughout the world so as to make use of and benefit from them.

138.    Al Jabri committed tortious acts by directing the scheme to obtain funds from Plaintiff and, through his control and dominance, causing Plaintiff to improperly transfer funds into accounts that he controlled.

139.    Khalid Al Jabri and Mohammed Al Jabri provided substantial assistance to the scheme to obtain and conceal funds from Plaintiff.  They acted as directors and signatories to companies established as part of the effort to conceal these funds, and held properties, purchased with the improperly obtained funds, in their names.  They took affirmative steps to encourage the achievement of this scheme, including registering companies, serving as officers and directors and managing properties purchased with the funds obtained from Plaintiff.

140.    Upon information and belief, the Al Jabri Family Defendants were aware that they were contributing to a common tortious plan.

141.    As a direct and proximate cause of Defendants' and their co-conspirators' efforts to fraudulently obtain and conceal funds from Plaintiff, Plaintiff has been deprived of, and Defendants have obtained, funds.  Forensic accounting investigation to date has identified approximately $850 million in funds that were misappropriated from Sakab and paid directly to Al Jabri and his co-conspirators.  Had Defendants not engaged in this conspiracy, Plaintiff would not have suffered these damages.  Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.

142.    As a result of their conspiracy, Defendants and their co-conspirators are jointly and severally liable to Plaintiff.

## COUNT SEVEN
### (Aiding and Abetting Against Khalid Al Jabri, Mohammed Al Jabri
### New East US, New East 804 805 and New East Back Bay)

143.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 98 as if fully set forth herein.

144.    Al Jabri was an agent of, a *de facto* director of, and exercised control over Plaintiff and the other Group Companies.  Al Jabri owed a fiduciary duty of care, loyalty, good faith and fair dealing to Plaintiff.

145.    Al Jabri breached this fiduciary duty, as alleged above.

146.    Khalid Al Jabri, Mohammed Al Jabri and the New East Defendants knowingly participated in these breaches.  They assisted Al Jabri in secreting the proceeds of this breach outside of the KSA, and concealing these proceeds by investing them in luxury real estate.  They registered companies, served as officers and directors and managed properties purchased with the funds obtained from Plaintiff.

147.    Khalid Al Jabri, Mohammed Al Jabri and the New East Defendants knowingly participated in Al Jabri's defrauding of Plaintiff.  As described above, they assisted Al Jabri in secreting the proceeds of this fraud outside of the KSA, and concealing these proceeds by investing them in luxury real estate.

148.    Khalid Al Jabri, Mohammed Al Jabri and the New East Defendants knowingly participated in Al Jabri's conversion of specific funds from Plaintiff.  As described above, they assisted Al Jabri in misappropriating these funds, transferring them outside of the KSA, and concealing these funds by investing them in luxury real estate.

149.    As a direct and proximate result of Khalid Al Jabri, Mohammed Al Jabri and the New East Defendants' aiding and abetting, Plaintiff has been damaged by having significant

amounts of funds transferred away from its control, and by having those funds concealed so as to prevent Plaintiff from recovering them.  Forensic accounting investigation to date has identified approximately $850 million in funds misappropriated from Sakab and paid directly to Al Jabri and his co-conspirators.  Had Khalid Al Jabri, Mohammed Al Jabri, and the New East Defendants not aided and abetted Al Jabri's misconduct, Plaintiff would not have suffered these damages.  Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT EIGHT
### (Unjust Enrichment Against All Defendants)

150.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 98 as if fully set forth herein.

151.    Plaintiff conferred a benefit on Defendants by transferring funds to accounts controlled by Defendants.  Defendants made use of these funds to purchase luxury properties throughout the world.

152.    Defendants were enriched by the virtue of unlawfully causing Plaintiff to provide Defendants with more than $253 million in funds.  Defendants made use of these funds to purchase luxury properties for their enjoyment, and to generate significant monthly rents, and for other personal beneficial uses, which benefits Defendants received and retained.

153.    Defendants were aware that they were receiving and retaining benefits from these funds, including the ownership of real estate holdings and the rents generated therefrom, inequitably at the significant expense and to the detriment of Plaintiff because they knew that they had no right to the funds received from Plaintiff.  In fact, Defendants participated in a conspiracy to fraudulently obtain and conceal these funds.

154.    Under these circumstances, equity and good conscience require that the Defendants give restitution for their receipt of the benefits that Plaintiff conferred, in the amount of the value of the benefit conferred, which will be proven at trial.  Forensic accounting investigation to date has identified at least $253 million in funds misappropriated from Sakab and paid directly to Al Jabri.

## COUNT NINE
### (Fraudulent Transfer Against All Defendants)

155.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 98 as if fully set forth herein

156.    As a result of the improper and unauthorized transfers of funds from Plaintiff to the Al Jabri Family Defendants as part of the Fraudulent Scheme, Plaintiff is a creditor with a right to recover the amount of the misappropriated funds (plus interest and any consequential damages provided for by law) from the debtor Al Jabri Family Defendants.

157.    After incurring this debt to Plaintiff by knowingly and improperly receiving misappropriated funds, debtor Al Jabri Family Defendants fraudulently transferred a portion of those funds to the New East Defendants with the intent to hinder, delay or defraud Plaintiff, their creditor.  The Al Jabri Family Defendants' intent is evidenced by the fact that, by virtue of their control over the New East Defendants, they retained control of the transferred funds, the funds were transferred without receipt of reasonably equivalent value, and the transfer had the effect of concealing the funds from the creditor by moving them to a different country and holding them indirectly.  The fraudulent transfer of funds from the Al Jabri Family Defendants to the New East Defendants is thus subject to avoidance, as Plaintiff has a right to recover those funds.

158.    Here, the funds fraudulently transferred to the New East Defendants have been used to purchase real property.  The New East Defendants are insiders and alter egos of the Al

41

Jabri Family Defendants.  The New East Defendants are not bone fide purchasers for value without knowledge of the fraudulent transfer.  Plaintiff is entitled to recover the properties purchased by Defendants, or the value thereof, as they were acquired with the fraudulently transferred funds.

159.    As Plaintiff has an ownership interest in those funds that were misappropriated as part of the Fraudulent Scheme and fraudulently transferred to the New East Defendants, it has an ownership interest in the properties purchased with those funds.  In addition, the properties purchased by Defendants should be deemed to be held by Defendants in constructive trust for the benefit of Plaintiff, pending the avoidance of the transaction and the recovery of the properties and the fraudulently transferred funds by Plaintiff.

160.    Plaintiff also has a right to prejudgment attachment of the property acquired by the New East Defendants to ensure that the property is not dissipated before Plaintiff can obtain recovery of the fraudulently transferred funds.  Plaintiff also has a right to request the court to issue an injunction barring Defendants from any further disposition or dissipation of the properties and the fraudulently transferred funds.

**COUNT TEN**
**(Alter Ego/Piercing Corporate Veil Against**
**New East US, New East 804 805 and New East Back Bay)**

161.    Plaintiff incorporates by reference paragraphs 1 through 98 as if fully set forth herein.

162.    The New East Defendants are and at all times have been beneficially owned by the Al Jabri Family Defendants.  They act as these individuals' corporate alter egos, and are completely dominated and controlled by them.

163.    The Al Jabri Family Defendants actively and directly participate in exercising pervasive control over each of the New East Defendants.

164.    The New East Defendants engaged in a confused intermingling between their assets and those of the Al Jabri Family Defendants, which were the proceeds of fraud.  Al Jabri transferred funds to the New East Defendants without receiving equivalent consideration.

165.    The New East Defendants are owned and pervasively controlled by the Al Jabri Family Defendants.  They are used for non-corporate transactions by and for the sole benefit of the dominant members and owners (the Al Jabri Family Defendants), primarily for the purpose of promoting and enabling fraud.

166.    Through the collection of rents, they profit from the proceeds of the fraud committed by the Al Jabri Family Defendants.

167.    The New East Defendants are plagued at all material times by non-functioning officers, directors and managers, including a director located in Switzerland.

168.    Upon information and belief, the Al Jabri Family Defendants and the New East Defendants have substantially disregarded any separate nature that they might otherwise have to each other under law.

169.    Piercing the corporate veil would address the gross inequity presented by the Al Jabri Family Defendants' efforts to make use of the corporate form to conceal their ill-gotten gains from the Fraudulent Scheme.  The New East Defendants were established for the purpose of allowing the Al Jabri Family Defendants to make use of the corporate form to engage in misconduct by concealing and enjoying their misappropriated funds.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff Sakab respectfully requests that the Court:

43

a.  Enter judgment against Defendants on Plaintiff's claims and award compensatory

   damages in an amount to be determined at trial.

b.  Issue an order confirming that Defendants hold their assets in the Commonwealth

   of Massachusetts in constructive trust for the benefit of Plaintiff, including:

   i.  Millennium Plaza (580 Washington Street, Boston, MA 02111), PH-01,

       held by New East US;

   ii.  Millennium Plaza (580 Washington Street, Boston, MA 02111), Unit 805,

       held by New East 804 805;

   iii.  Millennium Plaza (580 Washington Street, Boston, MA 02111), Unit 804,

       held by New East 804 805;

   iv.  Millennium Plaza (580 Washington Street, Boston, MA 02111), Unit 714,

       held by New East US;

   v.  Millennium Plaza (580 Washington Street, Boston, MA 02111), Unit 3E,

       held by New East US;

   vi.  Mandarin Oriental (776 Boylston Street, Boston, MA 02199), Unit

       W10-C, held by New East Back Bay;

   vii.  One Dalton Place (1 Dalton Street, Boston, MA 02115), Unit 5203, held

       by New East Back Bay;

   viii.  One Dalton Place (1 Dalton Street, Boston, MA 02115), Unit 5203, held

       by New East Back Bay.

c.  Order the disgorgement of rents received by Defendants from the properties

   owned by New East US, New East 804 805 and New East Back Bay, as these

   properties were acquired pursuant to the Fraudulent Scheme and the rents were

therefore received by Defendants as constructive trustees for the benefit of Plaintiff.

d. Order that the corporate veil of New East US, New East 804 805 and New East Back Bay is pierced and that these companies and their beneficial owners Al Jabri, Khalid Al Jabri and Mohammed Al Jabri be held jointly liable.

e. Issue an order of attachment of the assets held by Defendants in the Commonwealth of Massachusetts that were acquired as part of the Fraudulent Scheme, including:

  i. Millennium Plaza (580 Washington Street, Boston, MA 02111), PH-01, held by New East US;

  ii. Millennium Plaza (580 Washington Street, Boston, MA 02111), Unit 805, held by New East 804 805;

  iii. Millennium Plaza (580 Washington Street, Boston, MA 02111), Unit 804, held by New East 804 805;

  iv. Millennium Plaza (580 Washington Street, Boston, MA 02111), Unit 714, held by New East US;

  v. Millennium Plaza (580 Washington Street, Boston, MA 02111), Unit 3E, held by New East US;

  vi. Mandarin Oriental (776 Boylston Street, Boston, MA 02199), Unit W10-C, held by New East Back Bay;

  vii. One Dalton Place (1 Dalton Street, Boston, MA 02115), Unit 5203, held by New East Back Bay;

       viii.  One Dalton Place (1 Dalton Street, Boston, MA 02115), Unit 5203, held by New East Back Bay.

f.  Order the appointment of a receiver to secure control of the assets held by Defendants in the Commonwealth of Massachusetts that were acquired as part of the Fraudulent Scheme, and to collect and hold rents from those properties, pending resolution of Plaintiff's claims.

g.  Enjoin Defendants from selling, transferring, disposing of, dissipating, mortgaging, concealing or secreting any of their assets in the Commonwealth of Massachusetts, or allowing such assets to become subject to a security interest or lien, except upon approval by this Court.

h.  Award pre- and post-judgment interest as allowed by law.

i.  Award attorneys' fees and costs, as allowed by law.

j.  Award all such other and further relief in Plaintiff's favor as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

SAKAB SAUDI HOLDING COMPANY,

By its attorneys,

/s/  Richard M. Zielinski
Richard M. Zielinski (BBO#540060)
Douglas B. Rosner (BBO# 559963)
Denis M. King (BBO# 555838)
GOULSTON & STORRS PC
400 Atlantic Avenue
Boston, Massachusetts 02110-3333
Telephone: (617) 482-1776
Facsimile: (617) 574-4112
rzielinski@goulstonstorrs.com
drosner@goulstonstorrs.com
dking@goulstonstorrs.com

　　　　-and-

William R. Stein
Samuel W. Salyer
HUGHES HUBBARD & REED LLP
1775 I St., N.W.
Washington, D.C. 200006
Telephone: (202) 721-4600
Facsimile: (202) 721-4646
william.stein@hugheshubbard.com
samuel.salyer@hugheshubbard.com
(Pro Hac Vice Admission Request Forthcoming)

-and-

Neil J. Oxford
Meaghan Gragg
HUGHES HUBBARD & REED LLP

One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 299-6000
neil.oxford@hugheshubbard.com
meaghan.gragg@hugheshubbard.com
(Pro Hac Vice Admission Request Forthcoming)

Dated: March 24, 2021

**VERIFICATION**

I Abdulaziz Alnowaiser, under the pains and penalties of perjury, hereby depose and say that I am the Chief Executive Officer of Tahakom Investments Company and the General Manager of Sakab Saudi Holding Company, the plaintiff in this action, and that I have read the allegations in the foregoing Verified Complaint and, as to each statement of fact alleged therein, I hereby affirm and verify that each such fact is true to my knowledge, except where they are alleged on information and belief, in which case I believe them to be true.

Signed under the pains and penalties of perjury on this ____ day of March 2021

_____

Abdulaziz Alnowaiser
CEO, Tahakom Investments Company
General Manager, Sakab Saudi Holding Company

**<u>EXHIBIT 1</u>**

Court File No.   CV-21-00655418-00CL

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE | ) | FRIDAY, THE 22nd DAY OF |
| JUSTICE GILMORE | ) | JANUARY, 2021 |
| | ) | |

B E T W E E N:

**SAKAB SAUDI HOLDING COMPANY, ALPHA STAR AVIATION SERVICES COMPANY, ENMA AL ARED REAL ESTATE INVESTMENT AND DEVELOPMENT COMPANY, KAFA'AT BUSINESS SOLUTIONS COMPANY, SECURITY CONTROL COMPANY, ARMOUR SECURITY INDUSTRIAL MANUFACTURING COMPANY, SAUDI TECHNOLOGY & SECURITY COMPREHENSIVE CONTROL COMPANY, TECHNOLOGY CONTROL COMPANY, NEW DAWN CONTRACTING COMPANY and SKY PRIME INVESTMENT COMPANY**

Plaintiffs

- and -

**SAAD KHALID S AL JABRI, DREAMS INTERNATIONAL ADVISORY SERVICES LTD., 1147848 B.C. LTD., NEW EAST (US) INC., NEW EAST 804 805 LLC, NEW EAST BACK BAY LLC, NEW EAST DC LLC, JAALIK CONTRACTING LTD., NADYAH SULAIMAN A AL JABBARI, KHALID SAAD KHALID AL JABRI, MOHAMMED SAAD KH AL JABRI, NAIF SAAD KH AL JABRI, SULAIMAN SAAD KHALID AL JABRI, HISSAH SAAD KH AL JABRI, SALEH SAAD KHALID AL JABRI, CANADIAN GROWTH INVESTMENTS LIMITED, GRYPHON SECURE INC., INFOSEC GLOBAL INC. and QFIVE GLOBAL INVESTMENT INC.**

Defendants

# ORDER

## <u>NOTICE</u>

If you, the Defendant Saad Khalid S Al Jabri ("Al Jabri"), disobey this order you may be held to be in contempt of court and may be imprisoned, fined or have your assets seized.  You are entitled to apply on at least twenty-four (24) hours notice to

HHR-2554

the Plaintiffs, for an order granting you sufficient funds for ordinary living expenses and legal advice and representation.

Any other person who knows of this order and does anything which helps or permits Al Jabri to breach the terms of this Order may also be held to be in contempt of court and may be imprisoned, fined or have their assets seized.

THIS MOTION, made by the Plaintiffs, without notice, for an interim Order in the form of a *Mareva* injunction restraining the Defendant Al Jabri from dissipating his assets and other relief, was heard this day by judicial videoconference via Zoom due to the COVID-19 pandemic.

ON READING the Motion Record, including the Notice of Motion; the Affidavit of Abdulaziz Alnowaiser sworn January 18, 2021; the Affidavit of Neil David Hargreaves sworn January 18, 2021; the Affidavit of Abdulaziz Hamad Al Fahad sworn January 17, 2021; the Affidavit of James Bart Holladay sworn January 18, 2021; the Affidavit of Elizabeth Wozniak sworn January 18, 2021; and the Factum and Book of Authorities of the Plaintiffs;

AND ON NOTING the undertaking of the Plaintiffs to abide by any Order this Court may make concerning damages arising from the granting and enforcement of this Order;

AND UPON hearing the submissions of the lawyers for the Plaintiffs;

**_Mareva_ Injunction**

1.      THIS COURT ORDERS that Al Jabri, and his servants, employees, agents, assigns and anyone else acting on his or their behalf or in conjunction with any of them, and any and all persons with notice of this injunction, are restrained from directly or indirectly, by any means whatsoever:

- 3 -

(a)     selling, removing, disposing of, dissipating, alienating, transferring, assigning, encumbering, or similarly dealing with any of Al Jabri's assets, or any assets in which he has any type of interest, wherever situate, including but not limited to:

    (i)     Dreams International Advisory Services Ltd., 1147848 B.C. Ltd., New East (US) Inc., New East 804 805 LLC, New East Back Bay LLC, New East DC LLC and Jaalik Contracting Ltd, including any property or assets held directly or indirectly of any of them; and

    (ii)    the accounts and assets listed in **Schedule "1"**, **Schedule "2"**, **Schedule "3"**, **Schedule "4"**, **Schedule "5"**, **Schedule "6"** and **Schedule "7"** hereto;

(b)     instructing, requesting, counselling, demanding, or encouraging any other person to do so; and

(c)     facilitating, assisting in, aiding, abetting, or participating in any acts the effect of which is to do so.

2.     THIS COURT ORDERS that paragraph 1 applies to all of Al Jabri's assets whether or not they are in his own name and whether they are solely or jointly owned.  For the purpose of this Order, Al Jabri's assets include, but are not limited to:

(a)     any asset which he has the power, directly or indirectly, to dispose of or deal with as if it were his own.  Al Jabri is to be regarded as having such power if a third party holds or controls the assets in accordance with his direct or indirect instructions;

- 4 -

(b)      anything regarded in law or equity as property or as an interest in property, any

right or interest that can be transferred for value from one person to another, any

right, including a contingent or future right, to be paid money or receive any other

kind of property, and any cause of action in which Al Jabri has any interest;

(c)      any bank, investment or other account of Al Jabri at any bank, financial or other

institution;

(d)      any motor vehicle, trailer, or other vehicle registered to Al Jabri;

(e)      any real property in which Al Jabri has any interest;

(f)      any and all other personal property of Al Jabri; and

(g)      any and all share certificates, negotiable instruments and the like of Al Jabri.

3.      THIS COURT ORDERS that, without limiting the scope of paragraph 1, Al Jabri is further

prohibited from dealing with or using in any manner any secured credit, including but not limited

to any credit card, loan, or line of credit, for which payment is secured against any personal or real

property in which Al Jabri has any interest, pending further order of this Court.

**Ordinary Living Expenses**

4.      THIS COURT ORDERS that Al Jabri may apply for an Order, on at least twenty-four (24)

hours notice to the Plaintiffs, specifying the amount of funds which Al Jabri is entitled to spend

on ordinary living expenses and legal advice and representation.

HHR-2557

**Disclosure of Information**

5.      THIS COURT ORDERS that Al Jabri prepare and provide to the Plaintiffs within ten (10) days of the date of service of this Order, a sworn statement detailing the nature, value, and location of his assets worldwide, including all assets referred to in paragraph 2 herein, whether in his own name or not and whether solely or jointly owned or whether held in trust for any other party.

6.      THIS COURT ORDERS that Al Jabri submit to examinations under oath within ten (10) days of the delivery by Al Jabri of the aforementioned sworn statement.

7.      THIS COURT ORDERS that if Al Jabri refuses to provide the information referred to in paragraph 5 herein, he is contempt of court and may render Al Jabri liable to be imprisoned, fined, or have his assets seized.

**Third Parties**

8.      THIS COURT ORDERS the banks listed in **Schedule "1"**, **Schedule "2"**, **Schedule "3"**, **Schedule "4"**, **Schedule "5"**, **Schedule "6"** and **Schedule "7"** and any other banks, financial institutions or other financial entities that are served with a copy of this Order (the "Banks") to forthwith freeze and prevent any removal or transfer of monies or assets of Al Jabri held in any account or on credit on behalf of Al Jabri, with the Banks, until further Order of the Court, including but not limited to the accounts listed in **Schedule "1"**, **Schedule "2"**, **Schedule "3"**, **Schedule "4"**, **Schedule "5"**, **Schedule "6"** and **Schedule "7"** hereto.

9.      THIS COURT ORDERS that the Banks forthwith disclose and deliver up to the Plaintiffs any and all records held by the Banks concerning Al Jabri's assets, accounts and safety deposit

boxes, including the existence, nature, value and location of any monies or assets or credit, wherever situate, held on behalf of Al Jabri by the Banks.

10.      THIS COURT ORDERS that any of the Banks that know or become aware of any safety deposit box held by or on behalf of Al Jabri are directed to forthwith advise the Plaintiffs of the location of such safety deposit boxes and provide the Plaintiffs, or such other person as authorized to act on behalf of the Plaintiffs, with access to such safety deposit boxes, including without limitation, access to the contents of such safety deposit boxes.

**Variation, Discharge or Extension of Order**

11.      THIS COURT ORDERS that anyone served with or notified of this Order may apply to the Court at any time to vary or discharge this order, on four (4) days notice to the Plaintiffs.

12.      THIS COURT ORDERS that the Plaintiffs shall apply for an extension of this Order on February 1, 2021, failing which this Order will terminate.

**Service**

13.      THIS COURT ORDERS that service of this Order may be effected by delivering same to any party located in Ontario by email, PDF or facsimile.

**Foreign Proceedings**

14.      THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the British Virgin Islands, the Kingdom of Saudi Arabia, Switzerland, Turkey, the United Kingdom, and the United States, or in any other foreign jurisdiction necessary, to give effect to this Order and to assist the Plaintiffs and

- 7 -

its respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Plaintiffs as may be necessary or desirable to give effect to this Order.

15.    Insofar as this Order purports to have any effect outside of the territorial jurisdiction of this court, no person shall be affected by it or concerned by the terms of it until this Order is declared enforceable or registered or enforced by a foreign court of competent jurisdiction for that purpose, unless that person is:

     (a)     a party to this action or any agent of a party to this action; or

     (b)     a person who is subject to the judicial jurisdiction of this court, who has received written notice of this Order within the territorial jurisdiction of this court.

_____
    THE HONOURABLE JUSTICE GILMORE

**SCHEDULE "1"**

**Assets in Canada**

**Bank Accounts**

| Bank | Asset | Account Holder | Account Number |
|------|-------|----------------|----------------|
| HSBC Bank Canada | Bank Account | Saad Khalid S Al Jabri | 051-028727-150 |

**Real Estate**

| Person / Entity in Possession | Asset | Description |
|-------------------------------|-------|-------------|
| 1147848 B.C. Ltd | Real Estate | 14 The Bridle Path, Toronto, M2L 1C8; PIN 10126 – 0242; Described as: PT LT 8 CON2 EYS TWP OF YORK AS IN TB288346 EXCEPT THE EASEMENT THEREIN; TORONTO (N YORK), CITY OF TORONTO |

## SCHEDULE "2"

### Assets in the Kingdom of Saudi Arabia

**Bank Accounts**

| Bank | Asset | Account Holder | Account Number |
|---|---|---|---|
| Alawwal Bank | Bank Account | Saad Khalid S Al Jabri | SA1450000000010374772001 |
| Alawwal Bank | Bank Account | Saad Khalid S Al Jabri | 010374772028 |
| Alawwal Bank | Bank Account | Saad Khalid S Al Jabri | SA4250000000010374772079 |
| Alawwal Bank | Bank Account | Saad Khalid S Al Jabri | SA1750000000010374772044 |
| Alawwal Bank | Bank Account | Saad Khalid S Al Jabri | SA2050000000010374772087 |
| Alawwal Bank | Bank Account | Saad Khalid S Al Jabri | SA3950000000010374772036 |
| Alawwal Bank | Bank Account | Saad Khalid S Al Jabri | SA7050000000010374772060 |
| Alawwal Bank | Bank Account | Saad Khalid S Al Jabri | SA9250000000010374772052 |
| Alawwal Bank | Bank Account | Jaalik Contracting Ltd. | SA1150000000038045737015 |
| Alawwal Bank | Bank Account | Jaalik Contracting Ltd. | SA3350000000038045737007 |
| Banque Saudi Fransi | Bank Account | Jaalik Contracting Ltd. | 89083800124 |
| National Commercial Bank – Saudi Arabia | Bank Account | Saad Khalid S Al Jabri | 25747544000108 |
| National Commercial Bank – Saudi Arabia | Bank Account | Saad Khalid S Al Jabri | 25747544000206 |

| Bank | Asset | Account Holder | Account Number |
|---|---|---|---|
| Riyad Bank | Bank Account | Saad Khalid S Al Jabri | 2390006410440 |
| Riyad Bank | Bank Account | Saad Khalid S Al Jabri | 2390006419906 |
| Riyad Bank | Bank Account | Saad Khalid S Al Jabri | 2660027919940 |
| Riyad Bank | Bank Account | Saad Khalid S Al Jabri | 2660027910440 |
| Riyad Bank | Bank Account | Saad Khalid S Al Jabri | 2660027913840 |
| Riyad Bank | Bank Account | Saad Khalid S Al Jabri and AbdulRahman Khaled Saadallah AlJabri | 2390182669940 |
| Samba Financial Group SJSC | Bank Account | Saad Khalid S Al Jabri | 2610341164 |
| Samba Financial Group SJSC | Bank Account | Saad Khalid S Al Jabri | 2640069160 |
| Samba Financial Group SJSC | Bank Account | Jaalik Contracting Ltd. | 2807002609 |
| Saudi British Bank | Bank Account | Saad Khalid S Al Jabri | 020-007498-001 |

**Real Estate**

| Person / Entity in Possession | Asset | Description |
|---|---|---|
| Saad Khalid S Al Jabri | Real Estate | Deed No. 310111004681<br><br>Plot No. 1728, Block No. 139 of plan No. 2924 located in Al-Falah Neighborhood in the city of Riyadh |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 910120029195<br><br>Plot No. 295, Block No. 16 of plan No. 3119 located in Qurtuba Neighborhood in the city of Riyadh |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 410108034053<br><br>Plot No. 296, Block No. 16 of plan No. 3119 located in Qurtuba Neighborhood in the city of Riyadh |
| Saad Khalid S Al Jabr | Real Estate | Deed No. 310105034341<br><br>Plot No. 1932/2 of plan No. 2825 located in Al Hazm Neighborhood in the city of Riyadh |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 310107032212<br><br>Plot No. 191, Block No. 21 of plan No. 2163 located in Shabra Neighborhood in the city of Riyadh |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 320107000839<br><br>Plot No. 4, Block No. 55 of plan No. 1/7/78/[letter *ba'*] located in Batha Quraish Neighborhood in the city Mecca |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 420219007961<br><br>Plot No. 170, of plan No. 302/[letter *jim*]/[letter *sin*] located in South Obhur Neighborhood in the city of Jeddah |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 620118002302<br><br>Plot No. 133, of plan No. 1/15/23/[letter *ba'*] located in Prince Abdullah Al-Faisal Al-Shisha Neighborhood in Mecca |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 520211017433 |

| Person / Entity in Possession | Asset | Description |
|---|---|---|
| | | Flat No. 3/1, Third floor of Buildings situated on an unnumbered plot of plan No. 459/[letter *ba'*] located in Al-Shati Neighborhood in Jeddah |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 240114004385<br><br>The entire remaining part of the land located in southern Al Hurra Al Gharbiya Neighborhood in Medina |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 320220013373<br><br>Plot No. 19/[letter *ba'*], of plan No. 272/[letter *ba'*], located in Al-Zumurud Neighborhood in Jeddah |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 920215021391<br><br>The remaining parts of plot No. 227, of plan No. South Obhur located in South Obhur Neighborhood in Jeddah |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 310117029316<br><br>Plot No. 31/2, of plan No. 205, located in Al-Raid Neighborhood in the city of Riyadh |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 310117029317<br><br>Plot No. 31/3, of plan No. 205, located in Al-Raid Neighborhood in the city of Riyadh |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 310117029321<br><br>Plot No. 34/3, of plan No. 205, located in Al-Raid Neighborhood in the city of Riyadh |
| Saad Khalid S Al Jabri | Real Estate | Deed No. 310113063232<br><br>Plot No. 36/2, of plan No. 205, located in Al-Raid Neighborhood in the city of Riyadh |
| Nadyah Sulaiman A Aljabbari | Real Estate | Deed No. 310116008543<br><br>Plot No. 472, of plan No. 2301, located in Al Khaleej Neighborhood in the city of Riyadh |
| Nadyah Sulaiman A Aljabbari | Real Estate | Deed No. 310121030831 |

| Person / Entity in Possession | Asset | Description |
|---|---|---|
| | | Plot No. 1732, Block No. 139 of plan No. 2924 located in Al Falah Neighborhood in the city of Riyadh |
| Nadyah Sulaiman A Aljabbari | Real Estate | Deed No. 610116038809<br><br>Plot No. 35, of plan No. 2688, located in Al Janadriyah Neighborhood in Riyadh |
| Khalid Saad Khalid Al Jabri | Real Estate | Deed No. 810122036301<br><br>Plot No. 34/2, of plan No. 205, located in Al-Raid Neighborhood in the city of Riyadh |
| Saleh Saad Khalid Al Jabri | Real Estate | Deed No. 510112043372<br><br>Plot No. 35/1, of plan No. 205, located in Al-Raid Neighborhood in the city of Riyadh |
| Omar Saad Khalid al Jabri | Real Estate | Deed No. 310112043369<br><br>Plot No. 37/3, of plan No. 205, located in Al-Raid Neighborhood in the city of Riyadh |
| Naif Saad KH Al Jabri | Real Estate | Deed No. 910112043371<br><br>Plot No. 37/1, of plan No. 205, located in Al-Raid Neighborhood in the city of Riyadh |
| Sulaiman Saad Khalid Al Jabri | Real Estate | Deed No. 410112043375<br><br>Plot No. 33/1, of plan No. 205, located in Al-Raid Neighborhood in the city of Riyadh |
| Hissah Saad KH Al Jabri | Real Estate | Deed No. 910112043374<br><br>Plot No. 31/4, of plan No. 205, located in Al-Raid Neighborhood in the city of Riyadh |
| Hissah Saad KH Al Jabri | Real Estate | Deed No. 510105046583<br><br>Plot No. 883, Block No. 728 of plan No. 1637 located in Al Yasmin Neighborhood in the city of Riyadh |

## SCHEDULE "3"

### Assets in Switzerland

**Bank Accounts**

| Bank | Asset | Account Holder | Account Number |
|------|-------|----------------|----------------|
| HSBC Private Bank (Suisse) SA | Bank Account | Saad Khalid S Al Jabri | CH0708689050913184674 |
| HSBC Private Bank (Suisse) SA | Bank Account | Saad Khalid S Al Jabri | 1502433 |
| HSBC Private Bank (Suisse) SA | Bank Account | Saad Khalid S Al Jabri | 13309779 |
| HSBC Private Bank (Suisse) SA | Bank Account | Dreams International Advisory Ltd. | CH4708689050914082271 |
| HSBC Private Bank (Suisse) SA | Bank Account | Dreams International Advisory Ltd. | 14343334 |

## SCHEDULE "4"

### Assets in Turkey

**Bank Accounts**

| Bank | Asset | Account Holder | Account Number |
|------|-------|----------------|----------------|
| HSBC Bank A.S. | Bank Account | Saad Khalid S Al Jabri | TR510012300482102065377599 |
| Turkiye Cumhuriyeti Ziraat Bankasi A.S. | Bank Account | Saad Khalid S Al Jabri | TR480001000202749473005003 |
| Turkiye Cumhuriyeti Ziraat Bankasi A.S. | Bank Account | Saad Khalid S Al Jabri | TR210001000202749473005004 |
| Turkiye Garanti Bankasi A.S. | Bank Account | Saad Khalid S Al Jabri | TR940006200136600009097977 |
| Turkiye Garanti Bankasi A.S. | Bank Account | Saad Khalid S Al Jabri | TR240006200136600009097976 |

**SCHEDULE "5"**

**Assets in the United Kingdom**

**Bank Accounts**

| Bank | Asset | Account Holder | Account Number |
|------|-------|----------------|----------------|
| Citibank UK | Bank Account | Saad Khalid S Al Jabri | Unknown |
| HSBC UK | Bank Account | Saad Khalid S Al Jabri | 91832514 |
| Royal Bank of Scotland | Bank Account | Saad Khalid S Al Jabri | 00100385 |

## SCHEDULE "6"

### Assets in the United States – Massachusetts

**Bank Accounts**

| Bank | Asset | Account Holder | Account Number |
|---|---|---|---|
| HSBC Bank USA NA | Bank Account | New East 804 805 LLC | 0605184356 |
| HSBC Bank USA NA | Bank Account | New East Back Bay LLC | 0605183929 |
| HSBC Bank USA NA | Bank Account | New East (US) Inc. | 0605184364 |

**Real Estate**

| Person / Entity in Possession | Asset | Description |
|---|---|---|
| New East Back Bay LLC | Real Estate | Unit W10-C, Mandarin Oriental, 776 Boylston Street, Boston, Massachusetts, USA<br>Parcel 0401037856 |
| New East Back Bay LLC | Real Estate | Unit 5203, Four Seasons Boston, One Dalton Place, Boston, Massachusetts, USA<br>Parcel 0401149310 |
| New East Back Bay LLC | Real Estate | Unit 5202, Four Seasons Boston, One Dalton Place, Boston, Massachusetts, USA<br>Parcel 0401149308 |
| New East (US) Inc. | Real Estate | Pent House PH-01, Millennium Place, 580 Washington Street, Boston Massachusetts, USA<br>Parcel 0304488502 |
| New East (US) Inc. | Real Estate | Unit 714, Millennium Place, 580 Washington Street, Boston, Massachusetts, USA<br>Parcel 0304488242 |

- 2 -

| Person / Entity in Possession | Asset | Description |
|---|---|---|
| New East (US) Inc. | Real Estate | Unit 3E, Millennium Place, 580 Washington Street, Boston, Massachusetts, USA<br><br>Parcel 0304488052 |
| New East 804 805 LLC | Real Estate | Unit 805, Millennium Place, 580 Washington Street, Boston, Massachusetts, USA<br><br>Parcel 0304488266 |
| New East 804 805 LLC | Real Estate | Unit 804, Millennium Place, 580 Washington Street, Boston, Massachusetts, USA<br><br>Parcel 0304488264 |

HHR-2571

## SCHEDULE "7"

### Assets in the United States – District of Columbia

**Bank Accounts**

| Bank | Asset | Account Holder | Account Number |
|------|-------|----------------|----------------|
| HSBC Bank USA NA | Bank Account | New East DC LLC | 0605187223 |
| HSBC Bank USA NA | Bank Account | Saad Khalid S Al Jabri | 389-09170-7 |

**Real Estate**

| Person / Entity in Possession | Asset | Description |
|-------------------------------|-------|-------------|
| New East DC LLC | Real Estate | Millennium Square Condominium – 111 23rd Street, NW, in Washington DC – Penthouse<br><br>Deed: 2008094210 |

**<u>EXHIBIT 2</u>**

Court File No.   CV-21-00655418-00CL

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE | ) | FRIDAY, THE 22nd DAY OF |
| JUSTICE GILMORE | ) | JANUARY, 2021 |
| | ) | |

B E T W E E N:

**SAKAB SAUDI HOLDING COMPANY, ALPHA STAR AVIATION
SERVICES COMPANY, ENMA AL ARED REAL ESTATE INVESTMENT
AND DEVELOPMENT COMPANY, KAFA'AT BUSINESS SOLUTIONS
COMPANY, SECURITY CONTROL COMPANY, ARMOUR SECURITY
INDUSTRIAL MANUFACTURING COMPANY, SAUDI TECHNOLOGY
& SECURITY COMPREHENSIVE CONTROL COMPANY,
TECHNOLOGY CONTROL COMPANY, NEW DAWN CONTRACTING
COMPANY and SKY PRIME INVESTMENT COMPANY**

Plaintiffs

- and -

**SAAD KHALID S AL JABRI, DREAMS INTERNATIONAL ADVISORY SERVICES
LTD., 1147848 B.C. LTD., NEW EAST (US) INC., NEW EAST 804 805 LLC, NEW EAST
BACK BAY LLC, NEW EAST DC LLC, JAALIK CONTRACTING LTD., NADYAH
SULAIMAN A AL JABBARI, KHALID SAAD KHALID AL JABRI, MOHAMMED
SAAD KH AL JABRI, NAIF SAAD KH AL JABRI, SULAIMAN SAAD KHALID AL
JABRI, HISSAH SAAD KH AL JABRI, SALEH SAAD KHALID AL JABRI, CANADIAN
GROWTH INVESTMENTS LIMITED, GRYPHON SECURE INC., INFOSEC GLOBAL
INC. and QFIVE GLOBAL INVESTMENT INC.**

Defendants

# ORDER

THIS MOTION, made without notice by the Plaintiffs, for an Order pursuant to section

101 of the *Courts of Justice Act*, RSO 1990, c C.43, as amended (the "CJA") and Rule 41 of the

*Rules of Civil Procedure* appointing KSV Restructuring Inc. ("KSV") as receiver and manager (in

HHR-2574

such capacities, the "Receiver"), without security, over certain assets and properties of the defendants New East (US) Inc., New East 804 805 LLC, New East Back Bay LLC and New East DC LLC (collectively, the "New East Companies"); and QFive Global Investment Inc. ("QFive", and together with the New East Companies, the "Defendants"), was heard this day by judicial videoconference via Zoom due to the COVID-19 pandemic.

ON READING the Motion Record, including the Notice of Motion; the Affidavit of Abdulaziz Alnowaiser sworn January 18, 2021; the Affidavit of Neil David Hargreaves sworn January 18, 2021; the Affidavit of Abdulaziz Hamad Al Fahad sworn January 17, 2021; the Affidavit of James Bart Holladay sworn January 18, 2021; the Affidavit of Elizabeth Wozniak sworn January 18, 2021; the Factum and Book of Authorities of the Plaintiffs; and the consent of KSV to act as the Receiver;

AND UPON hearing the submissions of the lawyers for the Plaintiffs:

**Service**

1.      THIS COURT ORDERS that the time for service of the Notice of Motion and the Motion is hereby abridged and validated so that this motion is properly returnable today and hereby dispenses with further service thereof.

**Appointment**

2.      THIS COURT ORDERS that pursuant to section 101 of the CJA and Rule 41 of the *Rules of Civil Procedure*, KSV is appointed Receiver, without security, of the Defendants in respect of the following assets and properties, including all rents arising therefrom and proceeds thereof (the "Property"):

-3-

(a)     New East (US) Inc.:

    (i)     580 Washington Street, Unit PH-01, Boston, Massachusetts, USA (Parcel 0304488502);

    (ii)    580 Washington Street, Unit 714, Boston, Massachusetts, USA (Parcel 0304488242); and

    (iii)   580 Washington Street, Unit 3E Boston, Massachusetts, USA (Parcel 0304488052).

(b)     New East 804 805 LLC:

    (i)     580 Washington Street, Unit 805, Boston, Massachusetts, USA (Parcel 0304488266); and

    (ii)    580 Washington Street, Unit 804, Boston, Massachusetts, USA (Parcel 0304488264).

(c)     New East Back Bay LLC:

    (i)     776 Boylston Street, Unit W10-C, Boston, Massachusetts, USA (Parcel 0401037856);

    (ii)    One Dalton Place, Unit 5203, Boston, Massachusetts, USA (Parcel 0401149310); and

    (iii)   One Dalton Place, Unit 5202, Boston, Massachusetts, USA (Parcel 0401149308).

(d)     New East DC LLC:

    (i)     1111 23rd Street NW, Unit PH-1D, Washington, DC, USA.

(e)     QFive Global Investment Inc.:

    (i)     400,000 common shares in Canadian Growth Investments Limited.

-4-

3.      THIS COURT ORDERS that KSV's appointment as Receiver of each of the New East Companies shall only become effective once recognized by any court, tribunal, regulatory or administrative body having jurisdiction in the United States over each of the New East Companies, respectively.

4.      THIS COURT ORDERS that Lax O'Sullivan Lisus Gottlieb LLP be appointed as counsel to the Receiver.

**Receiver's Powers**

5.      THIS COURT ORDERS that the Receiver is hereby empowered and authorized, but not obligated, to act at once in respect of the Property and, without in any way limiting the generality of the foregoing, the Receiver is hereby expressly empowered and authorized to do any of the following where the Receiver considers it necessary or desirable:

> (a)      to take possession of and exercise control over the Property and any and all proceeds, receipts and disbursements arising out of or from the Property;

> (b)      to receive, preserve, and protect the Property, or any part or parts thereof, including, but not limited to, the changing of locks and security codes, the relocating of Property to safeguard it, the engaging of independent security personnel, the taking of physical inventories and the placement of such insurance coverage as may be necessary or desirable;

> (c)      to manage, operate, and carry on the business of the Defendants that relates to the Property, including the powers to enter into any agreements, incur any obligations in the ordinary course of business, cease to carry on all or any part

-5-

of the business, or cease to perform any contracts of the Defendants that relate
to the Properties;

(d)     to engage consultants, appraisers, agents, experts, auditors, accountants,
managers, counsel and such other persons from time to time and on whatever
basis, including on a temporary basis, to assist with the exercise of the Receiver's
powers and duties, including without limitation those conferred by this Order;

(e)     to purchase or lease such machinery, equipment, inventories, supplies, premises
or other assets to continue the business of the Defendants that relates to the
Property or any part or parts thereof;

(f)     to receive and collect all monies and accounts now owed or hereafter owing to
the Defendants that relate to the Property and to exercise all remedies of the
Defendants in collecting such monies, including, without limitation, to enforce
any security held by the Defendants that relate to the Property;

(g)     to settle, extend or compromise any indebtedness owing to the Defendants that
relate to the Property;

(h)     to execute, assign, issue and endorse documents of whatever nature in respect of
any of the Property, whether in the Receiver's name or in the name and on behalf
of the Defendants, for any purpose pursuant to this Order;

(i)     to initiate, prosecute and continue the prosecution of any and all proceedings and
to defend all proceedings now pending or hereafter instituted with respect to the
Property or the Receiver, and to settle or compromise any such proceedings. The

-6-

authority hereby conveyed shall extend to such appeals or applications for judicial review in respect of any order or judgment pronounced in any such proceeding;

(j)      to market any or all of the Property held by the New East Companies, including advertising and soliciting offers in respect of the Property or any part or parts thereof and negotiating such terms and conditions of lease as the Receiver in its discretion may deem appropriate for the purposes of leasing the Property;

(k)      to lease the Property or any part or parts thereof out of the ordinary course of business,

(l)      to report to, meet with and discuss with such affected Persons (as defined below) as the Receiver deems appropriate on all matters relating to the Property and the receivership, and to share information, subject to such terms as to confidentiality as the Receiver deems advisable;

(m)      to register a copy of this Order and any other Orders in respect of the Property against title to any of the Property;

(n)      to apply for any permits, licences, approvals or permissions as may be required by any governmental authority and any renewals thereof for and on behalf of and, if thought desirable by the Receiver, in the name of the Defendants;

(o)      to exercise any shareholder, partnership, joint venture or other rights which the Defendants may have that relate to the Property; and

> (p)    to take any steps reasonably incidental to the exercise of these powers or the performance of any statutory obligations.

and in each case where the Receiver takes any such actions or steps, it shall be exclusively authorized and empowered to do so, to the exclusion of all other Persons (as defined below), including the Defendants, and without interference from any other Person.

**Duty to Provide Access and Co-Operation to the Receiver**

6.    THIS COURT ORDERS that (i) the Defendants, (ii) all of their current and former directors, officers, employees, agents, accountants, legal counsel and shareholders, and all other persons acting on their instructions or behalf, and (iii) all other individuals, firms, corporations, governmental bodies or agencies, or other entities having notice of this Order (all of the foregoing, collectively, being "Persons" and each being a "Person") shall forthwith advise the Receiver of the existence of any Property in such Person's possession or control, shall grant immediate and continued access to the Property to the Receiver, and shall deliver all such Property to the Receiver upon the Receiver's request.

7.    THIS COURT ORDERS that all Persons shall forthwith advise the Receiver of the existence of any books, documents, securities, contracts, orders, corporate and accounting records, and any other papers, records and information of any kind related to the business or affairs of the Defendants that relate to the Property, and any computer programs, computer tapes, computer disks, or other data storage media containing any such information (the foregoing, collectively, the "Records") in that Person's possession or control, and shall provide to the Receiver or permit the Receiver to make, retain and take away copies thereof and grant to the Receiver unfettered access to and use of accounting, computer, software and physical facilities relating thereto, provided

however that nothing in this paragraph 6 or in paragraph 7 of this Order shall require the delivery of Records, or the granting of access to Records, which may not be disclosed or provided to the Receiver due to the privilege attaching to solicitor-client communication or due to statutory provisions prohibiting such disclosure.

8.      THIS COURT ORDERS that if any Records are stored or otherwise contained on a computer or other electronic system of information storage, whether by independent service provider or otherwise, all Persons in possession or control of such Records shall forthwith give unfettered access to the Receiver for the purpose of allowing the Receiver to recover and fully copy all of the information contained therein whether by way of printing the information onto paper or making copies of computer disks or such other manner of retrieving and copying the information as the Receiver in its discretion deems expedient, and shall not alter, erase or destroy any Records without the prior written consent of the Receiver. Further, for the purposes of this paragraph, all Persons shall provide the Receiver with all such assistance in gaining immediate access to the information in the Records as the Receiver may in its discretion require including providing the Receiver with instructions on the use of any computer or other system and providing the Receiver with any and all access codes, account names and account numbers that may be required to gain access to the information.

**No Proceedings Against the Receiver**

9.      THIS COURT ORDERS that no proceeding or enforcement process in any court or tribunal shall be commenced or continued against the Receiver except with the written consent of the Receiver or with leave of this Court.

**No Interference with the Receiver**

10.     THIS COURT ORDERS that no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Defendants that relate to the Property, without written consent of the Receiver or leave of this Court.

**Continuation of Services**

11.     THIS COURT ORDERS that all Persons having oral or written agreements with the Defendants or statutory or regulatory mandates for the supply of goods and / or services, including without limitation, all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation services, utility or other services to the Defendants that relate to the Property are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Receiver, and that the Receiver shall be entitled to the continued use of the Defendants' current telephone numbers, facsimile numbers, internet addresses and domain names as they relate to the Property, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by the Receiver in accordance with normal payment practices of the Defendants or such other practices as may be agreed upon by the supplier or service provider and the Receiver, or as may be ordered by this Court.

**Receiver to Hold Funds**

12.     THIS COURT ORDERS that all funds, monies, cheques, instruments, and other forms of payments received or collected by the Receiver from and after the making of this Order from any

source whatsoever, including without limitation the leasing of all or any of the Property and the collection of any accounts receivable in whole or in part, whether in existence on the date of this Order or hereafter coming into existence, shall be deposited into one or more new accounts to be opened by the Receiver (the "Post Receivership Accounts") and the monies standing to the credit of such Post Receivership Accounts from time to time, net of any disbursements provided for herein, shall be held by the Receiver to be paid in accordance with the terms of this Order or any further Order of this Court.

**Limitation on Environmental Liabilities**

13.      THIS COURT ORDERS that nothing herein contained shall require the Receiver to occupy or to take control, care, charge, possession or management (separately and/or collectively, "Possession") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder (the "Environmental Legislation"), provided however that nothing herein shall exempt the Receiver from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Receiver shall not, as a result of this Order or anything done in pursuance of the Receiver's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

**Limitation on the Receiver's Liability**

14.     THIS COURT ORDERS that the Receiver shall incur no liability or obligation as a result of its appointment or the carrying out the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Receiver by any applicable legislation.

**Service and Notice**

15.     THIS COURT ORDERS that the E-Service Protocol of the Commercial List (the "Protocol") is approved and adopted by reference herein and, in this proceeding, the service of documents made in accordance with the Protocol (which can be found on the Commercial List website at http://www.ontariocourts.ca/scj/practice/practice-directions/toronto/e-service-protocol/) shall be valid and effective service.  Subject to Rule 17.05 this Order shall constitute an order for substituted service pursuant to Rule 16.04 of the Rules of Civil Procedure. Subject to Rule 3.01(d) of the Rules of Civil Procedure and paragraph 21 of the Protocol, service of documents in accordance with the Protocol will be effective on transmission.

16.     THIS COURT ORDERS that if the service or distribution of documents in accordance with the Protocol is not practicable, the Receiver is at liberty to serve or distribute this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or facsimile transmission to the interested parties that relate to the Property at their respective addresses as last shown on the records of the Defendants that relate to the Property, and that any such service or distribution by courier, personal delivery or facsimile transmission shall be deemed to be received on the next

business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

**Receiver's Accounts**

17.     THIS COURT ORDERS that costs of the receiver shall be borne by the Plaintiffs, provided that nothing in this Order shall prevent the Plaintiffs from later claiming such costs in the cause.

**Extension of Order**

18.     THIS COURT ORDERS that the Plaintiffs shall apply for an extension of this Order on February 1, 2021, failing which this Order will terminate.

**General**

19.     THIS COURT ORDERS that the Receiver may from time to time apply to this Court for advice and directions in the discharge of its powers and duties hereunder.

20.     THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States to give effect to this Order and to assist the Receiver and its agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Receiver, as an officer of this Court, as may be necessary or desirable to give effect to this Order or to assist the Receiver and its agents in carrying out the terms of this Order.

21.     THIS COURT further confirms that the within Order is granted in accordance with the practice and procedure of the Ontario Superior Court of Justice and, further, that Ontario Courts

would honour a reciprocal form of request from a Court located elsewhere in Canada or in the United States.

22.    THIS COURT ORDERS that the Receiver be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the Receiver is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

23.    THIS COURT ORDERS that any interested party may apply to this Court to vary or amend this Order on not less than four (4) days' notice to the Receiver, the Plaintiffs and to any other party likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

_____

THE HONOURABLE JUSTICE GILMORE

**<u>EXHIBIT 3</u>**

**COURT FILE NO.:** CV-21-00655418-00CL
**DATE:** 20210127

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

| | | |
|---|---|---|
| **BETWEEN:** | ) | |
| | ) | |
| SAKAB SAUDI HOLDING COMPANY, | ) | *Munaf Mohamed Q.C., Amanda C.* |
| ALPHA STAR AVIATION SERVICES | ) | *McLachlan* and *Jonathan Bell*, for the |
| COMPANY, ENMA AL ARED REAL ESTATE | ) | Plaintiffs |
| INVESTMENT AND DEVELOPMENT | ) | |
| COMPANY, KAFA'AT BUSINESS | ) | |
| SOLUTIONS COMPANY, SECURITY | ) | |
| CONTROL COMPANY, ARMOUR SECURITY | ) | |
| INDUSTRIAL MANUFACTURING | ) | |
| COMPANY, SAUDI TECHNOLOGY & | ) | |
| SECURITY COMPREHENSIVE CONTROL | ) | |
| COMPANY, TECHNOLOGY CONTROL | ) | |
| COMPANY, NEW DAWN CONTRACTING | ) | |
| COMPANY AND SKY PRIME INVESTMENT | ) | |
| COMPANY | ) | |
| | ) | |
| Plaintiffs | ) | |
| **- and –** | ) | |
| | ) | |
| SAAD KHALID S AL JABRI, DREAMS | ) | |
| INTERNATIONAL ADVISORY SERVICES | ) | |
| LTD., 1147848 B.C. LTD., NEW EAST (US) | ) | |
| INC., NEW EAST 804 805 LLC, NEW EAST | ) | |
| BACK BAY LLC, NEW EAST DC LLC, | ) | |
| JAALIK CONTRACTING LTD., NADYAH | ) | |
| SULAIMAN A AL JABBARI, KHALID SAAD | ) | |
| KHALID AL JABRI, MOHAMMED SAAD KH | ) | |
| AL JABRI, NAIF SAAD KH AL JABRI, | ) | |
| SULAIMAN SAAD KHALID AL JABRI, | ) | |
| HISSAH SAAD KH AL JABRI, SALEH SAAD | ) | |
| KHALID AL JABRI, CANADIAN GROWTH | ) | |
| INVESTMENTS LIMITED, GRYPHON | ) | |
| SECURE INC., INFOSEC GLOBAL INC. and | ) | |
| QFIVE GLOBAL INVESTMENT INC. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | **HEARD:** January 22, 2021 |

**C. GILMORE, J.**

### REASONS ON *EX-PARTE* ORDERS

**OVERVIEW AND RELIEF SOUGHT**

[1]     The Plaintiffs allege they are victims of a massive international fraud, orchestrated by a former high-ranking government official in the Kingdom of Saudi Arabia (**"KSA"**), through which at least USD 3.5 billion has been brazenly stolen, misdirected and misappropriated (the **"Fraudulent Scheme"**).

[2]     The former Saudi cabinet minister behind the Fraudulent Scheme, the Defendant Saad Khalid Al Jabri (**"Al Jabri"**), has now relocated to Toronto in an attempt to avoid investigation. Each of the other Defendants, led by Al Jabri, has allegedly participated in or benefited from the Fraudulent Scheme to defraud the Plaintiffs.

[3]     The Plaintiffs allege that Al Jabri orchestrated the Fraudulent Scheme by leveraging and abusing his high-ranking government position in the KSA to:

   (a)     establish corporations intended ostensibly to perform anti-terrorism activities in accordance with a government directive;

   (b)     ensure those corporations were funded by the KSA; and

   (c)     then unlawfully and fraudulently direct and misappropriate billions of dollars from those companies to himself, the other Defendants, and other friends, family members and co-conspirators.

[4]     On this motion, the Plaintiffs seek the following relief:

   (a)     A worldwide *Mareva* injunction against Al Jabri in respect of his worldwide assets, including bank accounts, corporations and properties of which he is the ultimate beneficial owner and directing mind.

   (b)     A *Mareva* injunction against the defendant QFive Global Investment Inc. (**"QFive"**), an Ontario corporation, only in respect of the shares it holds in Canadian Growth Investments Limited (**"Canadian Growth"**) on the basis that funds allegedly stolen from the Plaintiffs have been traced to the purchase of those specific shares.

   (c)     A certificate of pending litigation over the property located at 14 The Bridle Path, Toronto (the **"Bridle Path Property"**), over which the Plaintiffs assert a constructive trust.

   (d)     The appointment of a Receiver under section 101 of the *Courts of Justice Act,* for purposes of preserving the relevant assets, in respect of (i) the New East Companies (as defined below) and their properties, subject to foreign recognition, and (ii) QFive, solely in respect of the shares it holds in Canadian Growth.

Page: 3

(e)     A Disclosure (Norwich) Order, against the persons and for the documents and materials particularized in the proposed Norwich Order, as required in order to continue tracing the funds misappropriated from the Plaintiffs and to quantify and discover the full extent of the Fraudulent Scheme.

[5]     I heard the *ex-parte* motion on January 22, 2021 and was satisfied that the record contained sufficient evidence to meet the tests for the Orders sought. A copy of the signed Orders was sent to counsel on that date for filing and for service on the Defendants as required. My endorsement of January 22, 2021 indicated that I would provide reasons in relation to my decision to grant those Orders.  These are those reasons.

[6]     This case has been a massive undertaking for the Plaintiffs. The Deloitte report alone was 156 pages long with seven Appendices and multiple Exhibits. The Motion Record was 6,900 pages long which included a 135 page affidavit from Abdulaziz Alnowaiser, the CEO of the Plaintiffs' parent company Tahakom Investments Company ("**TIC**"), affidavits from various translators, and a lengthy legal opinion from Abdulaziz Al Fahad. Mr. Al Fahad is a Saudi Arabian lawyer fluent in Arabic and English who provided background on the KSA legal system and in particular civil fraud claims and corporate structures, the legal effect of certain key documents, and restrictions on the receipt of compensation from outside sources for government employees and their friends and family. These reasons will be brief in comparison to the vast factual landscape of this case and in consideration of the fact that this is only the beginning of a very complex case.

**FACTUAL BACKGROUND**

[7]     The particulars of the factual background in this case are provided mostly in the affidavit of Abdulaziz Alnowaiser sworn January 18, 2021 ("**the affidavit**"), the lengthy Report of Deloitte Middle East dated January 18, 2021dated January 18, 2021 ("**the Report**") and the legal expert report of Abudulaziz H. Al Fahad dated January 17, 2021 ("**the Expert Report**").

[8]     Al Jabri is a former Director of the Department of Officers and Personnel Affairs and Security Advisor to the Ministry of Interior of the KSA. After rising through the ranks of the Saudi government to be appointed Minister of State and to the Council of Ministers, Al Jabri was relieved of his titles and position on September 10, 2015. Since fleeing the KSA in 2017 after the investigation against him commenced, Al Jabri has lived in Toronto, Ontario with his wife and several members of his family.

[9]     1147848 B.C. Ltd ("**114**") is a corporation registered in British Columbia.  The director of 114 is a a New York attorney, involved in setting up the U.S. entities through which Al Jabri purchased nine properties in the U.S. A certificate of pending litigation is being sought in respect of the Bridle Path Property which has 114 as its registered owner. The registered office of 114 is a law firm in Vancouver.

[10]     Relief is also being sought in respect of various "New East" entities created by Al Jabri and the real property held by these entities in the United States: New East (US) Inc., New East 804 805 LLC, New East Back Bay LLC and New East DC LLC (collectively, the **"New East Companies"**). As further explained below, the Plaintiffs submit that Al Jabri indirectly controls and is the beneficial owner of the New East Companies.

[11]    Canadian Growth, QFive, Gryphon Secure Inc. ("**Gryphon**") and Infosec Global Inc. ("**Infosec**") are Ontario corporations that received funds which the Plaintiffs allege were misappropriated from them. *Mareva* and Receivership relief is being sought against QFive on this motion because funds have been directly traced from the Plaintiffs into QFive that were utilized to purchase 400,000 shares of Canadian Growth.

[12]    Dreams International Advisory Services Ltd. ("**Dreams International**") is a corporation registered in the British Virgin Islands, which Al Jabri uses as his alter ego. The Plaintiffs have obtained a copy of a document titled "Establishment of the Beneficial Owner's Identity" for Dreams International (which was located in the records of the Group Companies) confirming that Al Jabri is the ultimate beneficial owner of Dreams International.

[13]    The Defendant Jaalik Contracting Ltd. ("**Jaalik**") is a corporation incorporated pursuant to the laws of the KSA. The Plaintiffs submit that Al Jabri indirectly controls and is the beneficial owner of Jaalik.

[14]    The other Defendants listed below are family members of Al Jabri, including his spouse and children, who allegedly participated in the Fraudulent Scheme including serving as nominee shareholders and directors of various corporations and by receiving misappropriated funds (often when still minors): Nadyah Sulaiman A Aljabbari, Khalid Saad Khalid Al Jabri, Mohammed Saad KH Al Jabri, Naif Saad KH Al Jabri, Sulaiman Saad Khalid Al Jabri, Hissah Saad KH Al Jabri, and Saleh Saad Khalid Al Jabri.

[15]    The Statement of Claim and the Affidavit also make reference to various co-conspirators and third parties who, while not Defendants, have participated in and acquiesced in the Fraudulent Scheme.

[16]    The Plaintiffs allege that Al Jabri received unauthorized payments and/or profits when he was prohibited from doing so as a government employee. Al Jabri, in concert with others, established the Plaintiff companies ostensibly to further counter-terrorism activities allegedly in the public interest. Thereafter, he installed his close friends and family members as "nominee shareholders" who received profits from the companies. According to the Plaintiffs' legal expert, family members of Al Jabri were also prohibited from receiving profits or compensation as a result of Al Jabri's government position.

[17]    In December 2019 after a forensic review by Deloitte, it was discovered that over 2.6B USD had been transferred from the Plaintiffs to Al Jabri and other Defendants and co-conspirators. Based on these findings the Plaintiffs engaged Deloitte to perform further analysis and tracing. Using the results of that analysis, Sakab obtained a Norwich Order from this court on December 18, 2020 with respect to information related to funds transferred and bank accounts.

[18]    The Deloitte investigation is still ongoing, but the report produced by Deloitte dated December 18, 2020, which is relied upon in this motion, revealed direct and indirect payments to El Jabri, Dreams International or Jaalik of 480M USD. This does not include funds traced to Al Jabri's co-conspirators and other fraudulent transactions set out in the Plaintiffs' claim. In total the Plaintiffs claim 3.47B USD as a result of the alleged Fraudulent Scheme.

Page: 5

[19]    The types of alleged fraud include but are not limited to;

    (a)    illegitimate and double counted profit;

    (b)    transfers of profit that had no relation to the company's actual profit;

    (c)    off-book transactions;

    (d)    inflated, handwritten and uncorroborated "valuations" of the Plaintiff companies which Deloitte described as "bearing no resemblance to reality" which were used as the basis to pay "rewards" from Sakab to Al Jabri;

    (e)    selling property owned by Al Jabri and his co-conspirators at grossly inflated prices to Enma Al Ared or KSA government agencies including substantial brokerage fees;

    (f)    the acquisition of significant real estate holding including;

        (i)    26 properties in the KSA many of which were gifted to El Jabri's children;

        (ii)    The purchase of nine luxury properties in the U.S. through corporations;

        (iii)    The purchase of two properties in Canada for cash; one for $13M and the other purchased by El Jabri's son Khalid for $4.465M.

        (iv)    Properties purchased in Geneva and Vienna which can be traced to Al Jabri.

    (g)    Holdings in Canadian companies including QFive which are alleged to have been purchases with funds originating from Sakab.

[20]    The Plaintiffs allege Al Jabri could never have accumulated the assets traced to him on his government salary. All of Al Jabri's assets were purchased with funds traceable to him which in turn can be traced back to the Fraudulent Scheme.

### *The Worldwide Mareva Injunction Against Al Jabri and the QFive Mareva*

[21]    In order to obtain the injunction sought, the Plaintiffs must establish a strong *prima facie* case of fraud, a genuine risk that the Defendant will put his assets beyond his creditors or out of the reach of the court and, that if not granted, the moving party will suffer irreparable harm.

[22]    The Plaintiffs need not prove their case at this point, they need only show that they would likely succeed based on the record before the court. The substantive law governing this case is the law of KSA (Shari'a law) and in the alternative, Ontario law.

[23]    Plaintiffs' counsel took the court through only one example of the elaborate manner in which El Jabri is alleged to have misappropriated funds. In one case, one of the Plaintiff companies ("SCC") was "valued" at 1.3B Saudi Riyal ("SAR") but made profits of only 2.2M SAR. Deloitte noted at para 5.35.2 of their report that this was 595 times its net income. 50% of the "valuation"

was then allocated as profit to El Jabri and another Person of Interest.  The same profit was paid out to them again two years later based on exactly the same valuation. Deloitte notes that the alleged valuation was handwritten on a page without letterhead and unsigned.  Deloitte concludes that such valuations did not relate in any way to the actual financial statements of SCC.

[24]    I am satisfied that the Plaintiffs' expert legal report establishes that a strong *prima facie* case has been established based on the equivalent or corresponding test in Shari'a law or based on well-established Ontario law. That is, the Deloitte report and the affidavits and exhibits filed demonstrate that Al Jabri used fraudulent means to divert funds that rightfully belonged to the Plaintiffs and the Plaintiffs suffered a loss from that conduct.

[25]    The documents filed establish on their face that Al Jabri was in a position of trust and confidence in relation the Plaintiffs. He breached his duties to the Plaintiffs by preferring his own interests and those of his family, friends and co-conspirators over those of the Plaintiffs.

[26]    With respect to the requirement of establishing assets *ex juris*, the Deloitte report has uncovered significant assets *ex juris* as further explained below with respect to the Norwich Order.

[27]    Turning to the issue of irreparable harm, the Plaintiffs must establish that there is a real risk that the Defendants will remove assets from the jurisdiction or dispose of or dissipate assets outside of the ordinary course.

[28]    It is clear from the Deloitte report that Al Jabri is adept at moving money around the world including establishing corporations (such as the New East companies) to permit him to hold property indirectly. In 2017 Al Jabri made a large payment to Identity Malta Agency. He and his family are now citizens of Malta. The conditions of obtaining citizenship required Al Jabri to make a large investment in Malta. The Plaintiffs are concerned that Al Jabri will move there with his family or use it as another place to shield assets.

[29]    I agree that, in accordance with the principles set out in *Sibley & Associates LP v. Ross,* 2011 ONSC 2951 at para 64, that "a pattern of prior fraudulent conduct may support a reasonable inference that there is a real risk the pattern will continue." Al Jabri has been bold in his schemes including transferring large amounts of money to himself and other Persons of Interest even after he was relieved of his duties with the government of KSA. I therefore conclude that the risk of removal or dissipation may be established by inference given Al Jabri's sophisticated, international, and multi-layered means of moving money and assets.

[30]    With respect to the balance of convenience I am satisfied that a refusal of the *Mareva* sought in light of the substantial and comprehensive financial tracing provided by Deloitte (which is still ongoing) would be harmful to the Plaintiffs' chance of recovery. Indeed, the tracing reveals that there may well be funds that form part of the Fraudulent Scheme which are well in excess of what has been uncovered thus far. Further, the usual protections can be put into place with respect to living expenses and variations of the Order as needed.

[31]    I am further satisfied that the Plaintiffs have made full and frank disclosure and have taken significant time and effort to put together a comprehensive record with compelling evidence of the alleged Fraudulent Scheme.

Page: 7

[32]     With respect to the *Mareva* sought against QFive, the tests are the same as above and need not be repeated. The evidence establishes a *prima facie* case as direct payments were made from Sakab to QFive and $8M USD of those funds were used to make an equity investment in Canadian Growth in exchange for 400,000 shares. I accept that the Plaintiffs may suffer irreparable harm if those shares are disposed of.

[33]     The Plaintiffs and their parent company TIC have provided an undertaking as to damages with respect to both *Mareva* Orders sought. TIC's 2019 income was almost $1B CDN and they are therefore well able to stand behind their undertaking.

### The Certificate of Pending Litigation

[34]     The Bridle Path property was purchased on February 28, 2018 for $13M CDN cash. It was purchased by 114 whose sole director is Mr. Wainright, a U.S. lawyer frequently used by Al Jabri as a nominee in various entities to hold real estate assets in the U.S. Mr. Wainright's involvement in Al Jabri's real estate holdings is more fully set out in relation to the grounds for granting the Norwich Order.

[35]     I find there is a triable issue with respect to a constructive trust claimed in relation to the Bridle Path Property in that there is a strong inference it was purchased using misappropriated funds. The equities favour granting the CPL.

### The Appointment of a Receiver

[36]     The Plaintiffs seek a Receivership Order over the New East Companies in the U.S. (being entities beneficially owned by Al Jabri) and over the Canadian Growth Shares in order to obtain the books and records of QFive.

[37]     The Plaintiffs do not intend to sell assets by way of the Receivership, only preserve assets into which the Plaintiffs have traced funds in the Fraudulent Scheme.

[38]     As a Receivership is intrusive and thus to be used sparingly, the threshold for an appointment is high one. In this case the *prima facie* case of fraud, along with the possibility of the Plaintiffs' right of recovery being put in jeopardy are important considerations. However, under the *Courts of Justice Act,* the Court must consider whether the appointment is just and convenient based on the factual circumstances of the case.

[39]     In this case assets owned by the New East Companies are only beneficially owned by Al Jabri and are therefore at greater risk of dissipation. The same risk of dissipation applies to the Canadian Growth shares. A Receivership would also ensure that the substantial rental payments in relation to the luxury properties are also protected. The rents are significant with total rents being in the range of $71,500 USD per month.

[40]     Finally, the cost of the Receiver is being borne entirely by the Plaintiffs at this point.  This is not a traditional Receivership in which the Receiver pays itself out of the assets of the estate, nor does the Receiver seek to dispose of any assets. The Receiver seeks to preserve assets and obtain financial records in order to complete the necessary tracing.

Page: 8

### *The Norwich Order*

[41]     The Plaintiffs seek a Norwich Order over the third parties, documents and materials as set out in the Order dated January 22, 2021.

[42]     The factors for the court to consider with respect to whether to grant such relief are:

(a)     Whether there is evidence provided by the Plaintiffs sufficient to raise a valid, reasonable or *bona fide* claim;

(b)     Whether the evidence establishes that the third parties are involved in the acts complained of;

(c)     Whether the third party is the only practicable source for the information;

(d)     Whether the third party can be indemnified for costs to which it may become exposed due to the disclosure, and;

(e)     Whether granting such an Order would be in the interests of justice.

[43]     As I have already found that the Plaintiffs have met the threshold of a *prima facie* case, there is no question that they are able to meet the lower threshold of raising a *bona fide* claim.

[44]     With respect to the second branch of the test, fraudulent schemes necessarily involve innocent parties such as banks, law firms and accounting firms through which money and transactions are processed.  As set out in *Isofoton SA v. Toronto Dominion Bank,* 2007 CarswellOnt 2741 (Sup Ct) at para 40, innocent parties who become mixed up in tortious acts so as to facilitate the wrongdoing of others owe a duty to the person wronged to provide information and the identity of the wrongdoer.

[45]     With respect to the law firms involved, the Plaintiffs are seeking only non-privileged information, understanding that payments in and out of a law firm's trust account are not privileged.

[46]     Given the above, I am satisfied that the second branch of the test is met and that the innocent third parties named in the Order have a duty to provide the information sought.

[47]     With respect to the third branch of the test, this is not a situation in which the information can be requested from the impugned parties. Indeed, I have already found that Al Jabri was likely to dissipate assets. There is no reason to believe that the other Defendants would not do the same given their connection or subordination to Al Jabri.

[48]     Finally, the Plaintiffs have agreed to indemnify the Respondents for their reasonable costs in relation to the Norwich Order. The interests of justice favour granting the Order to permit Deloitte to continue with its tracing exercise. Persons who engage in fraud cannot hide behind the confidentiality of banking and lawyers' records in order to shield their wrongdoing.

Page: 9

[49]     Given all of the above, I find that the Order sought meets the required test and the Norwich Order shall issue.

[50]     The parties shall return before me on February 1, 2021 at 2:00 p.m. for a scheduling appointment.

_____

C. Gilmore, J.

**Released:** January 27, 2021

**COURT FILE NO.:** CV-21-00655418-00CL
**DATE:** 20210127

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**BETWEEN:**

SAKAB SAUDI HOLDING COMPANY, ALPHA
STAR AVIATION SERVICES COMPANY, ENMA
AL ARED REAL ESTATE INVESTMENT AND
DEVELOPMENT COMPANY, KAFA'AT BUSINESS
SOLUTIONS COMPANY, SECURITY CONTROL
COMPANY, ARMOUR SECURITY INDUSTRIAL
MANUFACTURING COMPANY, SAUDI
TECHNOLOGY & SECURITY COMPREHENSIVE
CONTROL COMPANY, TECHNOLOGY CONTROL
COMPANY, TECHNOLOGY CONTROL
COMPANY, NEW DAWN CONTRACTING
COMPANY AND SKY PRIME INVESTMENT
COMPANY

Plaintiffs

**- and -**

SAAD KHALID S AL JABRI, DREAMS
INTERNATIONAL ADVISORY SERVICES LTD.,
1147848 B.C. LTD., NEW EAST (US) INC., NEW
EAST 804 805 LLC, NEW EAST BACK BAY LLC,
NEW EAST DC LLC, JAALIK CONTRACTING
LTD., NADYAH SULAIMAN A AL JABBARI,
KHALID SAAD KHALID AL JABRI, MOHAMMED
SAAD KH AL JABRI, NAIF SAAD KH AL JABRI,
SULAIMAN SAAD KHALID AL JABRI, HISSAH
SAAD KH AL JABRI, SALEH SAAD KHALID AL
JABRI, CANADIAN GROWTH INVESTMENTS
LIMITED, GRYPHON SECURE INC., INFOSEC
GLOBAL INC. and QFIVE GLOBAL INVESTMENT
INC.

Defendants

---

**REASONS ON *EX PARTE* ORDERS**

C. Gilmore, J.

**Released:** January 27, 2021

**<u>EXHIBIT 4</u>**

**Alice Chu**

| | |
|---|---|
| **From:** | Gilmore, Madam Justice Cory (SCJ) <Cory.Gilmore@scj-csj.ca> |
| **Sent:** | Monday, February 1, 2021 5:48 PM |
| **To:** | Munaf Mohamed; Amanda McLachlan; Jonathan Bell; Paul Le Vay; Nader Hasan; Stephen Aylward; Tom Curry; 'amoeser@litigate.com'; crawford smith; Andrew Winton; David Sieradzki |
| **Cc:** | JUS-G-MAG-CSD-Toronto-SCJ Commercial List |
| **Subject:** | Sakab Saudi Holding Company et al. v. Saad et al.  Court File No. CV-21-00655418 |

**Counsel: See my Endorsement below.**

Today is the scheduling date set by me and the expiry date of the El Jabri *Mareva,* the QFive *Mareva,* and the Receivership Order with respect to the various *ex-parte* Orders granted on January 22, 2021.

The Defendant Dr. Saad Khalid S Al Jabri ("Dr. Saad") has brought a motion to set aside the worldwide *Mareva* Order against him and the *Norwich* Order made against various third parties. He does so on the grounds that the Plaintiffs have misled the court about material facts. Alternatively, he seeks a stay of those orders pending an interlocutory hearing on the *Mareva* and *Norwich* Orders. Mr. Le Vay submits that this matter should be dealt with as quickly as possible and the requirement for examinations on any assets be put on hold. The type of information sought to be disclosed presents a personal security risk to his client who has already been targeted by the current Saudi regime. He seeks his relief pursuant to Rule 39.01 on the basis that the court has been materially misled and that his client has the right to seek a standalone set aside Order on an urgent basis. Any other suggested procedure is unfair to Dr. Saad as the time to prepare for a full interlocutory motion would be weeks.

The Defendants CGI, Gryphon and Infosec ("the Canadian Companies") have also brought a motion to set aside the January 22, 2021 *Norwich* Order and the Receivership Order as well as an Order to vary the December 18, 2020 Order of Hainey, J. to remove any disclosure obligation relating to those companies or their subsidiaries.

Mr. Curry does not act for Q5, however, there are allegations that funds allegedly misappropriated by the Defendants totaling in the range of $16.15M can be traced into the Canadian Companies. The Q5 shares have been sold and some financial information from CGI has already been provided to the Receiver. However, there remains a concern about national security issues with respect to confidential information in relation to foreign governments that could be disclosed as a result of the *Norwich* Order. If the Order is to continue there must be an Order to ensure that any sensitive information that is collateral to the Plaintiffs' intention should be preserved and protected.

Mr. Mohamed on behalf of the Plaintiffs submits that Dr. Saad's concerns about his personal security are merely a construct given that Dr. Saad did not hesitate to sue the Saudi regime in a lawsuit which is ongoing in the U.S. Mr. Mohamed will comply with any schedule set by the court but reminds that court that an interim stay will undermine the inferences drawn in the reasons for the various *ex-parte* Orders released on January 27, 2021. He points out that it will be difficult for the court to set aside the Orders as requested without further information allowing the court to make findings as to what is relevant and material for the set aside motion.

I agree with Mr. Mohamed. There is overwhelming evidence of fraud that has been presented to court. In response, I have an affidavit from Dr. Saad's son which is more of a political treatise than any concrete response to the serious allegations raised. Dr. Saad has apparently hired 24 hour security to deal with concerns about his personal safety. Before I can set aside or stay any Orders, more information is required to satisfy the court that it was misled in making the Orders of January 22, 2021. The schedule of all judges on the Commercial List is

currently already overextended. However, given the urgency of this matter, the time required, and the balance to be considered with respect to judicial availability I make the following Orders:

1. The *ex-parte* Orders dated January 22, 2021 shall be extended to February 19, 2021.
2. **The matter shall proceed by way of a full day hearing commencing at 10:15 a.m. on February 19, 2021.**
3. The moving parties (Dr. Saad and the Canadian Companies) shall file their motion material by February 5, 2021. I do not restrict the relief sought by the moving parties but remind them that no more than one day is allotted to this matter.
4. The Plaintiffs shall file their responding material by February 10, 2021.
5. The moving parties to file any reply material by February 12, 2021.
6. Cross-examinations, if any, to be conducted on February 15 and 16, 2021.
7. Facta to be exchanged on February 18, 2021.
8. Mr. Curry to identify any sensitive material which is disclosed by his clients and such disclosure shall be for counsels' eyes only until further court Order.

I remind counsel that the media has been seeking access to court material and the date for this motion. If there is confidential material to be filed in support of any motion, I may be spoken to with respect to a sealing Order. The media, if they request it, shall be provided with the date of the hearing and Zoom access.

February 1, 2021

*Madam Justice Cory A. Gilmore*
*Ontario Superior Court of Justice*
*361 University Avenue*
*4th Floor*
*Toronto, Ontario*
*M5G 1T3*

*cory.gilmore@scj-csj.ca*

**EXHIBIT 5**

**CITATION:** Sakab Saudi Holding Company v. Al Jabri, 2021 ONSC 1772
**COURT FILE NO.:** CV-21-00655418-00CL
**DATE:** 20210311

## ONTARIO

## SUPERIOR COURT OF JUSTICE

| | | |
|---|---|---|
| **BETWEEN:** | ) | |
| | ) | |
| SAKAB SAUDI HOLDING COMPANY, ALPHA STAR AVIATION SERVICES COMPANY, ENMA AL ARED REAL ESTATE INVESTMENT AND DEVELOPMENT COMPANY, KAFA'AT BUSINESS SOLUTIONS COMPANY, SECURITY CONTROL COMPANY, ARMOUR SECURITY INDUSTRIAL MANUFACTURING COMPANY, SAUDI TECHNOLOGY & SECURITY COMPREHENSIVE CONTROL COMPANY, TECHNOLOGY CONTROL COMPANY, NEW DAWN CONTRACTING COMPANY AND SKY PRIME INVESTMENT COMPANY | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | *Munaf Mohamed Q.C., Amanda C. McLachlan* and *Jonathan Bell*, for the Plaintiffs |
| Plaintiffs | ) ) | |
| **– and –** | ) ) ) | |
| SAAD KHALID S AL JABRI, DREAMS INTERNATIONAL ADVISORY SERVICES LTD., 1147848 B.C. LTD., NEW EAST (US) INC., NEW EAST 804 805 LLC, NEW EAST BACK BAY LLC, NEW EAST DC LLC, JAALIK CONTRACTING LTD., NADYAH SULAIMAN A AL JABBARI, KHALID SAAD KHALID AL JABRI, MOHAMMED SAAD KH AL JABRI, NAIF SAAD KH AL JABRI, SULAIMAN SAAD KHALID AL JABRI, HISSAH SAAD KH AL JABRI, SALEH SAAD KHALID AL JABRI, CANADIAN GROWTH INVESTMENTS LIMITED, GRYPHON SECURE INC., INFOSEC GLOBAL INC. and QFIVE GLOBAL INVESTMENT INC. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | *Paul Le Vay, Nader Hasan, Stephen Aylward, and Luisa Ritacca* for the Defendant Saad Khalid S Al Jabri

*J. Thomas Curry, Andrew Moeser, Scott Azzopardi and Sahar Talebi* for the Defendants Canadian Growth Investment Limited, Gryphon Secure Inc. and Infosec Global Inc. |
| Defendants | ) ) ) | |
| | ) | **HEARD:** February 19, 2021 |
| **C. GILMORE, J.** | | |

Page: 2

## RULING ON SET ASIDE MOTIONS

## OVERVIEW

[1]    In the motions before the court, the Defendant Saad Khalid Al Jabri ("Dr. Saad") and the Corporate Defendants Canadian Growth Investments Limited, Gryphon Secure Inc., and Infosec Global Inc. (the "Canadian Companies") seek to set aside certain Orders made by this court on an *ex-parte* basis, on January 22, 2021 and continued on February 1 and 19, 2021.

[2]    These motions are but one initial step in what will likely be lengthy and complex litigation. The court is not being asked in these motions to make any findings at to whether or not a fraud was perpetrated on the Plaintiffs. Rather, the court is being asked whether assets and documents alleged to be part of that fraud should be frozen and/or disclosed pending discovery and trial. As will be set out below, it is this court's view that some of the current Orders should stay in place but with various modifications.

[3]    Those Orders (referred to herein as the "Orders") granted detailed and wide-ranging relief on a without notice basis. The Orders may be summarized as follows:

    a.  A *Mareva* injunction against Dr. Saad restraining him from dissipating any worldwide assets he owns in his own name or jointly, or over which he has power or control. The Orders also required Dr. Saad to prepare a sworn statement of all of his worldwide assets within 10 days and to submit to an examination on that declaration.

    b.  A *Norwich* Order requiring certain banking, legal and accounting firms worldwide to provide various listed disclosure from certain listed Defendants for tracing purposes and requesting judicial assistance in the enforcement of the Order.

    c.  A *Mareva* Order restraining the Defendant QFive from dissipating or encumbering 400,000 common shares of the Defendant Canadian Growth Investments Ltd. ("CGI") and requiring that any banks served with the Order prevent any removal or transfer of the shares held in any account on behalf of QFive.

    d.  A Receivership Order limited to certain properties located in Boston and Washington, D.C., as well as the 400,000 common shares in CGI.

    e.  A Certificate of Pending Litigation over the property municipally known as 14 The Bridle Path, Toronto, Ontario.

[4]    The specific motions, argued before the court on February 19, 2021, are as follows:

*Dr. Saad's Motion:*

    a.  Dr. Saad seeks to set aside the *ex-parte* Orders on the grounds that

    i.    the Plaintiffs misled the court respecting material facts or failed to disclose material facts;

    ii.    they should be set aside pending a determination of the Plaintiffs' motion to continue the Orders on an interlocutory basis; or

    iii.    they should be varied to stay enforcement pending the Plaintiffs' motion to continue as set out above.

*The Motion of the Canadian Companies:*

a.    An Order setting aside the *Norwich* Order as it relates to the Canadian Companies or, in the alternative, an Order varying the *Norwich* Order to remove any disclosure obligations relating to the Canadian Companies and affected subsidiaries or to stay the enforcement of those obligations;

b.    An Order varying the *Norwich* Order of Hainey J. dated December 18, 2020, to remove any disclosure obligations related to the Canadian Companies and affected subsidiaries or stay the enforcement of those obligations;

c.    An Order setting aside the Receivership Order or to stay the enforcement of the Receivership Order with respect to any CGI shares;

d.    A Sealing Order and/or Confidentiality Order sealing or restricting the disclosure of any information obtained by the *Norwich* Order with respect to the Canadian Companies and any affected subsidiaries, including provision of a Counsels' Eyes Only designation to protect the information from being used for any purpose other than this proceeding;

e.    Further relief related to relieving the Canadian Companies, their affected subsidiaries and certain banking institutions of their obligations under the *Norwich* Order; and/or

f.    Restraining the Plaintiffs from taking steps to obtain aid and recognition of the *Norwich* Order outside of Ontario until there is a final determination of this matter.

*The Plaintiffs' Motion:*

a.    An Order extending the three *ex-parte* Orders made on January 22, 2021 and extended on February 1 and 19, 2021;

b.    An Order varying the *Mareva* Order to include the Defendant Mohammed Saad KH Al Jabri ("Mohammed Al Jabri");

c.    An Order requesting the court to sign letters of request to the relevant judicial authorities of the British Virgin Islands ("BVI"), the United Kingdom ("U.K.") and

Guernsey for judicial assistance to compel authorities to comply with the January 22, 2021 *Norwich* Order;

d.   A declaration that the deemed undertaking rule does not apply to documents obtained through the *Norwich* Order and to Dr. Saad's Declaration of Assets and Supplementary Statement of Assets; and

e.   An Order that the confidentiality provisions of paragraph 4 of the Extension Order no longer apply.

[5]      It should be noted that the motion to vary the *Mareva* Order to include Mohammed Al Jabri did not proceed on February 19, 2021. Mohammed Al Jabri's counsel appeared and sought an adjournment as Mohammed Al Jabri intends to challenge the jurisdiction of this court to make any order that is binding on him. Mohammed Al Jabri's counsel submitted that his client resides in the U.K. and has no connection to Ontario. This is contested by the Plaintiffs.

[6]      By way of my endorsement dated February 20, 2021, I adjourned that motion and will deal with it in my reasons herein.

## BACKGROUND FACTS

[7]      In addition to the background facts set out below, the court relies on background facts set out in my reasons dated January 27, 2021 and the endorsement dated February 1, 2021.

[8]      The Plaintiff companies (the "Group Companies") were established between 2007 and 2015 and operate in strategic industries, such as aerospace and cybersecurity. They also funded covert operations and served as commercial fronts for counterterrorism operations. The Group Companies operated legitimate businesses to provide plausible public cover for these activities.

[9]      Dr. Saad is a highly educated individual and served for decades as a senior civil servant in the security and intelligence agencies of the Kingdom of Saudi Arabia (the "KSA"). He served as a Minister of State and as a Special Advisor to Mohammed Bin Nayef ("MBN"), the former Crown Prince and Minister of the Interior.

[10]     In 2015, MBN was named Minister of the Interior and King Salman acceded to the throne on King Abdullah's death. On January 23, 2015, the current Crown Prince, Mohammed Bin Salman ("MBS") (King Salman's son and MBN's cousin), was appointed Minister of Defence at age 29.

[11]     On April 29, 2015, MBN was named Crown Prince and MBS was named Deputy Crown Prince. In September 2015 Dr. Saad was removed from office at the instance of MBS. The reason for the removal is in dispute. The Plaintiffs' position is that the removal was related to the discovery of Dr. Saad's fraudulent activity. Dr. Saad submits that it was because he met with the CIA Director at that time in the U.S. and did not report that meeting to MBS. Apparently, MBS felt that Dr. Saad had exceeded his authority in meeting with the CIA Director.

[12]    In late 2015, Dr. Saad applied for Maltese citizenship and left the KSA for Turkey in May 2017. He received Maltese citizenship in August 2017.

[13]    In June 2017, MBS texted Dr. Saad and requested that he return to the KSA. Dr. Saad did not return citing health reasons.

[14]    In June 2017, there was a palace coup in which MBN was deposed as Crown Prince and MBS was named as Crown Prince. MBN was placed under house arrest and texted Dr. Saad shortly thereafter warning him not to return to the KSA. MBN was arrested about a year ago on charges of treason and has not been seen since.

[15]    On June 21, 2017, Dr. Saad's children Omar and Sarah were prevented from leaving the KSA. In September 2017, Dr. Saad texted MBS requesting that he allow Omar and Sarah to leave the KSA in order to return to school in the U.S. MBS refused and advised Dr. Saad that he must return to the KSA to answer questions related to corruption, failing which MBS would file a complaint with Interpol. In September 2020, Sarah and Omar were charged with international money laundering and attempting to flee the KSA unlawfully. In November 2020, they were convicted and commenced appeals of the convictions immediately thereafter.

[16]    In August 2017, MBS as Chair of the KSA Public Investment Fund ("PIF") retained Ernst & Young ("EY") to provide a valuation report on the Group Companies.

[17]    In September 2017, the KSA Public Prosecution issued a warrant for the arrest of Dr. Saad. It was alleged that Dr. Saad received profits from the Group Companies by way of an abuse of power for personal financial gain and by placing the companies in the name of his nephew Majid Almuzaini and his friend Abdullah Alswelam. These allegations are different from the ones originally made by MBS for the removal of Dr. Saad from his government position in 2015. Two weeks after the arrest warrant for Dr. Saad was issued, EY published a draft report dated September 25, 2017 highlighting financial irregularities within the Group Companies.

[18]    In September 2017, Dr. Saad relocated to Toronto. The Plaintiffs submit this was because Dr. Saad was attempting to avoid the fraud allegations. Dr. Saad submits that he relocated to Toronto believing it would be safer for him and his family.

[19]    In November 2017, MBS created the Supreme Anti-Corruption Committee ("SACC") of which he is the Chair. The purpose of the committee is to investigate, freeze assets or take any other necessary measures to deal with corruption. In that same month, the bank accounts of Dr. Saad and his family in the KSA were frozen and Dr. Saad's investigation was placed under the purview of the SACC.

[20]    On December 24, 2017, MBS ordered the transfer of the ownership of the Group Companies to the PIF and Tahakom Investment Company ("TIC") was created. The Group Companies were then transferred to TIC, which is owned by PIF.

[21]    On January 9, 2018, Saudi Arabia issued an Interpol "Red Notice" against Dr. Saad citing allegations of corruption. Upon Dr. Saad's application, the Red Notice was removed on the grounds that it was politically motivated.

Page: 6

[22]    In May 2018, PIF retained Deloitte to conduct a forensic examination of the Group Companies. Deloitte reports were released in October 2018 and December 2019. In September 2020, Deloitte was retained by Bennett Jones (the Plaintiffs' counsel) on behalf of TIC to conduct a further analysis. In October 2020, the CEO of TIC sought access to the criminal investigation files from the KSA Public Prosecution Office ("the PPO") to assist in the fraud investigation.  The PPO required a Court Order. On December 18, 2020 the Plaintiffs received a *Norwich* Order from this court requiring the PPO to produce its investigation file to the Plaintiffs. On December 24, 2020, the PPO produced its investigative file. On January 18, 2021, Deloitte produced the report that is before this court. The Plaintiffs moved for injunctive relief immediately, following the delivery of the Deloitte report.

[23]    In October 2018, Jamal Khashoggi was killed at the Saudi consulate in Istanbul, Turkey, while trying to obtain documents for his upcoming marriage. The investigation is ongoing, but sources claim that MBS was behind the murder because Khashoggi was a prominent critic of the Saudi regime. The Saudi government described the event as a "rogue operation" and MBS has denied involvement. In that same month, certain individuals whom Dr. Saad claims were members of the "Tiger Squad," who had allegedly assassinated Mr. Khashoggi, were turned away at the Ottawa airport. Dr. Saad claims they were sent to assassinate him. In December 2020, RCMP agents met with Dr. Saad in Toronto to advise of a high threat level against his life.

[24]    The Canadian Companies and QFive are Ontario corporations that allegedly received funds misappropriated from the Plaintiffs. Relief was sought against QFive because funds traced directly from the Plaintiffs into QFive were used to purchase 400,000 shares of CGI.

[25]    The Defendant Dreams International Advisory Services Ltd. ("Dreams International") is a BVI corporation. The Plaintiffs contend that Dr. Saad is the ultimate beneficial owner of Dreams International.

[26]    The Defendant Jaalik Contracting Ltd. is a corporation incorporated pursuant to the laws of KSA. The Plaintiffs allege that Dr. Saad is Jaalik Contracting Ltd.'s beneficial owner.

[27]    The other defendants are family members of Dr. Saad, including his spouse and children. They are alleged to have participated in the alleged fraud by serving as nominee shareholders and directors of various corporations and by allegedly receiving misappropriated funds (often when still minors).

[28]    The Group Companies are ten Plaintiff companies who are members of a group of 17 KSA companies. Each of them claims to have suffered a loss due to the Defendants' alleged fraud.

[29]    On February 1, 2021, Dr. Saad delivered a declaration of assets to the Plaintiffs in accordance with the January 22, 2021 *Mareva* Order. Dr. Saad delivered a supplementary declaration of assets on February 11, 2021 and was examined on those declarations on February 11, 2021.

## THE SET ASIDE MOTION ON THE MAREVA AND NORWICH ORDERS—THE DEFENDANT DR. SAAD

*Positions of the Parties*

*The Defendant Dr. Saad*

[30]     Dr. Saad's position is that the Plaintiffs' motions were entirely inappropriate in the context of *ex-parte* proceedings and that the Plaintiffs failed to make the necessary full and frank disclosure. Such disclosure includes advising the court of facts explaining Dr. Saad's position as well as any legal defences he may have raised. Dr. Saad submits that the Plaintiffs completely failed in this regard and the Orders should be set aside.

[31]     Dr. Saad submits that the Plaintiffs have breached the duty of full and fair disclosure by failing to present the case in a balanced and forthright manner and bring to the attention of the court certain key information which may have made a difference in the outcome. Even if such information would not have made a difference in the outcome, the fact that it was not raised by the Plaintiffs at the *ex parte* hearing is fatal and sufficient to have the Orders set aside.

[32]     According to Dr. Saad, this is not a commercial dispute at all. It is a politically driven attack, masterminded by MBS through state-owned companies that he directly or indirectly controls. Dr. Saad's children Omar and Sarah have been arrested, detained and tried without due legal process, and he has been the subject of assassination attempts in Ontario. The court did not mention any of this in its Reasons with respect to granting the subject Orders because the court was not made aware of these allegations.

[33]     Counsel for Dr. Saad urges the Court to take judicial notice of the political situation in the KSA and cites authorities for this. Where the court is unable to take judicial notice, counsel urges the court to rely on Dr. Saad's experts' reports.

[34]     Dr. Saad agrees that as a highly placed civil servant he received large patronage gifts from the Royal Family. However, he maintains that this is an accepted custom in the KSA, despite civil servant salary limits. The patronage gifts were considered rewards for his loyalty and as a sign of favour from the King.

[35]     Dr. Saad denies that he was removed from office because of any wrongdoing. Rather, he was removed because of a meeting with the CIA, which King Salman viewed as exceeding his authority and believed should have been reported.

[36]     Counsel for Dr. Saad emphasized that the Plaintiffs failed to present to the court key facts relating to the transfer of the Group Companies to PIF by MBS in February 2018 and MBS's ultimate control over PIF. The nexus between MBS and the Group Companies was not sufficiently highlighted by the Plaintiffs and the events of February 2018 (re the transfer of the companies to PIF) was not part of the analysis provided by the Plaintiffs' expert.

[37]    Further, it is alleged that the court was not given full details about the SACC, its extensive powers and how the SACC, under the control of MBS, ordered the transfer of the Group Companies to PIF. The Plaintiffs' expert does not deal with the evidence presented by Dr. Saad head-on and does not address what is actually transpiring in the KSA. What should have been highlighted to the court was MBS's *de facto* control of the Plaintiff companies and that he was behind the seizure of the PIF.

[38]    Dr. Saad relies on three main areas of non-disclosure: the failure to disclose the involvement of MBS in this proceeding, the failure to disclose the Interpol decision and the failure to disclose the U.S. litigation.

[39]    In this motion, Dr. Saad relies on three sources of evidence: an affidavit from his son Dr. Khalid Al Jabri ("Dr. Al Jabri"), a cardiologist who resides in the U.S.; an affidavit/expert's report from Joseph Black, a former Director of the CIA's Counterterrorism Center; and the expert report of Chibli Mallat ("Mr. Mallat"), a Libyan lawyer and law professor who provides an expert opinion on MBS's role in the government and state-owned entities and the likelihood that MBS was involved in the commencement of the Ontario litigation.

*1.    The Affidavit of Dr. Al Jabri*

[40]    Dr. Al Jabri explained that he provided his affidavit on behalf of his father because of his father's fear of pursuit from agents of MBS who will attempt to assassinate him in Canada. He deposes that it is his view, as well as that of his father, that this proceeding is being used by MBS to obtain information about Dr. Saad in order facilitate his assassination.

[41]    Dr. Al Jabri explained that as a senior member of the Royal Court, his father received patronage gifts from the Royal Family as a sign of favour and as a reward for his loyalty. These included gifts of approximately $14.7M USD in 2015 alone.

[42]    Dr. Al Jabri further deposed that that he believes MBS views his father as a threat to U.S. support for his ascension to the throne due to sensitive information that Dr. Saad has about MBS and Dr. Saad's close ties to the U.S. Intelligence community.

[43]    After Dr. Saad left the KSA for Turkey in May 2017, MBS sent him several text messages, only days before he ousted MBN, requesting that he return to the KSA. Dr. Al Jabri speculates that MBS wanted his father to return to the KSA to coincide with his assumption of power as Crown Prince, meaning his father would be subject to MBS's control. It was around this same time that Dr. Saad received a text message from MBN warning him not to return.

[44]    Further, according to texts sent to Dr. Saad, MBS refused to deal with the issue of Sarah and Omar's return to the U.S. for school unless Dr. Saad returned to the KSA.  Dr. Al Jabri deposed that Sarah and Omar were being used as bargaining chips to entice his father to return to the KSA.

[45]    Dr. Al Jabri excerpted a certain text message sent to his father which threatened legal action if his father did not return to the KSA:

> Doctor, you are involved in many large cases of corruption that have been proven. You know what they are. There are also other cases. The legal complaint is ready. There is no state in the world that would refuse to turn you over.
>
> Don't force me to escalate things and take legal measures, as well as other measures that would be harmful to you. I am trying to save the state's reputation, as well as the reputations of its previous officials, especially insofar as you were among [MBN] close associates.
>
> You have two choices. The first is to return to the Kingdom, where you will be placed under house arrest until you answer some questions that relate to issues of corruption, after which you will be released and will be free to go wherever you want inside the Kingdom. The other choice is for us to pursue you legally, and by using all available means. We shall certainly reach you, because justice is with us. The choice is yours.
>
> I have promised you and offered you something that is unimaginably generous. Do not waste this opportunity. I am being completely transparent with you. You have one hour to decide. After that, the official document will be lodged with Interpol and be communicated to all states of the world.

[46]    According to Dr. Al Jabri, his father later learned that Interpol had issued a Red Notice on January 9, 2018, at the request of the National Central Bureau of Interpol of Saudi Arabia. Dr. Saad applied to the Commission for the Control of Interpol's Files ("CCF") to have the Red Notice removed. Ultimately the Red Notice was removed.

[47]    Dr. Al Jabri specified that the corruption allegations, reviewed in the CCF decision, bear a striking resemblance to the allegations in these proceedings:

> In Riyadh in 2015-2016, Saad ALJABRI held a position of authority in the Kingdom of Saudi Arabia, during which he committed an abuse of power, embezzlement of public funds, and money laundering. He was able to flee the country prior to his arrest. Investigations into auditing papers related to public funds revealed strong elements of the involvement of the individual, with a number of public employees entrusted with public funds, in illegitimate financial gain. Investigations into these financial transactions show the embezzlement of large sums of public funds by him with these employees.

[48]    In the end, the CCF determined, in a decision released on July 20, 2018, that the Red Notice be removed. It observed in its findings that anti-corruption proceedings in the KSA had been the source of criticism and used "as part of a political strategy by MBS to target any potential political rival or opposition…and further consolidate his already existing political and economic power." The CCF also remarked on the restrictive measures taken against Dr. Saad's family members, asserting that the case against Dr. Saad was "politically motivated rather than strictly juridical."

[49]    Dr. Al Jabri also gave evidence about ongoing safety concerns related to his family. He deposed that he had been taken aside at Boston Logan International Airport by FBI agents who warned him of risks to his safety and that of his father and family, related to MBS, and that the FBI was taking measures to protect his family.

[50]    Dr. Al Jabri mentioned the killing of Jamal Khashoggi on October 2, 2018, and the CIA's conclusion in November 2018 that MBS ordered Khashoggi's assassination. Dr. Saad told his son that within days of the news of Khashoggi's murder, he learned that agents of MBS had been dispatched to kill him in Canada. The agents were stopped by Canada Border Services Control but the RCMP is continuing its investigation. Dr. Al Jabri was interviewed as recently as December 1, 2020, by the RCMP about this matter. Dr. Saad has had 24-hour physical security at his home since July 2020, when he was advised that the threat level to his life remained high.

[51]    It is Dr. Al Jabri and Dr. Saad's belief that Omar and Sarah are being kept in the KSA to punish Dr. Saad for refusing to return to the KSA when MBS demanded that he do so.

[52]    In August 2020, Dr. Saad commenced a complaint in the U.S. District Court of Columbia (the "Complaint") seeking relief under the *Torture Victim Protection Act* and the *Alien Tort Statute*, alleging that MBS had made death threats against Dr. Saad, unlawfully detained his family members in the KSA and has dispatched agents to collect information about Dr. Saad in order to assassinate him.

[53]    On October 8, 2020, MBS submitted a request for a Suggestion of Immunity to the Department of State and on December 7, 2020, MBS filed a motion to dismiss the Complaint on the grounds that the U.S. lacks jurisdiction over him. A hearing date for the Motion to Dismiss has not yet been set.

[54]    Dr. Al Jabri submits that this litigation is not an actual commercial dispute but is simply another of MBS's attempts to persecute and punish his perceived opponents, in this case, Dr. Saad and his family. For example, it is important for the court to understand that TIC is wholly owned by PIF, and PIF is controlled by MBS. Further, the Plaintiff companies were formerly controlled by MBN who did not "leave his positions" in 2017 as claimed by the Plaintiffs. Rather, MBN was forcibly removed from his position in government and as Crown Prince by MBS. He was arrested by MBS in March 2020 and has not been seen since.

[55]    Dr. Al Jabri alleges that the Plaintiffs did not properly explain to the court at the *ex-parte* hearing that PIF was not "transferred" to TIC, it was expropriated by MBS pursuant to a Royal Directive. Further, the assertion by the Plaintiffs that PIF is an independent sovereign wealth fund is simply false. Dr. Al Jabri cites a 2019 report from the German Institute for International and Security Affairs which states that MBS "exerts massive influence on the day-to-day business of the PIF" whose board members are appointed by MBS based on "their personal proximity to the crown prince."

[56]    Dr. Al Jabri attempts to clarify in his court material why his father left the KSA and certain actions he has taken with respect to his property. These actions were not motivated by attempts to cover up any fraud as alleged by the Plaintiffs. Rather, they were intended by Dr. Saad to protect himself and his family.

[57]    It is not the case, as alleged by the Plaintiffs, that Dr. Saad left the KSA to avoid an investigation. The court was not provided with the alternative explanation in the Complaint which is that Dr. Saad fled the KSA for reasons related to his personal safety.

[58]    Dr. Saad did not attempt to conceal ownership of the Bridle Path property because it was purchased with misappropriated funds. The court was not provided with the actual explanation which was that Dr. Saad put the property in the name of a corporation to avoid detection through public search again to protect himself and his family from MBS.

[59]    Dr. Saad did not become a Maltese citizen in order to evade creditors or relocate as needed, as alleged by the Plaintiffs. The Plaintiffs were obliged to tell the court that many Saudis of high net worth are Maltese citizens. Malta provides a program whereby citizenship is granted in exchange for an investment in the jurisdiction. Similar programs exist in other countries in the world, even in the Province of Quebec. In Dr. Saad's case, it was important for him and his children to have alternative travel documents (*i.e.* a Maltese passport) given the restrictions put on Dr. Saad's family's Saudi travel documents.

### 2.  The Expert Report of Mr. Mallat

[60]    Mr. Mallat was retained by Dr. Saad and provided an expert's report along with the required Acknowledgement of Expert's Duty. Mr. Mallat is a lawyer and law professor who has taught and practiced Middle Eastern law for 40 years. In preparing his report, Mr. Mallat reviewed the Plaintiffs' Statement of Claim and factum dated January 18, 2021, the affidavit of Abdulaziz Alnowaiser sworn January 18, 2021, the expert report of Abdulaziz Hamad Al Fahad dated January 17, 2021, the Orders made on January 22, 2021 and the July 4, 2018 Interpol decision.

[61]    Mr. Mallat was asked to describe MBS's role in the KSA government. Mr. Mallat described MBS as the most powerful man in the KSA and it is a "universally averred reality that MBS runs the daily affairs of the Kingdom, including its international relations." He is the head of the Council of Economic and Development Affairs ("CEDA") which includes an assembly of over 20 ministers. CEDA was established by MBS in 2015 by Royal Order.

[62]    Mr. Mallat was asked to what extent "anti-corruption" was used as a cover by MBS for politically driven prosecutions. In 2017 a Royal Order appointed MBS as head of the Anti-Corruption Committee. The Committee was tasked with identifying corruption related violations and was given significant powers. The Committee began in November 2017 by arresting 160 prominent Saudi citizens, including 11 members of the Royal Family and confining them to the Ritz-Carlton Hotel in Riyadh. Bank accounts were frozen, arrest warrants issued and travel bans imposed. According to Mr. Mallat, the accused persons were forced into recanting and paying unknown penalties.

[63]    Mr. Mallat opined about MBS's approach to MBN and his allies since 2017. Mr. Mallat stated that in his view, MBN was removed from his positions as Crown Prince and Minister of the Interior. He relied on an article written by David Rundell in the publication *Vision or Mirage* in 2020, in which the author described that MBN was presented with a letter of resignation to sign and was then immediately greeted by the new Crown Prince, his replacement. MBN was detained without charge in March 2020 and has been denied visits by his family or doctor.

[64]    In terms of state involvement in PIF, Mr. Mallat explained that PIF must report to CEDA. MBS is the Chairman of CEDA as well as PIF. Board members of PIF are appointed by Royal Order. The majority of PIF board members are from the CEDA Board. CEDA exercises the "broadest powers and authorities" over PIF. Mr. Mallett opined that this means that control by CEDA over PIF may take any form and may concern any matter, including daily operations. In summary, any decision taken by MBS cannot be opposed by PIF or CEDA, except by way of being overruled by the King.

[65]    Finally, Mr. Mallat stated that it is clear that companies owned by PIF (such as the Group Companies) could not bring an action of this significance inside or outside Saudi Arabia "without the active involvement of the Crown Prince."

### 3.    The Affidavit of Joseph Black

[66]    Joseph Black ("Mr. Black") provided an expert opinion by way of an affidavit sworn on February 1, 2021. He does so based on his expertise as a former CIA officer.

[67]    Mr. Black stated that the ascent by MBS to the role of Crown Prince in 2017 has resulted in KSA becoming subject to one-man rule. Since MBS's father is in poor health, nothing occurs in any branch of Saudi government without MBS's authority. In his role as Crown Prince, he has authority over all state-owned entities, including PIF as well as the criminal justice system. As head of the criminal justice system, he can appoint and remove judges at will, initiate a criminal investigation into anyone in the KSA and order extra-judicial detention.

[68]    Mr. Black worked with MBN and Dr. Saad on joint U.S.-Saudi counterterrorism initiatives. His opinion is that Dr. Saad was highly regarded in the U.S. as being responsible for thwarting several terrorist plots in the Middle East and the U.S. This role meant that Dr. Saad had access to significant security and sensitive information, which made him a target for MBS. MBN is a target of MBS for similar reasons. Mr. Black was aware of the Interpol Red Notice issued in relation to Dr. Saad and sent a letter to Interpol in support of its removal.

[69]    Like Mr. Mallat, Mr. Black opines that PIF would not make significant decisions without MBS's knowledge and that MBS likely had direct involvement in the commencement of this action.

### The Position of the Plaintiffs

[70]    The evidence of the Plaintiffs comes primarily from Mr. Abdulaziz H. Al Fahad ("Mr. Fahad") and Mr. Abdulaziz Alnowaiser. Mr. Fahad is an expert retained by the Plaintiffs' counsel for the *ex-parte* motion and who delivered an expert's report dated January 17, 2021 and an

affidavit in response to Mr. Mallat's report. Mr. Abdulaziz Alnowaiser is the CEO of TIC. He provided an affidavit sworn January 18, 2021 for the *ex parte* hearing and a supplementary affidavit in response to the John Lever affidavit (on the Canadian Companies' motion) and in response to Dr. Al Jabri's affidavit.

[71]    The position of the Plaintiffs is that all of the Orders granted on January 22, 2021 should continue. All material facts and defences were disclosed. The fact remains that there is substantial evidence of fraud before the court. The political backdrop to this litigation is just that, a part of the factual matrix but not a basis to set aside the Orders. Dr. Saad has failed to put any real focus on the merits of the allegations but instead wants the court to focus on a now dated Interpol complaint, unrelated U.S. litigation and the politically negative aspects of the MBS regime.

[72]    The Plaintiffs urge the court to focus on the corporate fraud complaints and to question Dr. Saad's complaints about fear for his safety and well-being. Dr. Saad's factum confirms that he currently retains 24/7 private security. Various affidavits from process servers reveal that when attempting service, the gate at the Bridle Path residence was opened for them and the front door was answered. The Plaintiffs also take issue with Dr. Saad's insistence that his home at the Bridle Path is registered to a corporation in order to disguise his home address when bank records obtained from TD Bank, Scotiabank and a New York bank clearly show the Bridle Path address as Dr. Saad's home address.

[73]    The Plaintiffs' position is that much of Dr. Saad's supporting evidence is made up of newspaper clippings and unreliable experts. It is not a material non-disclosure to omit the fact that Dr. Saad is allegedly being persecuted by the current Saudi regime. That is a political issue and not a material fact related to the fraud claims.

[74]    The Plaintiffs urge the court to reject Mr. Black's evidence entirely. He last worked in intelligence 17 years ago but assured the court that he 'keeps up to date.' Mr. Black does not state what his expertise is, does not provide a copy of any engagement letter, was not given a copy of the Deloitte report and was not given any factual assumptions. The sources of much of the information in his affidavit are simply unknown.

[75]    Contrary to Dr. Saad's position, the court was made aware of both the Interpol Red Notice and its withdrawal, as well as the U.S. litigation. The Plaintiffs should not be held to a standard where they are required to engage in a rhetorical discussion of possible defence positions. Further, the Plaintiffs always made it clear to the court that they do not represent the KSA or MBS. Even if MBS is the controlling mind of either or both of PIF and TIC, the Plaintiffs query whether this is legally relevant as they are legitimate businesses in their own right and should not be precluded from pursuing recovery from frauds perpetrated against them.

[76]    The Plaintiffs also urge the court to be wary of accepting Mr. Mallat's evidence, which they submit is in large part compiled from sources such as the BBC's website and news articles. The Plaintiffs argue that Mr. Mallat's opinion is a political piece dressed up as a legal opinion.

[77]     The Plaintiffs remind the court that Dr. Saad continues to avoid dealing with the allegations against him head-on.  Apart from the fact that he has not filed an affidavit, unreasonable restraints were placed on the Plaintiffs' counsel when attempting to examine Dr. Saad on what the Plaintiffs describe as "generic" declarations of assets which fail to provide the detail envisioned by the *Mareva* Order.

[78]     Dr. Saad's supplementary declaration of assets was delivered a mere 30 minutes before his examination was set to begin. The main admission received during the examination was that Dr. Saad has gifted hundreds of millions of dollars in assets, bank accounts and shares to his son Mohammed Al Jabri. Where those assets are is not known. Dr. Saad admitted that he began transferring assets to Mohammed Al Jabri in 2017 and that, but for the *Mareva* Order, he would have continued to transfer assets to his son. Without the continuation of the *Mareva* Order, the Plaintiffs argue there is a real risk of further dissipation of assets by Dr. Saad.

[79]     Dr. Saad refused to answer any questions about what assets had been transferred to Mohammed Al Jabri (or any of Dr. Saad's other children) or the circumstances of those transfers, and would only answer questions related to the assets he owned as of the date he received the *Mareva* Order.

[80]     As the court was told during the *ex-parte* hearing, Mohammed Al Jabri was named by his father as a 50% nominee shareholder of the Plaintiff companies Enma Al Ared and New Dawn Contracting while he was a student.  He received 1% of the annual net profits from those companies despite having no actual interest in them. Mohammed El Jabri received $3,680,000 USD by way of those profits. It is not known if he retained those profits or paid them to his father.

[81]     Mohammed Al Jabri also manages one of Dr. Saad's U.S. corporations which owns five luxury condominiums in Boston, Massachusetts. It is alleged that that corporation also received misappropriated funds. The Deloitte report, referred to extensively in this Court's January 27, 2021 Reasons, shows transfers from Dr. Saad to Mohammed Al Jabri of $4.8M USD. He has received potentially another $480M USD by way of the deed of gift revealed at Dr. Saad's examination. Mohammed Al Jabri may be liable for breach of fiduciary duty, conspiracy, fraud and other related claims if his father has transferred large amounts of misappropriated funds to him as part of the fraudulent scheme.

[82]     The Plaintiffs seek an Order that the *Mareva* Order apply to Mohammed Al Jabri on the basis that the *Mareva* Order specifically includes assets owned by Dr. Saad but which may not be in his name. Mohammed Al Jabri submits this court has no jurisdiction to make Orders against him as he does not live in Canada, has no connection to Ontario and has not attorned to the jurisdiction.

[83]     The Plaintiffs seek to continue the current Orders but cannot enforce them outside of Canada without letters of request to the relevant judicial authorities in other jurisdictions. The Plaintiffs have provided drafts of those letters of request for consideration by the court.

*1.  The Evidence of Mr. Fahad*

[84]    Mr. Fahad, the Plaintiffs' legal expert did not agree with Mr. Mallat's report. Specifically, he commented on Mr. Mallat's opinion as to the structure and control of TIC and PIF. Mr. Fahad's evidence was that TIC is the sole shareholder of each of the Group Companies. TIC is governed by its own board of directors and is the sole shareholder of PIF. Each has a separate legal personality.

[85]    PIF has had a separate legal personality since April 2019 when a Royal Decree removed it from the control of the Ministry of Finance and granted it independence. PIF is free to invest and dispose of assets both within and outside the KSA and to enter into contracts in its own name. The Chair of PIF's Board of Directors is MBS but the Chair has no authority and no casting vote. The Board of Directors of PIF has authority to manage PIF's affairs without approval from the government.

[86]    Mr. Fahad disagrees with Mr. Mallat on the authority of CEDA with respect to PIF. According to Mr. Fahad, CEDA has no authority to issue any decisions except in the form of recommendations to the full Council of Ministers. All such recommendations are subject to the King's approval. While it is true that MBS chairs CEDA and PIF he has no authority to impose decisions on those entities. In summary, CEDA does not exert control of PIF or the companies it owns. Mr. Mallat's contrary conclusion in this regard is not supported by the relevant law in the KSA.

**Legal Analysis on the Set Aside Motions Brought by Dr. Saad**

*The Governing Legal Principles*

[87]    The law is clear that a party who seeks extraordinary relief in the form of an *ex parte* injunction (including a *Norwich* Order) must make full and frank disclosure. The reason for this is clear. The judge hearing the *ex parte* motion must have all of the factual and legal contentions which would be advanced by the opposing party available or an injustice is likely to be done to the absent party.

[88]    As Sharpe J. (as he then was) set out in *United States v. Friedland*, [1996] O.J. No. 4399 (Gen. Div.), at para. 27 [*Friedland*]:

> …the law imposes an exceptional duty on the party who seeks *ex parte* relief. That party is not entitled to present only its side of the case in the best possible light, as it would if the other side were present.  Rather, it is incumbent on the moving party to make a balanced presentation of the facts in law.  The moving party must state its own case fairly and must inform the court of any points of fact or law known to it which favour the other side.  The duty of full and frank disclosure is required to mitigate the obvious risk of injustice inherent in any situation where a Judge is asked to grant an order without hearing from the other side.

[89]     However, the duty of full and frank disclosure cannot be interpreted in a forced or stilted manner. In addressing the manner of interpreting the test, Sharpe J. went on in *Friedland* to say:

> The duty of full and frank disclosure is, however, not to be imposed in a formal or mechanical manner… A plaintiff should not be deprived of a remedy because there are mere imperfections in the affidavit or because inconsequential facts have not been disclosed. There must be some latitude and the defects complained of must be relevant and material to the discretion to be exercised by the court.

[90]     It is also a well-formed part of the law in this area that Dr. Saad and the Canadian Companies are not required to show that the outcome of the *ex parte* motion would have been different if the additional material had been disclosed: see *Bennett Estate v. Iran*, 2013 ONSC 6832, 368 D.L.R. (4th) 500 [*Bennett Estate*]. In *Bennett Estate*, at para. 18, citing *Euro United Corp. (Interim Receiver of) v. Rehani*, [2003] O.J. No. 2426 (S.C.), at para. 11, set out the duties of a moving party on an *ex parte* motion:

(i)     Material facts are those of which the court must be made aware in arriving at a decision, non-disclosure of which may have affected the court's approach to the motion, made the decision doubtful, or affected the outcome of the motion;

(ii)    This duty of a balanced presentation of facts and law extends not only to absent parties, but also to those who may be affected by the order;

(iii)   In making full and frank disclosure of the relevant facts, the plaintiff must include facts which may explain the defendant's position, if known to the plaintiff. The onus on the plaintiff to make full and complete disclosure is not discharged by disclosing only what is the most limited basis of information that may be relevant. Full disclosure may and often will require a plaintiff to advise the court of matters of both fact and of law which form the position of the other side;

(iv)    It is insufficient for a plaintiff to simply append a document as an exhibit without highlighting in the body of the affidavit itself any important clauses or portions of the exhibits;

(v)     The test of materiality is an objective one. In the *United States of America v. Friedland* the court quoted the following passage from the English text, Gee, *Mareva Injunctions and Anton Piller Relief* (3d Edition 1995 at p. 97):

> ... The duty extends to placing before the court all matters which are relevant to the court's assessment of the application, and it is no answer to a complaint of non-disclosure that if the relevant matters had been placed before the court, the decision would have been the same. The test as to materiality is an objective one, and it is not for the applicant or his advisers to decide the question; hence it is no excuse for the applicant subsequently to say that he was genuinely unaware, or did not believe, that the facts were relevant or important. All matters which are relevant to the 'weighing

operation' that the court has to make in deciding whether or not to grant the order must be disclosed.

(vi)    If a finding is made of material misrepresentation or material non-disclosure the court is not stripped of all of its discretion but, generally speaking, the *ex parte* order will be set aside.

*Analysis*

[91]    This court must determine whether, in applying the above principles, the Plaintiffs fairly presented their case. The fact that they alluded to the U.S. litigation and the Interpol Red Notice is not enough according Dr. Saad. The Plaintiffs were obliged to highlight that information and present a balanced case. While I find that the Plaintiffs did not make extensive reference to some of the documents and areas of complaints referred to by Dr. Saad, the deficiencies are either immaterial or not sufficient to have breached the requirement of full and frank disclosure.

[92]    Addressing Dr. Saad's complaints in turn, I reference the following.

### 1.  *Alleged Mischaracterization of the Group Companies*

[93]    Dr. Saad complains that the Plaintiffs have mischaracterized the purpose of the Group Companies. They were not established to further counterterrorism activities. They were intended to engage in actual commercial activity as a cover for counterterrorism.  This is why the Group Companies were not owned by the KSA and why funds for the companies were paid to MBN personally who then paid the Group Companies. There was deliberate "murkiness" in the financial arrangements of the Group Companies to ensure concealment of the Royal Family's involvement.

[94]    For example, the use of nominee shareholders was necessary as Saudi government officials could not hold roles in the Group Companies without revealing the involvement of the Royal Family. The top-secret nature of the operations of the Group Companies explained the poor record keeping practices and the accounting irregularities. The court was not directed to these important facts as the Plaintiffs failed to highlight that Dr. Saad was not involved in the Group Companies in a commercial context.

[95]    The problem with this position is the evidence provided by the Plaintiffs that some $194M USD was transferred to Dr. Saad after he left the government in September 2015. Table 5.0 in the Deloitte report dated January 18, 2021 (page 21) clearly traces only 180M Saudi Riyal ("SAR") to Dr. Saad while he was working for the Saudi government.

[96]    At page 109 of the Deloitte report, tracing of Dr. Saad's account statements also showed that he received over 114,000,000 SAR directly from MBN between March and May 2017—almost two years after he had left the Saudi government and while living in Turkey.

[97]    I agree with the Plaintiffs' submission that any argument related to murkiness or poor record keeping on the part of Dr. Saad is hard to reconcile when a large part of the traced funds were removed after Dr. Saad was asked to leave his position in the KSA government.

[98]     I also agree with the Plaintiffs that the affidavits of Dr. Al Jabri do not adequately explain any of the alleged fraudulent activities. While not required to respond to the merits of the case, Dr. Saad (through his son's affidavit) has merely glossed over the Deloitte report. Without an affidavit from Dr. Saad, the Plaintiffs were left without a means to fully explore the issues raised by his counsel.

[99]     Further, and contrary to Dr. Saad's assertions, the court was made aware of the fact that the Group Companies were established pursuant to a Royal Instruction and that funds were allocated to them by the KSA Ministry of the Interior for counterterrorism activities. This is clearly set out in the Plaintiffs' factum which was before the court on the *ex parte* motion.

[100]   While nominee shareholders may have been necessary to ensure that the Group Companies were distanced from the KSA government, it remains a question as to why Dr. Saad's spouse, children, relatives and friends were named as such nominee shareholders, especially where the nominee shareholders received profits from the Group Companies without performing any services for them.

[101]   Finally, with respect to the murkiness and poor recording keeping as an explanation for the secrecy required for the counterterrorism activities, there is a limit to such disorder when dealing with the large amounts of money that flowed through the Group Companies. For example, payments made to Dr. Saad, his family and friends from Sakab, totalling over $848M USD, were accounted for by handwritten notes or undated and unsigned Excel tables without explanations for the payments. "Rewards" for board members of Alpha Star, Security Control Company and Technology Control Company ("TCC") were recorded in handwritten notes, and profits were paid out based on "valuations" which appeared to bear no relationship to reality or based on the company's actual net profit. These are only some of the examples. Many more appear in the Deloitte report. Poor record keeping might have been a way of covering up counterterrorism expenditures while MBN and Dr. Saad were working in the government, but this cannot explain the large amounts paid out to them and Dr. Saad's family and friends after they left.

### 2.   *Failure to Disclose the Expropriation of the Group Companies by PIF*

[102]   Dr. Saad highlights that the Plaintiffs allege that MBN was a co-conspirator and even that Dr. Saad was acting on his direction, yet they have not named MBN as a defendant nor sought to freeze his bank accounts. And further, that the "transfer" of the Group Companies from MBN's control to PIF is simply glossed over by the Plaintiffs and the involvement of the SACC in that expropriation is not mentioned. Dr. Saad submits that if there was a fraud, which he denies, the victim of the fraud is the KSA, not the Plaintiffs.

[103]   The involvement of MBS with respect to the change of control of the Group Companies has been overstated in terms of a defence which ought to have been highlighted by the Plaintiffs in the context of this motion for following reasons:

      a.   The evidence of Mr. Fahad, the Plaintiffs' legal expert, confirms the right of the Plaintiff companies to bring this action, if they allege that they have suffered

damages. The companies allege that they have been defrauded. Neither MBS nor PIF is making such an allegation.

b.  Mr. Black opines that he does not have direct knowledge of the workings of the PIF but states he is aware that the PIF is controlled by CEDA which is led by MBS. He then, remarkably, concludes that it would be unlikely that the PIF would make significant decisions without MBS's knowledge. He also is able to conclude (without reference to any materials or expertise) that this action could not have been commenced without MBS's involvement. I cannot give significant weight to Mr. Black's evidence. He did not provide a statement setting out his actual expertise or provide a proper expert's report. He has not been working at the CIA since 2004 and claims to have gained his knowledge about the contemporary internal workings of the Saudi government by simply keeping up with the news. I agree with the Plaintiffs that these facts, and the fact that Mr. Black was apparently not given a copy of the Deloitte report, seriously detract from any weight this court should give his evidence.

c.  Mr. Alnowaiser's affidavit of January 18, 2021 clearly sets out that the Group Companies have been operated by a holding company (TIC) since February 2018 and that he is the CEO of TIC. It was never hidden from the court that TIC was owned by PIF. Whether PIF is a sovereign wealth fund (as the Plaintiffs contend) or an entity controlled at the whim of MBS remains in issue. That, however, does not derogate from the right of the Group Companies to bring an action in their own right.

d.  The Plaintiffs have always made it clear to the court they do not represent either the KSA or MBS.

3.  *The Alleged Failure to State Alternative Positions Advanced by Dr. Saad in the U.S. Litigation*

[104]  Dr. Saad complains that there was minimal reference to his Complaint in the U.S. litigation. His Complaint sets out alternative positions on many issues which should have fairly been put before the court on the *ex parte* motion.

[105]  First, it should be made clear that the U.S. Complaint was adverted to at the *ex parte* hearing, as well as allegations that Dr. Saad had been the subject of political persecution, that there had been an attempt on his life, and that his children Sarah and Omar were detained in the KSA.

[106]  With respect to why Dr. Saad left the KSA, he submits that his U.S. Complaint states he fled the KSA for his own safety, while this court accepted the information given by the Plaintiffs at the *ex parte* hearing that he fled the KSA to avoid investigation. Both statements are true. The texts from MBS produced at the *ex parte* hearing make it clear that if Dr. Saad had returned to the KSA when he was in Turkey, he would certainly have become the subject of investigation by MBS and his government.

[107]   Dr. Saad complains that the Plaintiffs told the court that the Bridle Path property was not put in his name for nefarious reasons and failed to highlight the reasons behind the title holding as set out in his U.S. Complaint. The court had accepted the Plaintiffs' information as set out in the January 27, 2021 reasons.

[108]   First, the Plaintiffs' factum, which was before the court on January 22, 2021, simply recites that the Bridle Path property was purchased by a numbered company for cash. The January 27, 2021 Reasons recite the same facts and go on to find that there were proper grounds for granting a CPL due to an inference that the property was purchased with misappropriated funds. That is different from finding that Dr. Saad held title by way of a numbered company for nefarious reasons.

[109]   Dr. Saad submits that the Plaintiffs alleged that Dr. Saad obtained Maltese citizenship in order to hide assets and possibly relocate, if needed. He does not hide this fact in the U.S. Complaint and provides an explanation that he obtained this citizenship for him and his family due to arbitrary travel restrictions put on him and his family by the KSA.

[110]   Dr. Saad is correct that the court was not provided with this alternate explanation for Maltese citizenship at the *ex parte* motion. Dr. Saad is also correct that this fact was presented by the Plaintiffs in such a way as to infer that Dr. Saad was a flight risk and easily able to move assets to another country. With respect to his ability to move assets, Dr. Saad already has real property and investments all over the world. The fact is he could have moved assets anywhere (not just Malta) at any time. With respect to the possibility of relocation, it is true that a reference to the U.S. Complaint explanation likely should have been made.

[111]   However, as per *Friedland,* the test of materiality cannot be applied mechanically. There was a massive amount of information presented to the court on January 22, 2021, over most of a day. The real reasons for Dr. Saad obtaining Maltese citizenship are not sufficiently material to reach the threshold of a breach of the duty of full and frank disclosure. In any event, Dr. Saad remains in Canada and has lived here for almost four years. He could have relocated to Malta at any time during the four years but did not.

### 4.   The Alleged Failure to Disclose Interpol's Decision that the Corruption Charges were Politically Motivated

[112]   Dr. Saad insists that the court's attention should have been drawn to three things in relation to the CCF's decision to remove the Red Notice:

    a.   That the charges against Dr. Saad in the CCF decision are strikingly similar to the allegations made by the Plaintiffs in this case,

    b.   That the CCF accepted that Dr. Saad was of political interest to MBS, and

    c.   That the charges against Dr. Saad were politically motivated.

[113]   While the CCF decision was contained in the Plaintiffs' Motion Record on January 22, 2021, it was at page 6777 and not drawn to the attention of the court. Dr. Saad submits it was imperative for the court to be advised that the prosecution was overseen by the SACC and part of MBS's strategy to target all political rivals.

[114]   It is quite true that there is no reference at all to the Interpol decision in the Reasons dated January 27, 2021. While it was mentioned at the *ex parte* hearing, it was a passing reference in the context of a significant amount of other material. In the end, however, this court fails to see the significance of the CCF decision with respect to the issues on this motion.

[115]   Reports of the political persecution of Dr. Saad were referred to in both the materials and oral submissions at the *ex parte* motion. The palace coup in 2017 and subsequent actions of MBS have been widely reported in the press. However, this is a case about an alleged fraud perpetrated by Dr. Saad while he was working in the KSA up to 2015 (and an allegation of funds continuing to be funnelled to him and others until 2017). The Interpol decision related to criminal charges being pursued against Dr. Saad by the KSA. Further, the CCF did not deal with any evidence but mentions in passing a reference to there being serious evidence of fraud (paras 60). The conclusion of the CCF decision is related to the politics behind the Interpol Red Notice, an issue which assists Dr. Saad.

[116]   I agree with the Plaintiffs with respect to the Interpol matter. The court was advised at the *ex parte* hearing of the Interpol complaint and the fact that the CCF removed it. The court was made aware, in general, of the political landscape in the KSA and Dr. Saad's treatment by MBS. While the reasons for the removal were not highlighted to the court, I do not find that to be objectively material with respect to the test for full and frank disclosure.

### 5.   *The Alleged Failure to Disclose MBS's Control of this Litigation*

[117]   Dr. Saad's main complaint is that the case was presented to the court on January 22, 2021 as a commercial dispute when in fact the PIF (which owns TIC and indirectly the Group Companies) is chaired and controlled by MBS. MBS's pursuit of Dr. Saad continues with a highly publicized motion in the U.S. in which he is attempting to dismiss Dr. Saad's Complaint. Both of Dr. Saad's experts conclude that it is inconceivable that MBS is not behind this lawsuit.

[118]   Mr. Mallat's conclusion that MBS runs the daily affairs of the KSA, given the King's poor health, the movement of PIF into MBS's direct control and MBS's exercise of political control of his enemies via the SACC, was critical evidence that should have been placed before the court in the course of the *ex parte* proceeding.

[119]   Dr. Saad submits that the evidence of his experts is unchallenged and must stand. However, I have already rejected the evidence of Mr. Black as set out above. With respect to Mr. Mallat, he is clearly not objective about the KSA or MBS. He supports his opinions with excerpts from the BBC and *The New York Times*. Despite his sources, Mr. Mallat's conclusions about MBS's involvement in the PIF and his overall control of the KSA government may well be true. But even if they are, what is the consequence in the context of this motion?

[120]   The answer lies, in part, with the decision of Penny, J. in *Petrochemical Commercial Company International Ltd. v. Nexus Management Group SDN BHD,* 2019 ONSC 1142. In that case, the court issued an *ex parte Mareva* Order over the holdings of the corporate Respondents. On the return motion, the Canadian Respondents attempted to set aside the Order on two grounds, one of which was the non-disclosure of material facts at the *Mareva* hearing.

[121]   That case also involved an alleged fraud. The Respondents complained that the true nature of the Applicant company had not been disclosed: the company was actually controlled by the government of Iran or a clandestine branch of the government which facilitates international terrorist operations and was on a U.S. sanctions list. The Respondents argued this serious non-disclosure was sufficient to set aside the *Mareva* Order.

[122]   The court disagreed. It held, at para. 17, that:

> Even if PCCI was owned or controlled, or acted for or on behalf of, the Iranian government, I would not regard this, standing alone, as the omission of a relevant fact…Further, government owned entities are as exposed to fraudulent activity as non-government entities and, absent other factors, are equally entitled to the protection of the civil law in the face of such activities.

[123]   In this case, neither party disputes that the Group Companies engage in legitimate business activities (even if a cover for other activities). As Mr. Fahad has stated, they have a right under the civil law to pursue their claims against Dr. Saad. Whether the Group Companies are controlled by MBS does not affect that right as per the *Petrochemical* decision above.

*Summary*

[124]   In summary, I find that Dr. Saad has not proven any non-disclosure that is objectively and sufficiently material to displace the current *Mareva* and *Norwich* Orders as they relate to him.

## THE SET ASIDE MOTION OF THE CANADIAN COMPANIES

### *Background*

### *The Canadian Companies*

[125]   The Defendant Canadian Companies (CGI, Gryphon and Infosec, referred to in this section as "the Canadian Companies") seek to set aside the *Norwich* Order and the Receivership Order granted on January 22, 2021 and continued on February 1 and 19, 2021, as well as Hainey J.'s *Norwich* Order granted in December 2020.

[126]   Mr. John Lever ("Mr. Lever") provided evidence on behalf of the Canadian Companies. He has been the COO of CGI and Gryphon since 2017 and is familiar with the operations of the Canadian Companies.

[127]   CGI was founded in 1997 by Nagy Moustafa ("Mr. Moustafa"). It is headquartered in Toronto. CGI acquires companies in the cybersecurity market, helps them grow and then sells them. Mr. Moustafa is the CEO and majority shareholder of CGI.

[128]   Infosec was founded in 2009 by Mr. Moustafa. It provides its clients with support and management of their secure communications systems. Gryphon was founded in 2014 and has an office in Toronto. Gryphon provides hardware for cybersecurity issues in tandem with Infosec.

[129]   Mr. Lever's evidence is that the Companies "operate in markets that involve highly confidential and sensitive information concerning cybersecurity solutions and security risks for clients nationally and around the world." The Companies have various subsidiaries which are also affected by the relevant Orders.

[130]   In 2007, the Companies identified international opportunities, including in the Middle East and Saudi Arabia, for cybersecurity technology. According to Mr. Lever, in 2012 Infosec and TCC entered into an agreement to present a bid to the KSA Ministry of the Interior ("MOI") for what became to be known as the Atlas project. That project was intended to result in the building of a countrywide infrastructure for wireless, voice and radio encrypted transmission. An initial payment of $300,000 USD was required to be paid to Infosec.

[131]   As work continued through 2015, Infosec issued invoices to TCC and was paid. In 2016 TCC stopped paying Infosec's invoices. By August 2017, Infosec was owed $3.8M USD for invoices rendered and completed work. Infosec commenced a claim in this court which was settled in February 2018. Infosec's claim was discontinued.

[132]   In December 2015, Gryphon entered into an agreement with the Plaintiff company Saudi MAKSAB Holding Co. ("MAKSAB") to prepare a bid to the KSA MOI to provide secure mobile communication infrastructure. Gryphon received funds from MAKSAB for the infrastructure provided pursuant to their agreement.

[133]   In 2016, Gryphon entered into a contract with the Plaintiff company Sky Prime Investment Company ("Sky Prime") to provide certain secure mobile communications solutions and in 2017, Gryphon also entered into an agreement with the Plaintiff company Tawari Information Technology Company for certain products and services. Gryphon rendered invoices and was paid for its services.

[134]   Certain subsidiaries of the Companies also entered into agreements with TCC and received payments for their services.

*QFive*

[135]   According to Mr. Lever, in August 2013, QFive invested $8M USD into CGI in exchange for 400,000 shares and a 29% ownership stake. On July 20, 2020, 2767143 Ontario Inc., a company wholly owned and controlled by Mr. Moustafa, purchased QFive's shares in CGI for $8M USD. Therefore, QFive no longer owns any shares in CGI or any of the Canadian Companies and their subsidiaries.

[136]   In 2017, Dr. Saad, through one of his companies, loaned funds to Gryphon based on what he saw was good development potential for Gryphon in the KSA. Mohammed Al Jabri was appointed as Director of Gryphon and Dr. Saad was employed as their Executive Vice-President of Infosec. Infosec assisted Dr. Saad with his Visa request to Canada under the temporary foreign worker program. Mohammed Al Jabri resigned as a Director of Gryphon in November 2019 and the loan to Gryphon is now held by Golden Valley Management Ltd.

*The Plaintiffs' Incorrect Allegations and Confidentiality Issues*

[137]   Mr. Lever deposed that Mr. Alnowaiser, on behalf of the Plaintiffs, is incorrect in his affidavit when he states that there was no legitimate reason for payments made to "corporations of interest." The Companies had legitimate contracts with the KSA for which they were paid.  Mr. Lever was surprised that Mr. Alnowaiser was not aware of this or the fact that Infosec sued TCC when he was the General Manager of the Plaintiff companies, which included TCC.

[138]   The allegation that Dr. Saad is "behind" the Companies is also false. As stated above, the Companies were all founded by Mr. Moustafa and have never been controlled in any way by Dr. Saad.

[139]   The Canadian Companies and their subsidiaries work for large enterprises, including state governments. Such clients require robust cybersecurity systems to defend against debilitating attacks on essential services. The disclosure of the names of individuals who do work for the Companies and have valuable information could pose an unacceptable security and reputational risk to their government clients. The clients must be able to be assured that their highly confidential information is kept secure.

[140]   The banking records from Canadian and Swiss banks, which are required to be disclosed pursuant to the *Norwich* Order dated January 22, 2021, could be used to identify both individuals and transactions. This will cause national and personal security concerns for the clients of the Canadian Companies. Further, the disclosure of such information risks reputational damage and competitive business concerns for the Companies.

**The Positions of the Parties**

*The Canadian Companies*

[141]   The Canadian Companies seek to set aside the *Norwich* and Receivership Orders as well as the *Norwich* Order granted by Hainey J. on December 18, 2020. Dr. Saad also seeks to set aside the Receivership Order on the grounds that the relevant shares are no longer held by QFive.

[142]   As will be detailed below, the Canadian Companies make two main arguments. The first is that the disclosure of the significant material covered by the *Norwich* Order creates significant security and competitive business concerns.

[143]   Second, the Plaintiffs did not fairly disclose all relevant information to the court as they were required to do. Specifically, it is inconceivable that Mr. Alnowaiser, as the CEO of TIC, could not have been aware of legitimate, contract-based payments to the Canadian Companies.

Claiming that there was no legitimate reason for such payments is simply disingenuous. This information should have been disclosed to both Hainey J. and Gilmore J. for their consideration in relation to the *Norwich* Order.

[144]  It is only in his reply affidavit that Mr. Alnowaiser sets out that he spoke to the current CEO of TCC and learned about the litigation between TCC and Infosec, invoices from subsidiaries of the Canadian Companies and invoices from Gryphon to Sky Prime. Dr. Saad's position is that Mr. Alnowaiser was not in a position to swear, as he did in his affidavit of January 18, 2021, at para 356, that he had made full disclosure when he had failed to make simple enquiries about transactions between the Canadian Companies and TCC. The non-disclosure is material and significant. The *Norwich* Order should be set aside, and the documents disclosed to date returned.

[145]  As well, the Canadian Companies seek a sealing Order and a confidentiality or Counsels' Eyes Only Order for the material that has already been disclosed (if not set aside) or the material that will be disclosed if they are not successful in having the relevant Orders set aside.

[146]  The Canadian Companies have serious concerns that disclosed bank records contain sensitive information that could be used to subvert security measures and could affect fair competition by the disclosure of customer names and pricing to competitors. They contend that the requirements under the test from *Sierra Club of Canada v. Canada (Minister of Finance)*, 2002 SCC 41, [2002] 2 SCR 522, at para. 53, are met and a sealing order should be granted.

[147]  The Canadian Companies submit that a Counsels' Eyes Only or a Confidentiality Order is also required because the Plaintiffs and the Canadian Companies are competitors. According to the Plaintiffs, the documents are required for tracing purposes, as such there is no need for the clients to be involved in that exercise. No evidence was produced with respect to why the Plaintiffs need to see these documents or how such an Order might impair the solicitor-client relationship.

*The Plaintiffs*

[148]  The Plaintiffs submit that the Canadian Companies mischaracterize themselves as innocent parties caught in the crossfire of this litigation. In fact, the majority of funds invested in the Canadian Companies came from either Sakab or through a company owned by Dr. Saad.

[149]  The relationship between the Canadian Companies, Sakab and QFive bears closer examination. 90% of the capitalization of CGI came from the $8M share purchase by QFive with money from Sakab.

[150]  QFive no longer owns the shares in CGI because they were transferred to a numbered company owned by Mr. Moustafa. The purchase agreement relevant to that transaction shows that the consideration for the transfer was an interest free unsecured promissory note. That is, no actual funds were transferred to complete the transaction. Mr. Lever, in cross-examination, advised that no valuation was done in relation to the transaction. Counsel for the Plaintiffs submits the Receivership Order should not be set aside as the transfer of the shares from QFive to the numbered company was a sham without consideration.

[151]   Mr. Moustafa was the CEO of QFive at the time of transfer of shares to the numbered company. He then resigned. There are no documents in relation to his resignation nor is there an affidavit from Mr. Moustafa about any of the transactions.

[152]   $10M USD was invested in Gryphon by a company controlled by Dr. Saad. There is a convertible loan agreement related to this transaction dated, February 13, 2017, which is able to be converted to a 45% interest in Gryphon. The loan is now held by Golden Valley Management Ltd., a Cayman Islands company. Dr. Al Jabri is on the board of directors of that company. On his cross-examination Mr. Lever refused to answer questions about the beneficial ownership of Golden Valley. In summary, 90% of the funds that went into CGI and 100% of the funds that went into Gryphon came from Sakab.

[153]   It should not be ignored, as well, that Dr. Saad was employed by Infosec who in turn helped him obtain his Canadian residency.

[154]   In response to Dr. Saad's position that Mr. Alnowaiser did not make full and frank disclosure about payments made by TCC to Infosec, the Plaintiffs submit that the basis for the *Norwich* Order against the Canadian Companies was the $8M payment. The Plaintiffs have always maintained that the Canadian Companies received funds misappropriated from the Plaintiffs.

[155]   Finally, Dr. Saad has conflated the required test for a *Mareva* and a *Norwich* Orders. The test for a *Norwich* Order is less stringent than the test for a *Mareva* Order.

[156]   The Plaintiffs require a continuation of both the *Norwich* and the Receivership Orders to fully trace the $8M USD payment. The information which Dr. Saad submits was not disclosed was neither material nor relevant and should not be used as a basis to set aside the Order.

*Analysis*

[157]   The Canadian Companies seek to set aside the *Norwich* and Receivership Orders as well as the Order of Hainey J. from December 2020 on the grounds that the Plaintiffs have failed to make full and frank disclosure relating to the true commercial relationship between the Plaintiffs and the Canadian Companies.

[158]   The main argument put forward by the Canadian Companies is that there were legitimate contracts between the companies and the Plaintiffs explaining why certain payments were made to them. Further, the Plaintiffs' main affiant did not refer to the contracts or the settlement agreement between TCC and Infosec at the *ex-parte* motion.

[159]   Counsel on behalf of the Canadian Companies submit that Mr. Alnowaiser could have made enquiries into both the Plaintiffs' documents and through the Plaintiffs' employees but failed to do so. Mr. Alnowaiser admitted to his failure to make such enquiries at his cross-examination, claiming that the approach taken was a specific one in order to avoid tipping off the Defendants about the investigation.

[160]   The Canadian Companies refer to and rely on the affidavit of Mr. Lever with respect to an explanation for a legitimate basis for the payments to the companies, the type of work done and the agreements made in relation to that work and the subsequent payment for the work.

[161]   Therefore, Mr. Alnowaiser's failure to make enquiries is fatal and material, as the court was unable to fairly assess the propriety of the *Norwich* Orders. As it stands, the *Norwich* and Receivership Orders are inappropriately being used to expedite discovery.

[162]   Further, the shares of CGI are no longer held by QFive and the Canadian Companies allege that the Receivership Order is simply being used as a tool to improperly investigate them.

*Should the Norwich Order and the Receivership Order Continue to Apply to the Canadian Companies?*

[163]   The question this court must ask is whether the Canadian Companies are, as they contend, innocently caught in the crossfire of litigation that should not involve them or whether there is some logical and supportable connection to Dr. Saad.

[164]   The Deloitte report (page 127, at paragraphs 12.36 and 12.38) clearly traces a payment of $8M USD from Sakab to QFive which in turn was used to buy the 400,000 shares in CGI. The $8M USD payment was the majority of CGI's capitalization. There is no mention of this in the Canadian Companies' factum. Those shares have now been transferred to a numbered company for a promissory note without interest, without security and without a valuation.

[165]   There is also the $10M USD that was invested in Gryphon, allegedly by Dr. Saad. The convertible loan in relation to that investment is now held by Golden Valley Management Ltd., a company on which Al Jabri family members sit on the board of directors.

[166]   It is clear that the funds traceable to QFive, CGI and Gryphon are now removed from the Canadian Companies. As the Plaintiffs suggest, this may well be another manner of subverting misappropriated funds by transferring them to yet another "layer", but that is an issue for the hearing on the merits.

[167]   I find that the Companies have legitimate business and security concerns with respect to the effects of the *Norwich* and Receivership Orders on their businesses, as they set out in their factum and as is summarized above.

[168]   With respect to their claims of a breach of a duty of full and frank disclosure, I find that the while the non-disclosure by Mr. Alnowaiser was not material, it changed the factual landscape. Given the facts as currently known by the court, the *Norwich* Order and the Receivership Order are overly broad and must be refashioned.

*Miscellaneous Issues*

[169]   The Plaintiffs seeks an Order that the deemed undertaking rule not apply to any document obtained from the *Norwich* Order. This is a broad and far reaching request. I will, however, grant the alternative relief sought by the Plaintiffs that the deemed undertaking rule should not apply to

documents obtained through the *Norwich* Order to pursue recognition and enforcement proceedings in other jurisdictions. Without such an Order, it will be impossible for the *Norwich* Order to be executed outside of Canada.

[170]   With respect to any of Dr. Saad's Canadian assets, I do not see why the deemed undertaking rule should not apply as there are no special circumstances with respect to those assets.

## **ORDERS**

[171]   Given all of the above, I make the following Order:

    a.   The *Mareva* Order dated January 22, 2021 as it relates to Dr. Saad shall be continued until further variation or order of the court.

    b.   The *Norwich* Order and the Receivership Order dated January 22, 2021 and the Norwich Order dated December 18, 2020 shall be set aside as against CGI, Gryphon and Infosec. Any documents already obtained by the Plaintiffs under the *Norwich* or Receivership Order in relation to GCI, Gryphon and Infosec shall be treated as confidential and shall be returned or destroyed as instructed by counsel for CGI, Gryphon and Infosec.

    c.   The court is prepared to entertain a motion on proper notice to extend the *Norwich* Order to include Golden Valley Management Ltd. and 2767143 Ontario Inc.

    d.   The QFive *Mareva* Order dated January 22, 2021 is maintained as there was no request made to the court to set it aside or vary it.

    e.   The *Norwich* Order dated January 22, 2021 shall be amended to include the Plaintiffs' right to trace and seek production of any documents related to gifts from Dr. Saad to his son Mohammed Al Jabri by way of Deed of Gift or any other means.

    f.   In the event the Plaintiffs seek the additional Orders against Mohammed Al Jabri in their Motion to Vary dated February 16, 2021, a motion on notice with respect to whether this court has jurisdiction to make those Orders shall be scheduled by the Plaintiffs in consultation with Mohammed El Jabri's Canadian counsel.

    g.   The CPL Order registered against the Bridle Path property shall remain on title.

    h.   The letters of request directed to the relevant judicial authorities of the British Virgin Islands, the United Kingdom and Guernsey for judicial assistance shall issue.

    i.   The deemed undertaking rule shall not apply to any documents obtained through the *Norwich* Order in foreign jurisdictions.

Page: 29

     j.   The deemed undertaking rule shall apply to Canadian assets owned by Dr. Saad. He may apply for further Orders in relation to those assets if required and the *Sierra Club* test is met.

     k.   A Case Conference shall be scheduled to determine next steps in this proceeding.

## COSTS

[172]   If the parties cannot agree on costs, I will receive written submissions of no more than 10 pages (double spaced) in length, exclusive of any Bill of Costs or Offer to Settle. All case law, transcript or other references in the submissions must be hyperlinked. Costs submissions are due on a seven-day turnaround, starting with the Plaintiffs and starting seven days from the release of this decision. All costs submissions are to be sent electronically to my assistant at Therese.Navrotski@ontario.ca.

C. Gilmore, J.

**Released:** March 11, 2021

**CITATION:** Sakab Saudi Holding Company v. Al Jabri, 2021 ONSC 1772
**COURT FILE NO.:** CV-21-00655418-00CL
**DATE:** 20210311

# ONTARIO

# SUPERIOR COURT OF JUSTICE

**BETWEEN:**

SAKAB SAUDI HOLDING COMPANY, ALPHA STAR
AVIATION SERVICES COMPANY, ENMA AL ARED
REAL ESTATE INVESTMENT AND DEVELOPMENT
COMPANY, KAFA'AT BUSINESS SOLUTIONS
COMPANY, SECURITY CONTROL COMPANY,
ARMOUR SECURITY INDUSTRIAL
MANUFACTURING COMPANY, SAUDI TECHNOLOGY
& SECURITY COMPREHENSIVE CONTROL
COMPANY, TECHNOLOGY CONTROL COMPANY,
NEW DAWN CONTRACTING COMPANY AND SKY
PRIME INVESTMENT COMPANY

Plaintiffs

**– and –**

SAAD KHALID S AL JABRI, DREAMS
INTERNATIONAL ADVISORY SERVICES LTD.,
1147848 B.C. LTD., NEW EAST (US) INC., NEW EAST
804 805 LLC, NEW EAST BACK BAY LLC, NEW EAST
DC LLC, JAALIK CONTRACTING LTD., NADYAH
SULAIMAN A AL JABBARI, KHALID SAAD KHALID
AL JABRI, MOHAMMED SAAD KH AL JABRI, NAIF
SAAD KH AL JABRI, SULAIMAN SAAD KHALID AL
JABRI, HISSAH SAAD KH AL JABRI, SALEH SAAD
KHALID AL JABRI, CANADIAN GROWTH
INVESTMENTS LIMITED, GRYPHON SECURE INC.,
INFOSEC GLOBAL INC. and QFIVE GLOBAL
INVESTMENT INC.

Defendants

## RULING ON SET ASIDE MOTIONS

C. Gilmore, J.

**Released:** March 11, 2021